THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MELISSA HALIGAS, | |
| *Plaintiff*, | Case No. 1:22-cv-00313 |
| v. | Hon. Elaine E. Bucklo |
| CITY OF CHICAGO et al., | Hon. Young B. Kim |
| *Defendants*. | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

Alison R. Leff
Thomas R. Kayes
The Civil Rights Group, LLC
2045 W Grand Ave, Ste B, PMB 62448
Chicago, IL 60612
(708) 722-2241
alison@civilrightsgroup.com
tom@civilrightsgroup.com

*Attorneys for Plaintiff*

The motion to dismiss filed by Defendants Chicago of Chicago, Richard McCallum, and Juan Delgado (ECF No. 16) reads like a summary judgment motion drawing all inferences in favor of the moving party. It relies almost exclusively on evidence outside the complaint—two body worn camera videos and the City's consent decree with the Department of Justice—construes the events depicted in those videos in the light most favorable to Defendants, and ignores misconduct alleged in the complaint. That is not how Rule 12(b)(6) works. Reading the complaint in the light most favorable to Plaintiff, as the Court must, Plaintiff has sufficiently alleged false arrest, excessive force, and failure to intervene against Defendants McCallum and Delgado; and liability against the City for unconstitutional practices and failure to train, supervise, and discipline its officers. The Court should deny the motion and allow the entire case to proceed.

## Legal Standard

"The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits. When evaluating such a motion, the court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor." *Thompson v. Williams*, No. 08-cv-6444, at \*1 (N.D. Ill. June 22, 2009) (citing 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356, at 354 (3d ed. 2004); *Hentosh v. Herman M. Finch Univ. of Health Sciences,* 167 F.3d 1170, 1173 (7th Cir. 1999); *Jang v. A.M. Miller & Assocs.,* 122 F.3d 480, 483 (7th Cir. 1997)). "[A] complaint must 'state a claim to relief that is plausible on its face.' A claim satisfies this standard when its factual allegations 'raise a right to relief above the speculative level.'" *Riley-El v. Godinez*, No. 13-cv-8656, at \*3 (N.D. Ill. July 27, 2015) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56 (2007)).The Seventh Circuit "has cautioned courts

and litigants against 'overreading' *Twombly,* and the Supreme Court has since dispelled the notion that it had abandoned notice pleading." *Thompson*, No. 08-cv-6444, at *1 (citations omitted). Thus, "'heightened fact pleading of specifics' is still not required." *Id.* at *1 (quoting *Killingsworth v. HSBC Bank Nevada,* 507 F.3d 614, 618 (7th Cir. 2007)).

## Argument

I.  **The Court Need Not Consider the Body Worn Camera Videos in Deciding this Motion; If It Does, It Must Construe Them in Plaintiff's Favor**

The thread that runs through each argument in the motion to dismiss is that footage from two body worn cameras, which is not attached to the complaint, reveals that Defendants' conduct was objectively lawful, so the case must fail. Defendants cite the videos more than 50 times in arguing their version of events. But the videos are extrinsic evidence that need not be considered on a motion to dismiss. And, even if the Court considers the videos, when viewed in the light most favorable to Plaintiff, they don't support dismissal.

"Generally, in deciding a motion to dismiss, courts cannot consider evidence outside the pleadings without converting the motion into a motion for summary judgment under Rule 56." *Brown v. The City of Chicago*, No. 21-CV-01397, at *8 (N.D. Ill. Mar. 23, 2022) (citing *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002)). Courts have recognized a narrow exception to that rule, under which they will consider extrinsic video footage if the video is central to the complaint's allegations. *See, e.g., Brown*, No. 21-cv-01397, at *8-9 (declining to consider footage, explaining, to "apply the 'narrow' doctrine of incorporation-by-reference, the BWC videos need to be referenced in the plaintiff's complaint and central to his claim"); *Brownmark Films LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir. 2012) (affirming dismissal based on videos found to have been incorporated by reference in complaint).

