```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
                     EASTERN DIVISION
```

```
Melissa Haligas,               )
                               )
          Plaintiff,           )
                               )
   v.                          )   No. 22 C 313
                               )
City of Chicago, Richard       )
McCallum, and Juan Delgado,    )
                               )
          Defendants.          )
```

Memorandum Opinion & Order

Chicago Police Officers Richard McCallum and Juan Delgado (the "Officers") arrested plaintiff Melissa Haligas after responding to a complaint that plaintiff was violating a child custody order. Plaintiff brings this lawsuit against the Officers pursuant to 42 U.S.C. § 1983, claiming false arrest, excessive force, and failure to intervene, and against the City of Chicago (the "City") pursuant to § 1983 and *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), claiming unconstitutional policies of escalating police encounters with non-threatening suspects and failure to train officers adequately. Plaintiff also brings a state law claim against the City for indemnification. Before me is defendants' motion to dismiss each of plaintiff's claims for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the motion is denied.

I.

For purposes of this motion, I accept the factual allegations in the complaint as true and draw all permissible inferences in plaintiff's favor. *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 349 (7th Cir. 2022) (citation omitted). On the afternoon of January 30, 2020, plaintiff was at home caring for her sick three-year-old. Compl., Dkt. No. 1 ¶¶ 10–11. Under a court order, plaintiff shares custody of the child with the child's father, who arrived at plaintiff's apartment building to pick up the child. *Id.* ¶¶ 12–13. Plaintiff asked the father to wait in the building lobby until the child woke up from a nap, but the father instead called the Chicago Police, claiming that plaintiff was violating the court order. *Id.* ¶¶ 15–16, 18–19. When the Officers arrived, the father showed Officer McCallum a document on his cell phone that he claimed supported his accusation. *Id.* ¶¶ 20–21. Officer McCallum found the document "confusing," but he declined the father's offer to email the document to Officer McCallum to review. *Id.* ¶¶ 22–23.

The Officers proceeded to plaintiff's apartment, where they accused her of violating the court order and threatened to arrest her and bring her to jail. *Id.* ¶¶ 24, 28, 33, 37. Plaintiff asked the Officers to keep their voices down, explaining that her son was sick and was asleep. *Id.* ¶ 26. They refused and continued to threaten her loudly, even as she showed the Officers her son's

2

bag, packed and ready to go to his father's home, and offered to show them the order to prove that allowing her son to awaken naturally before releasing him to his father was not inconsistent with its terms. *Id.* ¶¶ 27–31, 33. The Officers declined her offer to produce a copy of the order and continued to threaten her with arrest and jail. *Id.* ¶¶ 30, 32–33. Feeling threatened, plaintiff asked the Officers to leave her apartment and told them she was going to call 911. *Id.* ¶ 35. Officer McCallum then tried to grab plaintiff's cell phone from her, striking her hand in the process. *Id.* ¶ 36. Officer McCallum advanced toward plaintiff as she backed away, then handcuffed her and pulled her to the floor, where she screamed in fear and pain. *Id.* ¶¶ 39–40. The Officers then grabbed plaintiff's wrists and arms, pulling her to her feet as she shouted that they were hurting her. *Id.* ¶¶ 41–42. With plaintiff handcuffed in her apartment, Officer Delgado brought the child downstairs to his father, allowing the two of them to leave. *Id.* ¶¶ 47–48.

Officer McCallum led plaintiff out of her apartment building and into a squad car, where she remained for hours in her nightgown. *Id.* ¶¶ 49–50. When the Officers' supervisor arrived on the scene and learned what had happened, he expressed shock, asked the Officers if their body cameras were rolling, then turned his own body camera off. *Id.* ¶¶ 52–53. Plaintiff was ultimately released without booking or charge. *Id.* ¶ 51.

3

In the instant suit, plaintiff brings § 1983 claims for false arrest (Count I) and excessive force (Count II) against both Officers, alleging that their conduct violated her Fourth Amendment rights. In addition, she brings a § 1983 claim against Officer Delgado for failure to intervene (Count III). Against the City, she asserts two claims under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)—one for an unconstitutional custom of escalating police encounters with suspects (Count IV) and one for failure to train (Count V)—as well as a state law indemnification claim under 745 ILCS 10/9-102 (Count VI). Plaintiff seeks damages for the mental, emotional, and physical harm she claims resulted from her encounter with the Officers. Compl. ¶ 54. Defendants move to dismiss all claims against them.

I have jurisdiction over plaintiff's 42 U.S.C. § 1983 claims under 28 U.S.C. § 1331 and over her state law indemnification claim under 28 U.S.C. § 1367.

