IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MELISSA HALIGAS, | ) | |
| | ) | Case No. 22-cv-313 |
| Plaintiff, | ) | |
| | ) | Judge Elaine E. Bucklo |
| v. | ) | |
| | ) | Magistrate Judge Young B. Kim |
| CITY OF CHICAGO, RICHARD MCCALLUM, and JUAN DELGADO, | ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' LOCAL RULE 56.1(a)
STATEMENT OF UNCONSTESTED MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(a), Defendants, City of Chicago, Richard McCallum, and Juan Delgado, by and through one of their attorneys, Tyler D. Michals, Assistant Corporation Counsel, submit the following statement of material undisputed facts pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1:

**JURISDICTION & VENUE**

1. Jurisdiction and venue are proper as this action is brough under 42 U.S.C. § 1983 to redress the alleged deprivations of Plaintiff's civil rights under color of law which are alleged to have occurred within the Northern District of Illinois. Plaintiff's Complaint ("Pl. Comp."), ECF No. 1, a copy of which is attached hereto as **Exhibit A**, at ¶¶ 7-9; *see also* Defendant Officers' Answer to Plaintiff's Complaint, Affirmative Defenses, and Jury Demand ("Officers' Answer"), ECF No. 34, at ¶¶ 7-9 attached as **Exhibit B** ; Defendant City's Answer to Plaintiff's Complaint, Affirmative Defenses, and Jury Demand ("City Answer), ECF No. 35, at ¶¶ 7-9, attached as **Exhibit C**.

2. The claims at issue from Plaintiff's Complaint are her allegations that on Friday, January 31, 2020, Defendant Officers falsely arrested her (Count I), used excessive force against her (Count II), Defendant Officer Delgado failed to intervene to stop Defendant Officer McCallum from

1

making a false arrest and using excessive force (Count III). Ex. A. Plaintiff also alleges liability for Defendant City under 42 U.S.C. § 1983 based on allegations that Defendant City had a custom of "unnecessarily escalating encounters" (Count IV) and failed to adequately train officers to respond to disputes involving parenting agreements and situations where people become upset (Count V). *Id.* Plaintiff also asserts a claim for indemnification (Count VI). *Id.*

## PARTIES

3. At all times relevant hereto, Melissa Haligas (Plaintiff") resided in Chicago, Illinois. Ex. A, at ¶ 3; Ex. B, at ¶ 3; Ex. C. at ¶ 3; *see also* Deposition of Melissa Haligas (Pl. Dep.), a copy of which is attached as **Exhibit D**, at 15:19 – 16:8.

4. At all times relevant hereto, Defendant Officer Richard McCallum was employed by the City of Chicago as a police officer with the Chicago Police Department. Ex. A, at ¶ 4; Ex. B, at ¶ 4; Ex. C. at ¶ 4; *see also* Deposition of Richard McCallum (McCallum Dep.), a copy of which is attached as **Exhibit E**, at 23:9-10. On January 31, 2020, Officer McCallum was assigned to the 18th district as a patrol officer. *Id.* at 23:24-24:4.

5. At all times relevant hereto, Defendant Officer Juan Delgado was employed by the City of Chicago as a police officer with the Chicago Police Department. Ex. A, at ¶ 5; Ex. B, at ¶ 5; Ex. C. at ¶ 5; *see also* Deposition of Juan Delgado, a copy of which is attached as **Exhibit F**, at 23: 14-22. On January 31, 2020, Officer Delgado was assigned to the 18th district as a patrol officer. *Id.* at 23:20-22.

6. At all times relevant hereto, Defendant City was a municipal corporation located in Cook County, Illinois. *See* Ex. A, at ¶ 6; Ex. B, at ¶ 6; Ex. C. at ¶ 6.

## RESPONDING TO CALL OF DOMESTIC DIPSUTE

7. On Friday, January 31, 2020, shortly before 4:00 PM, Chicago Police Officers Richard McCallum and Juan Delgado, responded to a call of a domestic dispute by Kevin Howard at Plaintiff's

apartment building. Ex. E at 69:11-73:03; Ex. F at 66:2-11; Deposition of Kevin Howard, attached as **Exhibit G**, at 16:12-19, 17:16-24; 18:2-4; Ex. D at 117:13-14.

8. Kevin Howard met both officers in the lobby and advised them that Plaintiff, his ex-girlfriend, was refusing to turn over custody of their son pursuant to a court order. Ex. E. at 80:17-25; Ex. F at 77:9-25; Ex. G at 18:21-24, 21:10-12, 19:13-22, 21:10-12.