Applying that exception makes sense in a case like *Brownmark*, a copyright suit

2

involving a fair use defense, where the videos "were truly 'central to the claim': the dispute was over the videos themselves, and formed the premise of the copyright infringement claim. (That is why courts usually apply this incorporation-by-reference doctrine to contracts in breach of contract cases.)." *Koh v. Graf*, No. 11-cv-02605, at *20 (N.D. Ill. Sep. 24, 2013) (citations omitted). But the videos are not central to this case. Rather, Plaintiff's claims center around an arrest that "just so happens to have been filmed; [she] could have brought this § 1983 case if the [body camera] video had never existed in the first place." *Id.* at *20. Moreover, the videos do not show the arrest from Plaintiff's perspective, nor do they depict her entire detention. And the complaint references video only in passing, alleging Defendants' supervisor turned off his own body worn camera after learning Defendants hadn't collected a copy of the parenting order even after arresting Plaintiff. (ECF No. 1 ¶ 53.) As such, the narrow exception for considering extrinsic video on a motion to dismiss does not fit this case.

This court consistently rejects requests like Defendants' to dismiss civil rights cases on the basis of extrinsic body worn camera footage. In *Brown*, for example, the court declined to consider body worn camera footage attached to the City's motion to dismiss, reasoning:

> While Plaintiffs make passing reference to officer body-cameras in their complaint, the Court cannot say that the videos are "central" to Plaintiffs' claims, at least not "central" in the same manner as in the *Bogie* and *Brownmark* cases. In both of those cases, resolution of the disputes hinged upon the videos themselves, which formed the very basis of the plaintiffs' respective claims. Here, while the videos will provide key insights into the allegedly unreasonable events that took place on the morning of March 15th, the videos are not themselves dispositive of the facts at issue and Plaintiffs could have brought this § 1983 case if the BWC footage never existed.

*Brown*, No. 21-cv-01397, at *8-9 (internal citations omitted); *Bogie v. Rosenberg*, 705 F.3d 603 (7th Cir. 2013) (affirming dismissal of privacy case based on video attached as exhibit to complaint); *see also Evans v. City of Chicago*, 21-cv-4135 (N.D. Ill. Feb. 20, 2022); *Santiago v.*

3

*United States*, 20-cv-06371 (N.D. Ill. Feb. 8, 2022) (declining to consider video attached to DEA's motion to dismiss even though complaint mentioned video because "Doing so would require the Court to improperly make credibility determinations and findings of fact about the events in question at the pleading stage"). The City, despite being a party in *Brown* and *Evans*, doesn't mention, much less distinguish, those cases. If the City could explain why these decisions were wrong, it would have.

In the civil rights cases where this court has agreed to view extrinsic videos to deicide dismissal motions, the court has construed the footage in the light most favorable to the plaintiff and looked to the video only to assess whether the complaint was "'blatantly contradicted' and 'utterly discredited' by the footage." *See, e.g., Lonzo v. Blanco*, No. 21-cv-4558, at *2–3 (N.D. Ill. Apr. 25, 2022); *Koh*, No. 11-cv-02605, at *19-20. Both *Lonzo* and *Koh* found the videos, in the proper light, did not support dismissal. *Lonzo*, No. 21-cv-04558, at *3 (declining to find the video contradicted the complaint, "especially because 'video may not tell the whole story and reasonable people can sometimes draw different conclusions from the same video'") (quoting *Felton v. City of Chicago*, 827 F.3d 632, 637 (7th Cir. 2016)); *Koh*, No. 11-cv-02605, at *19-20 (concluding video of coercive interrogation, "in that light . . . does not actually contradict the Kohs' complaint and does not require dismissal of the Kohs' constitutional claims").

Instead of citing the most relevant decisions, the City cites a few distinguishable ones. (ECF No. 16 at 4.) *Brownmark*, again, is a copyright case that this court has found "does not lend much support" to the position that extrinsic video may be dispositive in a § 1983 case. *Koh*, No. 11-cv-02695, at *20. *Bogie* is another case that was *about* video—it involved privacy claims arising from the use of a video depicting plaintiff in the defendant's documentary. And Bogie attached the video to her complaint, so it was not even extrinsic evidence requiring an exception

4

to the general rule against considering facts outside the complaint. *Koh*, as discussed, presented a complete, unbiased view of the coercive interrogation leading to that lawsuit, unlike the videos in this case. And even so, the *Koh* court didn't rely on the video to dismiss the lawsuit.