II.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

4

misconduct alleged.'" *Law Offs. of David Freydin, P.C. v. Chamara*, 24 F.4th 1122, 1128 (7th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 678). I "accept well-pleaded facts as true and draw all reasonable inferences in the plaintiff['s] favor," *Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1060-61 (7th Cir. 2020) (citation omitted), but I am "not bound to accept legal conclusions as true," *Burger v. County of Macon*, 942 F.3d 372, 374 (7th Cir. 2019) (citing *Iqbal*, 556 U.S. at 678).

As an initial matter, I must determine whether I may consider video footage from the Officers' body-worn cameras ("BWCs"), which defendants submit in support of their motion. *See* Dkt. Nos. 18, 20. Generally, a court may not consider extrinsic evidence while deciding a Rule 12(b)(6) motion to dismiss without converting that motion to a Rule 56 motion for summary judgment. *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002). But a court may consider such materials on a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to [the] claim." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (citation and internal quotation marks omitted). Defendants cite *Brownmark Films* and *Hyung Seok Koh v. Graf*, No. 11-CV-02605, 2013 WL 5348326 (N.D. Ill. Sept. 24, 2013), to argue that I may appropriately consider the BWC footage.

Plaintiff urges me to reject this argument, insisting that her complaint makes only passing reference to the BWC footage,

5

which captures only a portion of the events at issue; reflects only the officers' perspectives; and is not central to her claims. Moreover, plaintiff observes, her claims are wholly unlike those asserted in *Brownmark Films*—a copyright infringement case in which the court considered videos of the original and allegedly infringing works in dismissing the plaintiff's claims based on the defense of fair use. *See id.* at 689.

It is true that the BWC footage is not integral to plaintiff's claims in the same sense as the videos in *Brownmark Films*, which were indeed "the only two pieces of evidence needed to decide the question of fair use." *Id*. at 690. *Hyung Seok Koh* is more closely on point, as that decision involved a motion to dismiss the plaintiff's § 1983 claims against police officers. The court considered video evidence of the plaintiff's interrogation on the authority of *Scott v. Harris*, 550 U.S. 372 (2007), which the court construed to support consideration of video evidence that a defendant claims "utterly discredit[s]" the plaintiff's account of the facts. *Hyung Seok Koh*, 2013 WL 5348326, at *9 (citing *Scott*, 550 U.S. at 380-81). The court acknowledged that *Scott* was decided at summary judgment but noted that the Seventh Circuit has applied similar reasoning at the motion to dismiss stage. *Id.* (citing *Bogie v. Rosenberg*, 705 F.3d 603, 608-09, 610-12 (7th Cir. 2013)). Accordingly, it considered the video the defendants submitted in support of their motion but viewed it in the light most favorable

6

to the plaintiffs, as is required at the pleading stage. *Id*. at *10.

That approach is sensible here, too. Although plaintiff argues that her complaint makes only cursory reference to the BWC footage, she does not dispute that some of her allegations—specifically, those describing the Officers' encounter with her son's father in the lobby of her building—assert facts she knows only because she viewed that footage. *See* Compl. ¶¶ 18-24. As to those allegations, at least, the footage is arguably central to her claims. In any event, having viewed the footage myself, I conclude that it largely supports, rather than discredits, plaintiff's allegations. Accordingly, she is not prejudiced by my considering it at this stage.

### III.

Defendants seek to dismiss plaintiff's false arrest claim on the ground that plaintiff's own allegations and the BWC footage establish probable cause for her arrest. *See Neita v. City of Chi.*, 830 F.3d 494, 497 (7th Cir. 2016) ("To prevail on a false arrest claim under § 1983, a plaintiff must show that there was no probable cause for her arrest." (citation omitted)). Probable cause exists if "at the time of the arrest, the 'facts and circumstances within the officer's knowledge...are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has

7

committed, is committing, or is about to commit an offense.'" *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). "Probable cause requires only that a probability or substantial chance of criminal activity exists; it does not require the existence of criminal activity to be more likely true than not true." *Mucha v. Village of Oak Brook*, 650 F.3d 1053, 1056-57 (7th Cir. 2011) (citations omitted).