9. Defendant Officers were wearing body worn camera (BWC). *See* Body Worn Camera footage for Officer McCallum, attached as **Exhibit H**, at 1:20-5:20; *see also* Body Worn Camera footage for Officer Delgado, attached as **Exhibit I**, at 3:24-7:22 (both videos showing the interactions between Defendants and Mr. Howard).

10. Mr. Howard presented Officer McCallum with a copy of a court order, dated January 8, 2020, on his phone. Ex. E at 73:12-22; Ex. F at 70:13-16, Ex. G at 19:21-22, Ex. H at 1:50-1:56, 22:25-22:31.

11. Officer McCallum skimmed every line of the document and identified the provisions of the order that he determined were the most relevant to parenting time. Ex. E at 79:22-25, 76:19-77:15, 80:15-25, 91:8-14; Ex. H at 2:05-3:50.

12. Mr. Howard advised that his parenting time began at 3:00 PM – a fact Plaintiff acknowledges – but that Plaintiff was refusing to turn over their son because he was ill. Ex. E at 80:21-25, 81: 19-22, 197:13-16; Ex. G at 21:10-12. Ex. H at 1:20-2:31; Ex. I at 3:24-3:52; Ex. D, at 110:21-23; 113:21 – 114:1; 128:11-20.

13. Officer McCallum also reviewed messages between Plaintiff and Mr. Howard contained on Mr. Howard's phone where it was also conveyed to Officer McCallum that Plaintiff was not turning over their son to Mr. Howard because their son was ill. Ex. E at 81: 1-6; Ex. I at 3:57-5:18. Ex. D at 118:11-16. Nothing in these messages mentioned that Plaintiff could maintain custody

3

of M.H. based on any court order or clause. *See* Messages Between Plaintiff and Kevin Howard, attached as **Exhibit N**.

14. Officer McCallum returned Mr. Howard his cell phone, and the officers proceeded to Plaintiff's apartment on the 22nd floor. Ex. I at 5:18-6:00.

15. Based on what Officer McCallum was presented with from Mr. Howard, Officer McCallum believed that if there was other pertinent information to the court case that Mr. Howard did not present, he could learn that information through Plaintiff as a part of his investigation. Ex. E at 89:1-6, 92:18-22, 93:1-95:8.

## PLAINTIFF'S ARREST

16. Plaintiff, who was wearing a night gown, answered the door to her apartment and immediately invited the officers into her apartment, despite the officers having offered to speak with her in the hallway. Ex. H at 6:46-7:08; Ex. I at 8:54-9:10; Ex. D at 149:8-18. Officers did not have any information about Plaintiff's criminal history prior to making contact with her. Ex. E, at 68:8-10.

17. She also insisted that the officers talk in a lowered voice so her son does not wake up. Ex. E at 201:11-13; Ex. H at 7:07-7:11; Ex. I at 9:12-9:17; Ex. D at 51:2-4.

18. Officer McCallum refused to lower his voice to ensure that the interaction is recorded on his BWC, and that Plaintiff heard what he said. Ex. E at 201:16-201:14; Ex. D at 151:6-13

19. Officer McCallum asked "why aren't you handing over your son?" Plaintiff responded, "because he has the stomach flu," and that she would not wake him up until after his nap. Ex. H at 7:22-7:25; Ex. I at 9:24-9:27; Ex. D at 123:4-9.

20. Officer McCallum explained that Plaintiff had not provided a valid justification for not handing over custody, nor did Plaintiff ever mention that a clause in any prior parenting agreement

4

addressed instances where M.H. was sick. Ex. H at 7:26-7:34; Ex. I at 9:29-9:36; Ex. D at 150:16-24, 156:4-13.

21. Plaintiff insisted that the officers did not understand the court order, and that it prohibits Mr. Howard from picking up their son before 3:00 PM. Ex. H at 8:23-8:32; Ex. I at 10:30-40.; Ex. D at 99:4-5, 110:3-4, 114:18 – 115:21.

22. She explained that the order was drafted to make sure Mr. Howard did not pick up their son "mid-nap." Ex. H at 8:43-8:54; Ex. I at 10:45-10:57; Ex. D at 109:15 – 110:1

23. The officers explained that it was 4:00 PM, therefore the fact that their son was napping had nothing to do with the language of the order. Ex. H at 8:00-8:39, 8:55-9:00; Ex. I at 10:18-10:30, 10:57-11:02; Ex. D 110:21-23.