To be clear, Plaintiff welcomes the existence of video evidence in this case. The body camera footage strengthens Plaintiff's allegations. But Defendants' near-exclusive reliance on the videos to the complete neglect of the complaint's allegations is improper under Rule 12(b)(6) and should not be countenanced. Indeed, the City takes the same problematic tack in this motion it was chastised for in *Evans*: "More generally, the defendants' motion essentially calls upon the Court to draw inferences (from the complaint's allegations and the videos) in the defendants' favor, which is exactly the opposite of the standard that a court is required to apply in considering a motion to dismiss under Rule 12(b)(6)." *Evans*, 21-cv-04135, at \*3. As in *Evans*, here, the Court should reject Defendants' attempt to subvert the Rule 12(b)(6) analysis.

## II. Count I States a Claim for False Arrest

Plaintiff has sufficiently alleged a claim of false arrest against Defendants McCallum and Delgado. Defendants' argument to the contrary begins with a lengthy discussion of whether making an arrest in violation of state law is sufficient to violate the Fourth Amendment. (ECF No. 5–6.) This discussion misses the point. Plaintiff does not allege, as Defendants appear to believe, that because Defendants arrested her for a non-arrestable offense under Illinois law (which they did), they violated the Fourth Amendment. Rather, Plaintiff alleges that Defendants lacked probable cause to think she was committing a crime. That is all Plaintiff must do to proceed to discovery.

"To prevail on a false arrest claim, a plaintiff must show that the police lacked probable cause to arrest. This Court examines probable cause based on the facts and circumstances known

to police officers at the time of the arrest. The information must be 'sufficient to warrant a prudent person, or one of reasonable caution, in believing' that the suspect 'has committed, is committing, or is about to commit an offense.'" *George v. City of Chicago*, No. 1:20-cv-06911, at \*10 (N.D. Ill. Mar. 21, 2022) (citing and quoting *Neita v. City of Chi.*, 830 F.3d 494, 497 (7th Cir. 2016)). Though an officer "may rely on a credible eyewitness' statement to supply probable cause," "where the facts and circumstances would render a reasonable officer suspicious, police officers have a duty to investigate beyond the initial statement." *George*, No. 1:20-cv-06911, at \*10 (citing *Askew v. City of Chicago*, 440 F.3d 894, 985 (7th Cir. 2006)).

The complaint contains all the facts necessary to meet that standard. Plaintiff alleges the defendant officers came to her building to respond to her son's father's call complaining she was violating a court order governing parenting time. (ECF No. 1 ¶¶ 13–16.) She alleges the father showed the officers, on his phone, a document he claimed supported his accusation, and that Defendant McCallum was confused by the document and said it could be fake. McCallum then declined the father's invitation to receive the full document by email, instead proceeding to Plaintiff's door without looking at any other paperwork. (*Id*. at ¶¶ 20–24.) The complaint also alleges the father showed Defendants *the wrong court order*, Haligas told them as much, she offered to get a copy of the relevant order, and they declined. (*Id.* at ¶¶ 29–32.) Those facts, taken as true, support the inference that a reasonable officer in McCallum's and Delgado's position would have recognized he did not have sufficient information to believe Haligas was violating a court order. Moreover, given the obviously contentious nature of the parents' relationship, the complaint supports the inference that the father was not a credible source on which to base a probable cause assessment. The facts make it plausible that a reasonable officer—like Defendants' supervisor who expressed shock at their conduct (ECF No. 1 ¶ 53)—

6

would have viewed the father's representation about the paperwork with caution and investigated further, at the very least by looking at the documents Haligas offered to show she was complying with the order. Count II thus states a claim under the Fourth Amendment.