Defendants insist that statements made by the child's father, together with the document he showed them on his phone, furnished probable cause to arrest plaintiff for violating the child custody order. It is true that statements made by an eyewitness can "supply probable cause when the statements, if true, show that a crime has occurred." *Askew v. City of Chi.*, 440 F.3d 894, 895 (7th Cir. 2006) (citing *Gramenos v. Jewel Cos.*, 797 F.2d 432 (7th Cir. 1986)). But "where the facts and circumstances would render a reasonable officer suspicious" of the eyewitness account, *George v. City of Chi.*, No. 20-cv-06911, 2022 WL 832675, at *5 (N.D. Ill. Mar. 21, 2022) (citing *Askew*, 440 F.3d at 895), such as where "the police know that the accuser may harbor a grudge against the accused," *Askew*, 440 F.3d at 895 (citing *Hebron v. Touhy*, 18 F.3d 421 (7th Cir. 1994)), eyewitness statements may not suffice. In such cases, some follow-up investigation may be required to make an officer's

8

conduct "reasonable." *Id.*; *George*, 2022 WL 832675, at *5 (citation omitted).

Here, a prudent officer would arguably have investigated further before handcuffing plaintiff and threatening her with jail time. Parents who call the police to help resolve a child custody dispute likely have a contentious relationship, and indeed, statements made by both plaintiff and her son's father, which were recorded by the Officers' BWCs, suggested that that was the case here. *See* Exh. 1, Dkt. No. 20 at 3:22–3:30 (father stating that he had not been up to plaintiff's apartment "since the last time police were involved because she hit me"); *id.* at 8:25–8:54 (plaintiff explaining that the court order was necessary because the father used to pick the child up from daycare in the middle of his nap). It is reasonable to conclude that a prudent officer hearing these statements should have investigated further before arresting plaintiff based entirely on the father's interpretation of plaintiff's conduct and a cursory review of a document the father claimed was a custody order, especially after plaintiff offered to provide a full copy of the custody order to establish her compliance. *See* Compl. ¶¶ 19–24.

Defendants next argue that the Officers had probable cause to arrest plaintiff because she resisted arrest. To prevail on this argument, defendants would have to persuade me that a factfinder would have to conclude, based on the allegations and footage, that

9

any reasonable officer would have believed plaintiff was resisting arrest. But viewed in the light most favorable to plaintiff, neither her allegations, nor the BWC footage, establish that she resisted arrest. The footage shows her explaining that the custody order allowed her to wait for her son to awaken before releasing him to his father, and that she intended to do just that, indicating her son's bag, packed and ready to accompany him to his father's home. Exh. 1 at 7:57-8:53. Then, it shows her asking the Officers to leave her apartment after they continued to threaten her with arrest, *id.* at 10:02-10:08; telling the Officers she was going to call 911, *id.* at 10:08-10:11; and flinching after Officer McCallum hit her hand, *id.* at 10:11-10:15. It then shows the Officers forcefully and aggressively handcuffing plaintiff while repeatedly threatening to take her to jail. *Id.* at 10:08-11:15. In short, the complaint and video footage do not establish as a matter of law that the Officers had probable cause to arrest plaintiff based on her reaction to their threats and aggression. Her false arrest claim may proceed.

With respect to plaintiff's excessive force claim, defendants concede that the complaint alleges facts sufficient to support the claim but contend that these facts are belied by the BWC footage. Dkt. No. 27 at 8-9. Not so. As noted above, the footage shows the Officers advancing on plaintiff while threatening to send her to jail and striking her hand when she indicated that she was going

10

to call 911. The Officers then forcefully restrained plaintiff after she recoiled from their show of force and continued to restrain her as she screamed in pain and pleaded with them to release her. Exh. 1 at 10:08-11:15. This footage is sufficient to raise a plausible claim for excessive force. *See Turner v. City of Champaign*, 979 F.3d 563 (7th Cir. 2020) (noting that in cases of "passive resistance to lawful detention...significant force can violate the Fourth Amendment").

## IV.

I turn next to plaintiff's *Monell* claims. Under *Monell*, 436 U.S. 658, a municipality may incur § 1983 liability if a deprivation of constitutional rights "was the result of municipal 'custom or policy.'" *City of Okla. City v. Tuttle*, 471 U.S. 808, 817 (1985). Additionally, "to state a § 1983 claim against a municipality, the complaint must allege that an official policy or custom not only caused the constitutional violation, but was 'the moving force' behind it." *Estate of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989); additional citations omitted).