24, Plaintiff offered to show the order to the officers, and the officers explained that they had just looked at it. Ex. H at 8:25-8:33; Ex. I at 10:30-10:36; Ex. D, 199:13-24, 200:1-4. Plaintiff did not tell the officers that the language they needed to see was in an order from June 2017. Ex. D 199:14-200:4.

25. Officer McCallum did not review the order again because Plaintiff had not disputed that her son belongs with Mr. Howard after 3:00 PM, Plaintiff did not hand it to him, and she did not explain to Officer McCallum how Officer McCallum's understanding of the order was incorrect, nor whether there was any clause in the order pertaining to a situation where M.H. was sick. Ex. E. at 113:1-6, 209:21-210:2, 210:21-24, 211:11-22, 212:6-11, 213:3-5; Ex. D at 150:16-24, 156:4-13.

26. Plaintiff then asked Officer McCallum "would you like to wake my son yourself?" and showed the officers her son sleeping in his bedroom. Ex. H at 9:00-9:16; Ex. I at 11:04-11:20; Ex. D, at 151:6-13.

27. Officer McCallum explained that Plaintiff was violating a court order, which Plaintiff denied and stated "you know what? A part of being a parent, you're accommodating. I've accommodated him a whole bun[ch]." Ex. H at 9:18-9:34; Ex. I at 11:20-11:35.

28. Plaintiff said she would not wake up her son. Ex. H at 9:36-9:38; Ex. I at 11:38-11:40; Ex. D at 159:13-21. Officer McCallum advised her that she would go to jail for unlawful violation of visitation. Ex. E at 214:14-24; Ex. H at 9:38-9:43; Ex. I at 11:40-11:46; Ex. D 160:14-17.

29. Plaintiff stated to Officer McCallum that he did not understand what is in the court order, and stated she would like to call her child advocate. Ex. H at 9:43-9:48, Ex. D, 157:21-158:12, 99:4-5, 110:3-4, 114:18 – 115:21.

30. Officer McCallum explained that regardless of what the child advocate had to say, he would still arrest her because ultimately, he would have to "answer to" a judge. Ex. H at 9:49-10:03.

31. More than three minutes after allowing Officers into her apartment, Plaintiff stepped towards the officers, pointed to the apartment entrance, and told them to leave. Ex. E at 217: 19-21; Ex. H at 10:03-10:08; Ex. I at 8:55-12:11; Ex. D at 161:16-23.

32. The officers refused, and Officer McCallum indicated for Plaintiff to calm down. Ex. H at 10:07-10:11; Ex. I at 12:09-12:13; Ex. D at 223:19-22.

33. Officer McCallum took out a pair of handcuffs, in preparation for making an arrest of Plaintiff. Ex. E at 219:17-18; Ex. F at 171:2-6; Ex. I at 12:12-12:13.

34. Plaintiff then threatened to call 911. Ex. E at 219: 9-11; Ex. H at 10:09-10:11; Ex. I at 12:12-12:14.

35. Officer McCallum again asked Plaintiff to calm down. Ex. H at 10:10-10:12; Ex. I at 12:13-12:15; Ex. D at 223:19-22.

36. Officer McCallum sensed that Plaintiff was escalating matters, and the situation was no longer calm. Ex. E at 218:5-20; 220:7-14; Ex. D at 161:11-15.

37. Officer McCallum was holding handcuffs and reached for Plaintiff's hand, which was holding a cell phone, to make an arrest. Ex. E at 226:1-3; Ex. H at 10:11-10:13; Ex. I at 12:14-12:16.

38. Officer McCallum again asked Plaintiff to calm down, advising he would otherwise arrest her. Ex. H at 10:14-10:17; Ex. I at 12:17-12:20.

39. Plaintiff yelled at Officer McCallum "I will call my doorman right now and have you removed from this premises!" Ex. H at 10:17-10:21; Ex. I at 12:20-12:24.

40. As she threatened to call her doorman, Officer McCallum approached Plaintiff in her kitchen, continuing to advise her to be calm because he was going to place handcuffs on her. Ex. E at 221:3-12; Ex. H at 10:20-10:24; Ex. I at 12:23-12:28; Ex. D at 167:1-13.

41. Plaintiff then started to yell "back up" at Officer McCallum while flailing her arm. Ex. H at 10:22-10:24; Ex. I 12:25-12:28.

42. Officer McCallum was worried that Plaintiff could use an object in her kitchen to cause injury to him or someone else. Ex. E at 221:20-23.

43. In moving towards Plaintiff in her kitchen, he hoped to back her into corner where she would have less access to the rest of the kitchen. Ex. E at 222:2-7.

44. Officer McCallum believed he was de-escalating the situation by securing her to make sure she is not a threat. Ex. E 222:13-16, 224:4-6, 225:12-13.