Defendants' argument for dismissing this count does not acknowledge those allegations, let alone accept them as true. (ECF No. 16 at 7–8.) In fact, the motion abandons the pleading entirely, relying exclusively on the videos, which Defendants interpret in their favor. Citing the videos, Defendants marshal three facts they assert are fatal to Plaintiff's wrongful arrest claim: Defendants "confirmed" the father's characterization of the order by "reviewing" it; Plaintiff "admi[tted] that the order granted custody to the father" at the relevant time; and Plaintiff resisted arrest. (ECF No. 16 at 7–8.) But none of those facts is pleaded in the complaint. In fact, Plaintiff pleads the opposite: Defendants *did not* read the relevant order (ECF No. 1 ¶ 32); the order *did not* obligate Plaintiff to wake up her sick child to turn him over to the father immediately (ECF No. ¶ 30); and Plaintiff *did not* resist arrest (ECF No. ¶¶ 35–44). Nor does the video establish any of those facts when viewed in the light most favorable to Plaintiff, as it must be. *Koh*, No. 11-cv-02605, at \*22. Defendants' self-serving review of extrinsic videos does not create a basis for dismissing Plaintiff's well-pleaded Fourth Amendment claim.

### III. Count II States a Claim for Excessive Force

The complaint also pleads a viable claim of excessive force. Defendants' argument for dismissing Count II rests on the same false premise as their request to dismiss Count I: that the court may disregard all the allegations in the complaint in favor of viewing the extrinsic video evidence in the most charitable manner for Defendants. Because the complaint pleads sufficient facts to support an inference that Defendants used excessive force in arresting Plaintiff and the videos do not clearly contradict those facts, Defendants' motion fails here as well.

7

"Courts analyze excessive force cases under an objective reasonableness standard; meaning that the officers' actions must be objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. This analysis is inherently fact-dependent, requiring consideration of such factors as the crime's severity, whether the person posed an immediate safety threat, and whether the person actively resisted the officers." *Louden v. Carter*, No. 18-cv-5242, at *4 (N.D. Ill. Dec. 13, 2021) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989); citing *Williams v. Ind. State Police Dep't*, 797 F.3d 468, 472-73 (7th Cir. 2015)) (internal quotation marks omitted). Other relevant circumstances include "the need for the use of force, the relationship between the need for the use of force and the amount of force used, the extent of the plaintiff's injury, any efforts made by the defendant to temper or limit the amount of force, the severity of the crime at issue, the threat reasonably perceived by the officer(s), and whether the plaintiff was actively resisting arrest or was attempting to evade arrest by fleeing". Seventh Cir. Pattern Jury Instr. 7.10.

The facts alleged in the complaint set out a plausible claim of excessive force. Plaintiff pleads that during her interaction with Defendants, she was dressed only in a thin, sleeveless, thigh-length nightgown and flip-flops (ECF No. 1 ¶ 25). She alleges she explained to officers that her son was sick and sleeping in the next room and asked the officers to keep their voices down so as not to awaken him. Plaintiff told the officers she was just waiting for her son to wake up naturally before turning him over to his dad, and she showed them her son's packed bag, ready to go with him to his father's house. (*Id.* at ¶¶ 26–31.) The complaint further claims that Haligas told Defendants the court order governing her parenting arrangement allowed her to request this accommodation from the father, and she offered to show them the document to disabuse them of their misunderstanding of what they read on the father's phone. (*Id.* at ¶¶ 17,

8

30.) From there, the complaint alleges that the officers unnecessarily escalated the situation by threatening to take Haligas to jail, refusing to lower their voices, trying to snatch Haligas's phone out of her hand when she said she wanted to call 911, and backing her up against a wall while she was visibly upset and fearful. (*Id.* at ¶¶ 33–38.) The complaint goes on to allege that the officers pulled Haligas to the floor after cuffing one of her arms, and then pulled her up by her arms wrenching them behind her to cuff her other wrist. (*Id.* at ¶¶ 39–42.)