Plaintiff alleges that at the time of her arrest, the Chicago Police Department had a custom of unnecessarily escalating encounters, and that that custom caused her to be falsely arrested and subjected to excessive force. Compl. ¶¶ 76, 79. Defendants argue that these allegations are merely conclusory boilerplate,

11

but plaintiff's support for them includes references to a report by the United States Department of Justice from an investigation into the Chicago Police Department (the "DOJ Report").[1] *Id.* ¶¶ 76–77. According to the complaint, the DOJ Report documented a widespread practice by Chicago Police officers of unnecessarily escalating encounters with suspects, including in circumstances analogous to her own encounter.[2] *Id.* To withstand dismissal, "plaintiff does not have to come forward with facts proving a widespread practice[,]...[she] need only state a plausible claim for relief." *Arquero v. Dart*, No. 19-cv-1528, 2022 WL 595730, at *6 (N.D. Ill. Feb. 28, 2022) (citing *Shields v. City of Chi.*, 2018

---

[1] Defendants ask me to take judicial notice of a consent decree that they assert resulted from the DOJ Report, arguing that it shows that "the City has not turned a blind eye to the problems Plaintiff complains of, nor adopted any widespread practice as its own." Dkt. No. 16 at 14 & n.1. However, I can "only take judicial notice of a fact that is not subject to reasonable dispute." *Snell-Jones v. Hertz Corp.*, No. 19-cv-00120, 2020 WL 1233825, at *3 (N.D. Ill. Mar. 13, 2020) (citing Fed. R. Evid. 201; *Tobey v. Chibucos*, 890 F.3d 634, 648 (7th Cir. 2018)). So while it may be permissible to take judicial notice of the *existence* of the consent decree (which plaintiff does not appear to dispute), it is unclear how doing so would support defendants' argument. If anything, the existence of the consent decree suggests that the City was aware of the types of constitutional violations complained of by plaintiff.

[2] The Officers' unnecessary escalation of the encounter is further supported by the BWC footage, which shows the Officers threatening to arrest plaintiff and put her in jail soon after entering her apartment. *See, e.g.*, Exh. 1 at 9:29-9:44; *id.* at 9:50-9:55. These turned out to be empty threats, *see* Compl. ¶ 51 (alleging that plaintiff was released without booking or charge), which leaves one with the impression that they were unnecessary and served only to escalate the encounter.

WL 1138553, at *4 (N.D. Ill. 2018)). Plaintiff's allegations concerning the findings in the DOJ report, coupled with her description and the BWC footage of her own encounter with the Officers, are sufficient to "allow[] [me] to draw the reasonable inference that the [City] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556); *see Johnson v. City of Chi.*, No. 20 C 7222, 2021 WL 4438414, at *5 (N.D. Ill. Sept. 28, 2021) (DOJ Report bolstered plausibility of *Monell* claim and "permit[ted] the reasonable inference that the practice is so widespread so as to constitute a governmental custom." (citations omitted)); *Brown v. City of Chi.*, No. 21-CV-01397, 2022 WL 865796, at *10 (N.D. Ill. Mar. 23, 2022) (same).

Plaintiff's failure-to-train claim is a somewhat closer call. Failure-to-train liability fits within the *Monell* framework because "by failing to train an employee whose conduct the municipality knows to be deliberately indifferent to the public, the municipality itself demonstrates deliberate indifference to that known risk." *Flores v. City of S. Bend*, 997 F.3d 725, 731 (7th Cir. 2021). The Seventh Circuit's recent decision in *Flores* notes that "failure-to-train liability does not require proof of widespread constitutional violations before that failure becomes actionable; a single violation can suffice where a violation occurs and the plaintiff asserts a recurring, obvious risk." *Id.*

Plaintiff alleges that at the time of her arrest, the City inadequately trained its officers to handle child custody disputes between co-parents, and that given the highly contentious nature of such disputes, policymakers were aware of a "recurring, obvious risk" that Chicago Police Officers would be called upon to enforce the rights of parties subject to child custody orders. *See* Compl. ¶ 82. In particular, plaintiff alleges that the City's police officers are inadequately trained to manage and deescalate highly emotional situations in which unarmed, non-violent individuals become upset when law enforcement is called to resolve custody disputes. *Id.* ¶¶ 81, 83. In addition, plaintiff alleges that the Officers' aggressive response in her case reflects the general pattern documented in the DOJ Report of unnecessary escalation by officers dealing with non-violent, non-threatening suspects. *Id.* ¶ 84. I conclude that these allegations are minimally sufficient to survive defendants' motion to dismiss as to her failure-to-train claim.

V.

Finally, defendants argue that plaintiff's remaining claims— failure to intervene against Defendant Delgado, and indemnification against the City—must be dismissed because they are merely derivative of the putatively infirm claims discussed above. But because I conclude that plaintiff's primary claims may proceed, her derivative claims likewise survive dismissal.

14

## VI.

For the foregoing reasons, defendants' motion to dismiss is denied.

**ENTER ORDER:**

_Elaine E. Bucklo_ (signature)

**Elaine E. Bucklo**
United States District Judge

Dated: June 29, 2022