45. Plaintiff tried to maneuver around Officer McCallum in order to leave the kitchen area, Plaintiff ran into Officer McCallum. Ex. H at 10:24-10:27; Ex. I at 12:28-12:31; Ex. D at 164:13-16.

46. In Plaintiff's attempt to get around Officer McCallum. Ex. H at 10:24-10:27; Ex. I at 12:28-12:31; Ex. D at 226:17-19.

47. Officer McCallum then asked her to turn around and put her hands behind her back. Ex. H at 10:30-10:31; Ex. I at 12:33-12:35; Ex. D at 166:15-19, 167:1-16.

7

48. By this time, Officer McCallum had determined he had probable cause for making an arrest for unlawful child visitation because Plaintiff had explicitly said she would not turn M.H. over to Mr. Howard. Ex. E at 224:12-19; 226:12-18.

49. Despite Officer McCallum's repeated orders, Plaintiff moved backwards to a wall in her kitchen. Ex. H at 10:31-10:35; Ex. I at 12:35-12:39; Ex. D at 223:23 – 224:1.

50. Officer McCallum repeatedly ordered Plaintiff to turn around and place her hands behind her back, and in response, Plaintiff held her arms tight to her body and yelled "no, leave me alone". Ex. H at 10:31-10:38; Ex. I at 12:35-12:41; Ex. D at 167:12-24; 168:1-19.

51. While continuing to yell, she then dropped her body weight to the ground. Ex. H at 10:38-10:40; Ex. I at 12:40-12:42; Ex. D at 171:13-16, 183:2-4, 224:15-18.

52. Plaintiff verbally and physically refused to turn her body around so the officers could handcuff her wrists. Ex. H at 10:40-10:49; Ex. I at 12:42-12:48; Ex. D 167:12-24, 168:1-19.

53. As Officers tried to handcuff her, she moved her body between the floor and the ground to resist arrest. Ex. H at 10:50-11:15; Ex. I at 12:49-13:17; Ex. D at 164:13-16, 166:1-4, 167:20 – 168:5, 171:13-16, 226:14-19. While this was going on, Klauminzer was urging Plaintiff to calm down, albeit unsuccessfully. Ex. D, at 170:1-5.

54. She contorted her body and moved her arms to avoid contact with the officers. Ex. H at 10:31-11:15; Ex. I at 12:35-13:15; Ex. D at 168:1-19, 226:12-13. For her part, Plaintiff claims that Officer McCallum used excessive force in arresting her. Ex. D at 171:18-21, 185:2, 259:16-19. 226:18-19, 229:18-23. She could not, however, point to any force used by Officer Delgado that would constitute excessive force. Ex. D, at 270:7-13, 270:11 – 271:9.

55. While Officers attempted to put Plaintiff's arms behind her back to apply handcuffs, Plaintiff yelled, "My wrist, my wrist." Ex. I at 12:56-13:00. After handcuffs were applied, and the situation had de-escalated, Plaintiff did not mention anything further about wrist pain, shoulder pain,

8

handcuff tightness, or prior medical conditions; nor did Plaintiff tell Officers about any clause of a court order pertaining to what to do if M.H. was sick. Ex. I at 13:15-13:17; Ex. D at 197:11-16, 201:4-9, Ex. D at 157:6-8, 215:19-24, 261:16 – 262:4, 263:2-12

56. Officer Delgado called for a sergeant to come to the scene, and explained to Plaintiff that she is under arrest for violating the court order and resisting arrest. Ex. H at 12:28-12:30, 14:25-14:29; Ex. I at 14:40-14:50; Ex. D at 210:4-10.

57. Officer Delgado asked Plaintiff's fiancé, Jay Klauminzer, who was also present, to grab a jacket, jeans, and shirt for Plaintiff. Ex. H at 14:04-14:06; Ex. I at 14:14-14:16, 16:05-16:17; Ex. D at 189:9-12.

58. Officer McCallum explained that he would call the child advocate at the station, but that Plaintiff had not mentioned anything the child advocate would explain that is not in the order he read. Ex. H at 14:30-14:45; Ex. I at 16:37-16:47.

59. Officer Delgado also explained to Plaintiff that the order says "past three o'clock" and that it was 4:04 PM when the officers had arrived, and that she was refused to give over the child and refused orders from Officer McCallum. Ex. H at 15:02-15:11; Ex. I at 17:05-17:14.

60. Officer McCallum also explained that it is not up to child advocate to resolve disputes regarding the meaning of the court order. Ex. H at 15:28-15:49; Ex. I at 17:30-17:51.