Those facts present a set of circumstances that, taken as a whole, make out a plausible claim of excessive force. The allegations show that no reasonable officer would have thought Plaintiff posed an immediate physical threat—she was unarmed, wearing a nightgown, and speaking quietly to avoid waking her son. Plaintiff does not allege she ran away or attempted to evade arrest in any manner. And the "crime" Defendants suspected Plaintiff of was not a violent act, but interference with parenting time, punishable by the issuance of a notice to appear (not jail, as Defendants threatened). (*Id.* at ¶ 34.) Nor was there any need to use force—Plaintiff showed Defendants her son's packed bag and made clear she intended to bring him down to his dad as soon as he woke up. Finally, the allegations support the inference that Defendants made no effort to temper or limit the amount of force they used, for example by simply asking Plaintiff, at any point, to please wake up her son and get him ready to go. In view of those facts, Count II is legally viable.

In arguing Count II does not meet the pleading standard, Defendants overlook the totality of the circumstances alleged, instead focusing solely on the facts related to their physical contact with Plaintiff. (ECF No. 16 at 9.) They then turn away from the complaint to the extrinsic video, which they claim "clearly contradict[s]" Plaintiff's allegations because it shows she was "not under control and was actively yelling and flailing her arms." (*Id.* at ¶ 40.) Defendants offer a

9

play-by-play of what they see when they watch their body worn camera footage, highlighting the facts they find helpful and ignoring the unflattering events and the broader context in which the arrest occurred. (ECF No. 16 at 9.) Again, the Court should not look beyond the complaint to resolve this motion; but even if it did, and even if it accepted Defendants' self-serving rendition of the arrest, their argument fails. Yelling, backing up, and "not being under control" does not amount to resisting arrest and would not justify any use of force. *See, e.g., Skube v. Williamson*, No. 12-3185, at *25 (C.D. Ill. Jan. 27, 2015) (plaintiff did not resist arrest by taking a step back after officer said she was under arrest, and collecting cases showing "a short period of arguing and not complying with police orders does not constitute resisting arrest") (citations omitted); *Covington v. Smith*, No. 05-1204, at *21 (C.D. Ill. Dec. 16, 2005) ("verbally challeng[ing] an officer's authority to enter and search . . . home without a warrant" "can hardly justify an officer's use of force to effectuate an arrest"). And Defendants' characterization of Plaintiff's collapse during her cuffing as "thr[owing] herself on the ground" (ECF No. 16 at 9) would not invalidate her excessive force claim at the pleadings stage in any event. Those facts would only create a question for resolution by the factfinder of whether the force used was proportionate to the passive resistance, as Defendants' own cases show. *See, e.g., Turner v. City of Champaign*, 979 F.3d 563, 569 (7th Cir. 2020) (explaining that in cases of "merely passive resistance to lawful detention. . . . significant force can violate the Fourth Amendment").

Finally, Defendants' cases underscore their confusion about the legal standard rather than supporting their argument for dismissal: every case Defendants cite under this heading is a summary judgment opinion decided after discovery was completed, based on the full evidentiary record. (ECF No. 10 (citing *Turner*, 979 F.3d 563; *Rebolar v. City of Chi.*, 897 F. Supp. 2d 723 (N.D. Ill. 2012); *Fitzgerald v. Santoro*, 707 F.3d 725 (7th Cir. 2013); *Padula v. Leimbach*, 656

10

F.3d 595 (7th Cir. 2011); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997)).) Those cases speak to the evidence required to *prove* excessive force; they do not show that Plaintiff's factual allegations are insufficient to *plead* excessive force.

### IV. Counts IV and V State Claims of Municipal Liability

Defendants also seek dismissal of Plaintiff's claims against the City arguing her allegations are insufficient to show a widespread unconstitutional practice of unnecessary escalation and retaliatory force existed in January 2020, or that the practice led to Defendants' misconduct. They also argue the municipal liability claims drop away because no underlying constitutional violations occurred. (ECF No. 16 at 13.) Those arguments lack merit as well.