61. Plaintiff repeatedly apologized. Ex. H at 14:55-14:58, 15:55-15:58; Ex. I at 17:00-17:02; Ex. D at 190:21-24, 193:7 – 194:1.

62. Another individual that was present, Jay Klauminzer, Plaintiff's fiancé, incorrectly claimed the court order allowed Plaintiff to have custody past 3:00 PM, and until 5:00 PM, on days when Plaintiff's son was not in school. Ex. H at 17:09-17:19; Ex. I at 19:14-19:20, 34:35-34:51; Ex. D at 195:6-10.

63. Officer McCallum pointed out that he did not see that rule in the order, and that this is the first time Plaintiff and Mr. Klauminzer had mentioned it. Ex. H at 17:21-17:27; Ex. 2 at 19:20-19:31.

64. Mr. Klauminzer explained that he had a copy of the "original" order, but kept searching a phone for an additional order to support his claim that Plaintiff was not in violation of a court order, and Officer McCallum explained that the order he viewed was dated from January 8, 2020 – just a few weeks earlier. Ex. H at 22:20-22:35; Ex. I at 24:14-24:36.

65. Sergeant Higgins arrived. Ex. H at 27:32-27:35; Ex. I at 29:25-29:29; BWC for Sergeant John Higgins, attached as **Exhibit J**, at 3:34-3:38.

66. Officers helped gather Plaintiff's belongings, Mr. Klauminzer helped Plaintiff get dressed, and Sergeant Higgins and Officer McCallum escorted Plaintiff to a police vehicle. Ex. H at 31:00-43:30; Ex. J at 12:00-20:00.

67. Officer Delgado brought Plaintiff's son to Mr. Howard in the lobby. Ex. I at 35:50-37:20; Ex. D at 42:6-12.

68. Shortly before exiting the apartment, Plaintiff stated, "I know I'm not handling this situation appropriately, if I had a do-over, I would do things very different." Ex. H at 36:53-37:00; Ex. D 218:4-15.

**TRANSPORT TO HOSPITAL**

69. Officers eventually transported Plaintiff to Northwestern Memorial Hospital for an injury she claimed. BWC Footage for Officer Salvatore Cianflone, attached as **Exhibit K**, at 3:20-5:50; Deposition of Lieutenant Michael O'Malley, attached as **Exhibit L**, at 82:19-25; Ex.D at 238:15-22

70. Officers also advised Plaintiff that she would be released without charging. Ex. K at 8:25-8:40.

71. Plaintiff was taken to Northwestern Memorial Hospital that evening, although she did not want to go. Exhibit D at 81:2-7.

72. Plaintiff did not receive treatment at Northwestern Memorial Hospital that evening and went home from the hospital. Ex. D at 81:8-9.

### TREATMENT THE FOLLOWING DAY

73. The following day, February 1, 2020, Plaintiff went to Northwestern Immediate Care for two separate reasons: 1) For an examination of her right wrist, and 2) for an unrelated health reason. Exhibit D at 81:10-22, 242:20 – 245:2.

74. According to Carly Martinez, the physician assistant who treated Plaintiff on February 1st, Plaintiff did not complain of pain to her left wrist, elbows, or shoulders. *Deposition of Carly Martinez*, attached as **Exhibit M** at 46:13-23, 33:9-14.

                      Respectfully submitted,

                      /s/ *Tyler D. Michals*
                      Tyler D. Michals
                      Assistant Corporation Counsel

Jessica L. Griff, Assistant Corporation Counsel Supervisor
Tyler D. Michals, Assistant Corporation Counsel
City of Chicago Department of Law
Federal Civil Rights Litigation Division
2 N. LaSalle Street, Suite 420
Chicago, Illinois 60602
(312) 744-2826
Attorney No. 6309134
Jessica.Griff@cityofchicago.org
Tyler.Michals@cityofchicago.org
*Attorneys for the Defendant Officers*

                      /s/ *Maxwell Evan Lisy*
                      MAXWELL EVAN LISY
                      Assistant Corporation Counsel Supervisor

Maxwell Evan Lisy, Assistant Corporation Counsel Supervisor
William Cook, Assistant Corporation Counsel
City of Chicago Department of Law
Federal Civil Rights Litigation Division
2 North LaSalle Street, Suite 420
Chicago, Illinois 60602
(312) 742-0305
Attorney No.: 6321014
[Maxwell.lisy@cityofchicago.org](mailto:Maxwell.lisy@cityofchicago.org)
*Counsel for Defendant City of Chicago*