#### A. Legal Standard Governing Municipal Liability

Plaintiff alleges two theories of municipal liability against the City of Chicago. "The Supreme Court has made clear that federal courts must not apply a heightened pleading standard in civil rights cases alleging § 1983 municipal liability. . . . The Seventh Circuit has interpreted this mandate to allow 'conclusory' *Monell* complaints to survive motions to dismiss when they are 'sufficient to put the local governing body on notice of plaintiff's claim against it' and if the plaintiff gives the defendant 'notice of the crux of the plaintiff's charges' and does not 'leave out facts necessary to give the defendants a complete understanding of the claims made against them.'" *Lyons v. City of Chicago*, No. 20-cv-03412 (N.D. Ill. Sept. 30, 2021) (cleaned up; quoting *Howard v. Sheriff of Cook Cty.*, No. 15 C 9384, 2016 WL 4366598, at *3 (N.D. Ill. Aug. 16, 2016); citing *Horton v. Guzman*, No. 16 C 741, at *5 (N.D. Ill. Apr. 4, 2017)); *see also Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164 (1993); *McCormick v. City of Chicago*, 230 F.3d 319, 323 (7th Cir. 2000) ("The language

11

contained in McCormick's second amended complaint, while conclusory, is sufficient to put the City on notice of his claim against it.").

To state her claim in Count IV, Plaintiff must plead facts that put the City on notice of an unconstitutional, widespread practice at the Chicago Police Department "so permanent and well-settled as to constitute a custom or usage with the force of law". And she must plead facts showing such practice was the moving force behind her injuries. *Johnson v. City of Chicago*, No. 20-cv-7222, at *9-10 (N.D. Ill. Sept. 28, 2021) (citing *McCormick*, 230 F.3d at 324; *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917 927 (7th Cir. 2016)). Plaintiff may, but is not required to, plead her failure to train claim in the same manner. The Seventh Circuit recently explained:

> Notably, failure-to-train liability does not require proof of widespread constitutional violations before that failure becomes actionable; a single violation can suffice where a violation occurs and the plaintiff asserts a recurring, obvious risk. As the Court put it in *Brown*, "we did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability."

*Flores v. City of South Bend*, 997 F.3d 725, 731-32 (7th Cir. 2021) (quoting *Bd. Of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997); citing *Connick v. Thompson*, 563 U.S. 51, 63 n.7 (2011)). Both municipal liability counts meet this standard.

### B. Counts IV and V Contain Sufficient Factual Allegations

Count IV of the Complaint alleges the police had a "custom of escalating encounters unnecessarily, including incidents in which Chicago Police Department officers used retaliatory force against people who objected and claimed they were unlawfully detained by police". (ECF No. 1 ¶ 77.) Count V alleges the City's training program was inadequate to train its officers to properly handle situations in which (1) parents are accused by co-parents of violating court orders regarding parenting time; and (2) non-violent, unarmed citizens become upset during

12

encounters with police, as Haligas did. (ECF No. 1 ¶¶ 74–85.) Defendants do not analyze the two municipal liability theories separately, but instead, generally criticize both claims as "boilerplate", "conclusory" and supported only "a reference to the United States Department of Justice ('DOJ') investigation into the Chicago Police Department". (ECF No. 13–14.)

The facts underlying both claims of municipal liability in Plaintiff's complaint put the City on notice of the crux of her charges. Though Defendants wish to minimize the DOJ report, this court has found the report sufficient to support the inference that unconstitutional practices were pervasive. In *Johnson*, for example, the court rejected a similar motion to dismiss, accepting the plaintiff's argument that "although he need not provide additional examples of other individuals harmed by the alleged practice at the motion to dismiss stage, the DOJ's conclusions and the Chicago Police Superintendent's acknowledgement that a code of silence exists in the Chicago Police Department support the conclusion that the City has a widespread policy or practice of covering up misconduct. *Johnson*, No. 20-cv-07222, at *10 (internal citation omitted). The court found those allegations "'permit the reasonable inference that the practice is so widespread so as to constitute a governmental custom.'" *Id.* (quoting *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017); citing *Shields v. City of Chicago*, No. 17 C 6689, 2018 WL 1138553, at *4 (N.D. Ill. Mar. 2, 2018) (finding that the plaintiff's use of the Department of Justice Report to highlight CPD practices relevant to his claims created a "reasonable inference that he is not alone in suffering constitutional injuries resulting from this alleged practice or custom")); *see also Arquero v. Dart*, No. 19-cv-01528, at *10–11 (N.D. Ill. Feb. 28, 2022) (finding *Monell* claim sufficiently alleged widespread practice based on plaintiff's general allegation that "other individuals" were subjected to the same harm, and his statement in response to motion to dismiss that plaintiff knew of "at least seven individuals"). As such,

Plaintiff sufficiently pleaded the existence of a widespread unconstitutional practice by alleging others were affected by the same harm and by reference to the DOJ report. (ECF No. 1 ¶ 76.)

Defendants again veer outside the complaint to avoid the inferences the DOJ report supports, arguing its consent decree with DOJ proves it "has not turned a blind eye to the problems Plaintiff complains of, nor adopted any widespread practice as its own." (ECF No. 14.) The City's attempts to shoehorn this summary judgment argument into the dismissal stage using the "judicial notice" doctrine falls flat. (*Id.* at 14 n.1.) The doctrine does not permit the Court to make the leap from the existence of a consent decree to the conclusion that the City is in perfect compliance, having eradicated the misconduct the DOJ report documented. *See, e.g., Snell-Jones v. Hertz Corp.*, No. 19-cv-00120, at *6 (N.D. Ill. Mar. 13, 2020) ("a court may only take judicial notice of a fact that is not subject to reasonable dispute") (citations omitted).

Defendants next argue Plaintiff fails to allege enough facts "to make it plausible that the alleged widespread practices were the moving force behind" Defendants' misconduct. (ECF No. 16 at 14–15). Again, that's more than what's required to plead Count V. But in any event, the complaint is sufficient. Among other things, the complaint alleges facts showing the officers came to Plaintiff's apartment investigating a minor offense and encountered a barely clothed, unarmed mother of a sick child sleeping in the next room. (ECF No. 1 ¶¶ 16, 25–26.) Plaintiff asked the defendant officers to keep their voices down, told them she was not violating the order, and told them they appeared to misunderstand the order. (*Id.* at ¶¶ 26, 30.) In response, Defendants threatened to arrest her and take her to jail. Plaintiff asked them to leave and said she would call 911. (*Id.* at ¶¶ 33, 36.) McCallum then tried to snatch Plaintiff's phone from her hand, pursued her into her kitchen, and violently handcuffed her, telling her this was happening because she wouldn't "calm down." (*Id.* at ¶¶ 39–44.) After cuffing her, Defendants refused to

allow Plaintiff to get dressed, forcing her to walk to their squad car in a short nightgown and flip flops in January in Chicago. (*Id.* at ¶ 49.) Those facts present a plausible story that Defendants ramped up their aggression in response to Plaintiff's refusal to acquiesce to their misreading of the court order and became physically violent when she asked them to leave. Taken as true, the allegations make it plausible that the custom at the Chicago Police Department, documented by the DOJ, of unnecessary escalation and retaliatory force in response to being questioned by civilians led to Plaintiff's injuries.

Last, Defendants argue that Counts IV and V should be dismissed based upon pleading deficiencies with Counts I and II. But because Plaintiff's false arrest and excessive force claims meet the pleading standard, this basis for dismissing the municipal liability claims fails too.

### V. Counts III and VI State Derivative Claims

Defendants seek dismissal of Plaintiff's claims for failure to intervene against Defendant Delgado (Count III) and indemnification against the City of Chicago (Count VI), arguing that because the complaint fails to state claims for false arrest or excessive force, those counts must fall as well. (ECF No. 16 at 10, 15.) Again, as discussed above, Counts I and II satisfy the pleading standard. As Defendants offer no further basis for their request to dismiss the derivative claims, the motion to dismiss Counts III and VI also should be denied.

### CONCLUSION

The Court should deny the motion to dismiss and permit Plaintiff's entire case to proceed. If, however, the Court grants any aspect of the motion, Plaintiff seeks leave to replead.

Dated: April 28, 2022  Respectfully submitted,

/s/ Alison R. Leff
Attorney for Plaintiff

15