## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MELISSA HALIGAS, | ) | |
| | ) | Case No. 22-cv-313 |
| Plaintiff, | ) | |
| | ) | Judge Elaine E. Bucklo |
| v. | ) | |
| | ) | Magistrate Judge Young B. Kim |
| CITY OF CHICAGO, RICHARD | ) | |
| MCCALLUM, and JUAN DELGADO, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT

Pursuant to FRCP 56 and Local Rule 56.1(a), Defendants, City of Chicago, by and through one if its attorneys, William Cook, and Officers Richard McCallum, and Juan Delgado, (collectively "Defendants") by and through one of their attorneys, Tyler D. Michals, Assistant Corporation Counsel, submit this Memorandum of Law in support of their Motion for Summary Judgment and state as follows:

# TABLE OF CONTENTS

Statement of Facts .................................................................................................................. 7

Legal Standard .................................................................................................................... 10

Argument ............................................................................................................................. 11

     I.     Officers Had Probable Cause to Arrest Plaintiff................................................... 11

          A.     Officers Had Probable Cause to Arrest Plaintiff for Unlawful Visitation Interference............................................................................................................... 14

               i. Unlawful Visitation Interference is an Arrestable Offense.................... 14

          B.     Officers Had Probable Cause to Arrest Plaintiff for Resisting Arrest............. 15

     II.     Plaintiff's Claim for Excessive Force Fails ........................................................ 19

          A.     Officers Did Not Use Excessive Force ............................................................. 21

          B.     Officer Delgado Did Not Use Excessive Force................................................. 25

     III.     Plaintiff's Failure to Intervene Claim Against Officer Delgado Must Fail ................. 26

     IV.     Officers are Entitled to Qualified Immunity ..................................................... 27

          A.     Plaintiff's Arrest for Unlawful Visitation Interference Did Not Violate a Clearly Established Constitutional Right........................................................... 27

          B.     Alternatively, Plaintiff's Arrest was Justified Because She Resisted Arrest .... 28

          C.     Whether Plaintiff was arrested for Unlawful Visitation Interference or Resisting Arrest, Officers are entitled to qualified immunity because they had arguable probable cause .................................................................................... 28

          D.     The Force Used by Officers to Bring Plaintiff Under Arrest was Not So Excessive as to Have Violated Plaintiff's Clearly Established Constitutional Rights .................................................................................................................. 29

     V.     Punitive Damages Should be Dismissed........................................................... 31

     VI.     Because There is No Underlying Claim Against the Individual Officers, Plaintiff is Not Able to Recover Damages Against the City under *Monell* .............................................. 32

Conclusion ........................................................................................................................... 33

Cases                                                                                          Page(s)

*Abbott v. Sangamon County,*
   705 F.3d 706 (7th Cir. 2013) ................................................................................. Passim
*Abdullahi v. City of Madison,*
   423 F.3d 763 (7th Cir. 2005) ................................................................................. 20
*Acevedo v. Canterbury,*
   457 F.3d 721 (7th Cir.2006) ................................................................................. 18, 19
*al-Kidd,*
   131 S.Ct. ................................................................................................................. 29
*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ....................................... 10
*Anderson,*
   483 U.S. 107 S.Ct. 3034 ........................................................................................ 29
*Atwater v. City of Lago Vista,*
   532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001) ..................................... 15
*Baird v. Renbarger,*
   576 F.3d 340 (7th Cir.2009) ................................................................................. 20
*Bell v. Irwin,*
   321 F.3d 637 (7th Cir. 2003) ................................................................................. 20
*Brooks v. City of Aurora,*
   653 F.3d 478 (7th Cir. 2011) ................................................................................. 17, 18, 19
*Brooks,*
   653 F.3d ................................................................................................................. 30
*Calhoun v. DeTella,*
   319 F.3d 936 (7th Cir. 2003) ................................................................................. 32
*California v. Hodari D.,*
   499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) ..................................... 18, 19
*Campbell v. Miller,*
   499 F.3d 711 (7th Cir. 2007) ................................................................................. 11
*Celotex Corp. v. Catrett,*
   477 U.S. 317, 106 S.Ct. 2548 (1986) ................................................................... 10
*Cibulka v. City of Madison,*
   992 F.3d 633 (7th Cir. 2021) ................................................................................. 28, 29, 30
*City of Los Angeles v. Heller,*
   475 U.S. 796 (1986) .............................................................................................. 32
*Clarett v. Roberts,*
   657 F.3d 664 (7th Cir. 2011) ................................................................................. 17, 23
*Dawson v. Brown,*
   803 F.3d 829 (7th Cir. 2015) ................................................................................. 30
*DeShaney v. Winnebago County Department of Social Services,*
   489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) ....................................... 26
*Devenpeck v. Alford,*
   543 U.S. 146, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004) ....................................... 19
*Dockery v. Blackburn,*
   911 F.3d 458 (7th Cir. 2018) ................................................................................. 17, 29, 30

*Estate of Escobedo v. Bender,*
   600 F.3d 770 (7th Cir.2010) ............................................................... 29

*Findlay v. Lendermon,*
   722 F.3d 895 (7th Cir. 2013) .............................................................. 30

*Forrest v. Prine,*
   620 F.3d 739 (7th Cir. 2010) .............................................................. 17

*Garcia v. City of Chicago,*
   2012 WL 601844 (N.D. Ill. Feb. 23, 2012) ........................................ 24

*Graham v. Connor,*
   490 U.S. 386 (1989) ........................................................................... 20

*Gutierrez v. Kermon,*
   722 F.3d 1003 (7th Cir. 2013) ............................................................ 11

*Hardrick v. City of Bolingbrook,*
   522 F.3d 758 (7th Cir.2008) .............................................................. 17

*Howell v. Smith,*
   853 F.3d 892 (7th Cir. 2017) .............................................................. 24

*Hunter,*
   502 U.S. 112 S.Ct. 534 ...................................................................... 27

*Jenkins v. Keating,*
   147 F.3d 577 (7th Cir. 1998) .............................................................. 10

*Johnson v. Eau Claire Police Dep't,*
   2020 WL 10702725 (W.D. Wis. 2020) .............................................. 14

*Kemezy v. Peters,*
   79 F.3d 33 (7th Cir.1996) .................................................................. 32

*Malley,*
   475 U.S. 106 S.Ct. 1092 ............................................................... 27, 28

*Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,*
   475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ...................... 10

*McDonald v. Vill. of Winnetka,*
   371 F.3d 992 (7th Cir. 2004) .............................................................. 10

*Monell v. New York City Dept. of Social Services,*
   436 U.S. 658 (1978) ........................................................................... 32

*Mustafa,*
   442 F.3d ................................................................................... 27, 28

*Mwangangi v. Nielsen,*
   48 F.4th 816 (7th Cir. 2022) .............................................................. 26

*Neita v. City of Chicago,*
   830 F.3d 494 (7th Cir. 2016) .............................................................. 11

*Padula v. Leimbach,*
   656 F.3d 595 (7th Cir. 2011) ................................................... 20, 22, 23

*Pennsylvania v. Dunlap,*
   129 S. Ct. 448 (2008) ........................................................................ 14

*People v. Agnew–Downs,*
   404 Ill.App.3d 218, 344 Ill.Dec. 24, 936 N.E.2d 166 (2010) ............ 17

*People v. Fitzpatrick,*
   2013 IL 113449 .......................................................................... 15, 27

*People v. O'Leary,*
   376 Ill.App.3d 39 (2nd Dist. 2007) .................................................... 15

*Phillips v. Community. Ins. Corp.*,
  678 F.3d 513 (7th Cir. 2012) ........................................................................... 21
*Reichle v. Howards*,
  —— U.S. ——, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012) ................................. 29
*Rooni v. Biser*,
  742 F.3d 737 (7th Cir. 2014) ....................................................................... 24, 30
*Ross v. Mauro*,
  861 N.E.2d 313 (1st Dist. 2006) ..................................................................... 32
*Scott v. Harris*,
  550 U.S. 372 (2007) ....................................................................................... 11
*Smith v. Wade*,
  461 U.S. 30 (1983) ......................................................................................... 31
*Sow*,
  636 F.3d .......................................................................................................... 24
*Stainback v. Dixon*,
  569 F.3d 767 (7th Cir. 2009) .......................................................................... 24
*Stokes v. Board of Educ. of the City of Chicago*,
  599 F.3d 617 (7th Cir. 2010) .......................................................................... 11
*Thayer*,
  705 F.3d 2012 WL 6621169 ....................................................................... 27, 28
*Thompson v. Boggs*,
  33 F.3d 847 (7th Cir. 1994) ........................................................................... 32
*Tibbs v. City of Chicago*,
  469 F.3d 661 (7th Cir. 2006) .......................................................................... 25
*Towne v. Donnelly*, No. 20 C,
  2021 WL 3022327 (N.D. Ill. July 16, 2021) (dismissing .............................. 26
*Turner v. City of Champaign*,
  979 F.3d 563 (7th Cir. 2020) .......................................................................... 26
*United States v. Lanier*,
  520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) ................................. 29
*Virginia v. Moore*,
  553 U.S. 164 ................................................................................................... 16
*Wheeler v. Lawson*,
  539 F.3d 629 (7th Cir.2008) ........................................................................... 27
*Williams v. Rodriguez*,
  509 F.3d 392 (7th Cir.2007) ........................................................................... 19
*Woodward v. Corr. Med. Servs. of Illinois, Inc.*,
  368 F.3d 917 (7th Cir. 2004) .......................................................................... 31

## Statutes

720 ILCS 5/10-5.5(c) - (d) ................................................................................. 15
720 ILCS 5/10-5.5(b) (West 2010) ................................................................... 12
720 ILCS 5/31-1 (West 2014) ........................................................................... 17
725 ILCS 5/107-12(d) ...................................................................................... 15
745 ILCS 10/2-109 ........................................................................................... 32
Inst. 7.28 .......................................................................................................... 31

Rules

Fed. Rule Civ. Proc. 56(c)........................................................................................................................ 10

## STATEMENT OF FACTS

On Friday, January 31, 2020, shortly before 4:00 PM, Chicago Police Officers Richard McCallum and Juan Delgado, responded to a call of a domestic dispute by Kevin Howard at Plaintiff's apartment building. SOF ¶ 7. Kevin Howard met both officers in the lobby and advised them that Plaintiff, his ex-girlfriend, was refusing to turn over custody of their son pursuant to a court order. SOF ¶ 8. Mr. Howard presented Officer McCallum with a copy of a court order, dated January 8, 2020, (hereinafter, "January Order") on his phone. SOF ¶ 10. Officer McCallum skimmed every line of the document and identified the provisions of the order that he determined were the most relevant to parenting time. SOF ¶ 11.

Mr. Howard advised that his parenting time began at 3:00 PM – a fact Plaintiff acknowledged – but that Plaintiff was refusing to turn over their son because he was ill. SOF ¶ 12. Officer McCallum also reviewed messages between Plaintiff and Mr. Howard contained on Mr. Howard's phone where it was also conveyed to Officer McCallum that Plaintiff was not turning over their son to Mr. Howard because their son was ill. SOF ¶ 13. In her exchange of messages with Mr. Howard, Plaintiff never stated that based on any order or clause she was lawfully maintaining custody of M.H. SOF ¶ 13. The messages do not make mention of any clause that allows Plaintiff to maintain custody when M.H. is ill. SOF ¶ 13. Officer McCallum returned Mr. Howard his cell phone, and the officers proceeded to Plaintiff's apartment on the 22nd floor. SOF ¶ 14.

Plaintiff, who was wearing a night gown, answered the door to her apartment and immediately invited the officers into her apartment, despite the officers having offered to speak with her in the hallway. SOF ¶ 16. Officer McCallum asked "why aren't you handing over your son?" Plaintiff responded, "because he has the stomach flu," and that she would not wake him up until after his nap. SOF ¶ 19. Officer McCallum explained that Plaintiff had not provided a valid justification for not

handing over custody, nor did Plaintiff ever mention that a clause in any prior parenting agreement addressed instances where M.H. was sick. SOF ¶ 20.

Plaintiff insisted that the officers did not understand the court order, and that it prohibits Mr. Howard from picking up their son before 3:00 PM. SOF ¶ 21. She explained that the order was drafted to make sure Mr. Howard did not pick up their son "mid-nap." SOF ¶ 22. The officers explained that it was 4:00 PM, therefore the fact that their son was napping had nothing to do with the language of the order. SOF ¶ 23. Plaintiff offered to show the order to the officers, and the officers explained that they had just looked at it. SOF ¶ 24. Officer McCallum did not review the order again because Plaintiff had not disputed that her son belongs with Mr. Howard after 3:00 PM, Plaintiff did not hand it to him, and she did not explain to Officer McCallum how Officer McCallum's understanding of the order was incorrect. SOF ¶ 25.

Officer McCallum explained that Plaintiff was violating a court order, which Plaintiff denied. SOF ¶ 27. Plaintiff said she would not wake up her son. SOF ¶ 28. Officer McCallum advised her that she would go to jail for unlawful violation of parental visitation (hereinafter, Unlawful Visitation Intervference"). *Id.* At this point, Officer McCallum determined he had probable cause for making an arrest for Unlawful Visitation Interference. SOF ¶ 48

Plaintiff stepped towards the officers, pointed to the apartment entrance, and told them to leave. SOF ¶31. The officers refused, and Officer McCallum took out a pair of handcuffs, in preparation for making an arrest of Plaintiff. SOF ¶¶ 32, 33. Plaintiff then threatened to call 911. SOF ¶ 34. Officer McCallum was holding handcuffs and reached for Plaintiff's hand, which was holding a cell phone, to make an arrest. SOF ¶ 37. Officer McCallum approached Plaintiff in her kitchen, continuing to advise her to be calm because he was going to place handcuffs on her. SOF ¶¶ 37,40.

Plaintiff then started to yell "back up" at Officer McCallum while flailing her arm. SOF ¶ 41. Officer McCallum was worried that Plaintiff could use an object in her kitchen to cause injury to him

or someone else. SOF ¶ 42. Plaintiff tried to maneuver around Officer McCallum to leave the kitchen. SOF ¶ 45. In doing so, she ran into Officer McCallum. SOF ¶ 46.Officer McCallum then asked her to turn around and put her hands behind her back. SOF ¶ 47. Plaintiff moved backwards to a wall in her kitchen trying to avoid arrest. SOF ¶ 49.

Officer McCallum repeatedly ordered Plaintiff to turn around and place her hands behind her back, and in response, Plaintiff held her arms tight to her body and yelled "no, leave me alone." SOF ¶ 50. She then dropped her body weight to the ground. SOF ¶ 51. She refused to turn her body around so the officers could handcuff her wrists. SOF ¶ 52.As the officers tried to handcuff her, she moved her body between the floor and the ground to resist arrest. SOF ¶ 53. She contorted her body and moved her arms to avoid contact with the officers. SOF ¶ 54. The officers eventually handcuffed her. SOF ¶ 55.

Officer Delgado called for a sergeant to come to the scene, and explained to Plaintiff that she was under arrest for violating the court order and resisting arrest. SOF ¶ 56. Officer Delgado asked Plaintiff's fiancé, Jay Klauminzer, who was also present, to grab a jacket, jeans, and shirt for Plaintiff. SOF ¶ 57. Sergeant Higgins arrived on scene, and Officers helped gather Plaintiff's belongings. SOF ¶ 65. Mr. Klauminzer helped Plaintiff get dressed, and Sergeant Higgins and Officer McCallum escorted Plaintiff to a police vehicle. SOF ¶ 66. Shortly before exiting the apartment, Plaintiff stated, "I know I'm not handling this situation appropriately, if I had a do-over, I would do things very different." SOF ¶ 68.

Officers eventually transported Plaintiff to Northwestern Memorial Hospital for an injury she claimed. SOF ¶ 69. Officers also advised Plaintiff that she would be released without charging. SOF ¶ 70. Plaintiff was taken to Northwestern Memorial Hospital that evening, although she did not want to go. SOF ¶ 71. Plaintiff did not receive treatment at Northwestern Memorial Hospital that evening and went home from the hospital. SOF ¶ 72. The following day, February 1, 2020, Plaintiff went to

Northwestern Immediate Care for two separate reasons: 1) For an examination of her right wrist, and 2) for an unrelated health reason. SOF ¶ 73. According to Carly Martinez, the physician assistant who treated Plaintiff on February 1st, Plaintiff did not complain of pain to her left wrist, elbows, or shoulders. SOF ¶ 74.

## LEGAL STANDARD

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986). Courts construe all facts in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Jenkins v. Keating*, 147 F.3d 577, 583 (7th Cir. 1998). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004).

At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the

record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Where video depicting the incident clearly contradicts the set of facts put forth by the non-moving party, the facts should be looked at in the light depicted by the video. *Id.*

## ARGUMENT

### I. OFFICERS HAD PROBABLE CAUSE TO ARREST PLAINTIFF.

Plaintiff claims that Officers did not have probable cause to believe she had committed a crime at the time they arrested her. Pltf. Compl. ¶ 57-58. This claim fails for two separate reasons. First, Officers had probable cause to arrest Plaintiff for the offense of Unlawful Visitation Interference. Second, Officers had probable cause to arrest Plaintiff for the offense of Resisting Arrest.

#### a. Officers Had Probable Cause to Arrest Plaintiff for Unlawful Visitation Interference

To prevail on a false arrest claim under section 1983, the plaintiff must show that there was no probable cause for her arrest. *Neita v. City of Chicago*, 830 F.3d 494, 497 (7th Cir. 2016). A "custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment." *Campbell v. Miller*, 499 F.3d 711, 716-17 (7th Cir. 2007). Probable cause exists "if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott v. Sangamon County*, 705 F.3d 706, 714 (7th Cir. 2013). This is "a practical, commonsense standard that requires only the type of fair probability on which reasonable people act." *Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013). *See also Stokes v. Board of Educ. of the City of Chicago*, 599 F.3d 617, 622-23 (7th Cir. 2010)("To form a belief of probable cause, an arresting officer is not required ... to act as a judge or jury to determine whether a person's conduct satisfies all of the essential elements of a particular statute.")

In this case, Officers had probable cause to arrest Plaintiff for the offense of Unlawful Visitation Interference. 720 ILCS 5/10-5.5(b) (West 2010). The relevant provision of the Unlawful Visitation Interference statute states that:

> Every person who, in violation of the visitation, parenting time, or custody time provisions of a court order relating to child custody, detains or conceals a child with the intent to deprive another person of his or her rights to visitation, parenting time, or custody time commits the offense of unlawful visitation or parenting time interference.

*Id.*

Plainly, the facts known to Officers at the time justified them in their belief that Plaintiff had committed Unlawful Visitation Interference. Upon meeting with Howard in the lobby of Plaintiff's apartment building, Howard informed Officers that Plaintiff was refusing to turn over M.H. into his custody as required by a court order. SOF ¶ 12, 13, 19. Howard showed Officer McCallum a digital copy of the January Order, which Officer McCallum reviewed. SOF ¶ 12. Further, text messages between Plaintiff and Howard, which were reviewed by Officer McCallum, further indicated that Plaintiff was refusing to turn over M.H. SOF ¶ 13. None of those text messages make any mention of a clause pertaining Still, Officer McCallum determined he would speak with Plaintiff before coming to any conclusions about whether Plaintiff was violating the order by refusing to turn over M.H. SOF ¶ 15.

Plaintiff invited Officers into her apartment to discuss the matter. SOF ¶ 16. Officers spoke with Plaintiff and inquired as to why she was refusing to turn over M.H. in accordance with the January Order. SOF ¶ 19. Plaintiff stated that M.H. was sick and offered to pull up the order. *Id.* Officer McCallum, however, explained that he had already read the order, which showed that Howard's parenting time had begun at 3 p.m., which Plaintiff did not dispute. SOF ¶ 24.

Based on this interaction, it is clear that the information available to Officers at the time demonstrated that Howard's parenting time had begun at 3 p.m., and that Plaintiff was refusing to turn M.H. over to Howard. Although Plaintiff made reference to an order that she had been willing

to show Officers, there would have been no reason for Officers to re-read the order that Howard had just shown them minutes earlier. SOF ¶ 24. In fact, Officer McCallum specifically inquired as to whether there was a provision covering a situation where M.H. was sick, but Plaintiff did not respond directly. SOF ¶ 20.

Indeed, Plaintiff made no connection whatsoever between M.H.'s illness and any clause contained in any of the parenting agreement(s). SOF ¶ 20. Had such a connection existed, it would have been reasonable for Officers to expect Plaintiff to have informed them of this, considering that it would have been directly on point. That's precisely what Officer McCallum alluded to at his deposition, pointing out that Plaintiff merely referred vaguely to an order that she wanted to show him, and stated that M.H. was sick, but she never connected the two. SOF ¶ 25.

To the extent that a specific clause of any parenting agreement was brought to the attention of Officers, it came from Klauminzer. According to what Klauminzer told Officers only after Plaintiff was under arrest, there was a provision in one the parenting agreements that dealt with situations where M.H. stayed home from school, as he did on the date in question, which specified that Howard's parenting time began at 5 p.m. on such days. SOF ¶ 64. It turned out, however, that Klauminzer was mistaken, a fact that he subsequently acknowledged to Officers while at the scene. SOF ¶ 62. No one – not Plaintiff, Klauminzer, or Howard – ever told Officers about any clause covering a situation where M.H. was sick.

Plaintiff admitted at her deposition that she never told Officers about a clause that would alter the parenting time when M.H. was sick, but argued that Officers never gave her an opportunity to tell SOF ¶ 25. This is clearly belied by the record. More than three full minutes pass between the moment that Plaintiff answers the door until the point that Plaintiff orders Officers out of her apartment. SOF ¶ 31. In that span, Plaintiff had enough time to tell Officers to read an order, to keep their voices down, to ask if they wanted to wake up M.H., to ask Officer McCallum if he had children, to let them

know M.H. was sick, that M.H. was asleep, and to ask to call the child advocate. *Id.* One thing Plaintiff emphatically did not do in that time, was to tell Officers about any clause specifying what to do if M.H. was sick. *Id.* Even after things had calmed down, Plaintiff did not tell Officers about a clause pertaining to if M.H. was sick – even after Officer McCallum specifically inquired. SOF ¶ 55.

Regardless, although Officers here *did* seek out Plaintiff's side of the story, they were not required to go digging for a possible innocent explanation where none was immediately apparent. *See Johnson v. Eau Claire Police Dep't*, 2020 WL 10702725, at *3 (W.D. Wis. 2020) ("[P]robable cause doesn't require officers to weigh the inculpatory and exculpatory evidence."); *see also Pennsylvania v. Dunlap*, 129 S. Ct. 448, 449 (2008) (Roberts, C.J., dissenting from denial of certiorari) ("In any event, an officer is not required to eliminate all innocent explanations for a suspicious set of facts to have probable cause.")

For the foregoing reasons, based on the information available to Officers at the time, probable cause plainly existed to believe Plaintiff had violated the statute against Unlawful Visitation Interference when she refused to comply with the January Order giving Howard parental custody of M.H. past 3 p.m. on the day in question.

### i. Unlawful Visitation Interference is an Arrestable Offense.

Notwithstanding whether Officers had probable cause to believe Plaintiff had committed Unlawful Visitation Interference, Unlawful Visitation Interference is an arrestable offense. Subsections (c) and (d) of the Unlawful Visitation Interference statute provide that:

> c) A person committing unlawful visitation or parenting time interference is guilty of a petty offense. Any person violating this Section after 2 prior convictions of unlawful visitation interference or unlawful visitation or parenting time interference, however, is guilty of a Class A misdemeanor.

> (d) Any law enforcement officer who has probable cause to believe that a person has committed or is committing an act in violation of this Section shall issue to that person a notice to appear.

- 14 -

720 ILCS 5/10-5.5(c) - (d).

According to subsection (c), a first-time arrest for Unlawful Visitation Interference would constitute a petty offense. *Id.* On the other hand, an arrest following two prior convictions for Unlawful Visitation Interference would become a Class A misdemeanor. *Id.*

As a threshold matter, it's true that Officers had no information about Plaintiff's criminal history at the time of her arrest. SOF ¶ 16. This cuts both ways, however, since Officers did not have an opportunity to determine whether Plaintiff had prior convictions for Unlawful Visitation Interference before she ordered Officers to leave her apartment. Therefore, it was entirely possible that Plaintiff was not only committing a petty offense, but perhaps even a Class A misdemeanor.

In any event, Officers were justified in arresting Plaintiff if they reasonably believed she had committed a petty offense. As the Illinois Supreme Court has put it:

> "[J]ust as Illinois has no common law tradition of prohibiting arrests for minor offenses, there is no such statutory tradition either. In fact, any statutory tradition that Illinois has is to *allow* such arrests. Clearly, no grounds exist to depart from lockstep on this issue."

*People v. Fitzpatrick*, 2013 IL 113449 ¶ 21.[1] This is consistent with decisions by the U.S. Supreme Court, which have held that a custodial arrest for a misdemeanor punishable by a fine only does not run afoul of the United States Constitution's prohibition against unreasonable searches and seizures. *Atwater v. City of Lago Vista,* 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001). Further, Illinois law implicitly allows for Officers to arrest for petty offenses. *See e.g.,* 725 ILCS 5/107-12(d)("In any case in which a

---

[1] At least one Illinois appellate court has considered the ramifications for a petty violation of Unlawful Visitation Interference statute, albeit in an unrelated context. In *People v. O'Leary*, 376 Ill.App.3d 39 (2nd Dist. 2007), the defendant had been arrested and convicted of Unlawful Visitation Interference, even though she had only been convicted once previously of the same offense – meaning that her violation was a petty offense. In *O'Leary*, the Second District Appellate Court found that Supreme Court Rule 401(a) did not require the trial court to advise Plaintiff of her right to counsel, because the possible penalties did not include jail time. The appellate court did not consider the validity of the Defendant's arrest, nor does it appear that the defendant challenged her arrest on appeal. *Id.*

person is arrested for a Class C misdemeanor *or a petty offense* and remanded to the sheriff other than pursuant to a court order, the sheriff may issue such person a notice to appear.")(emphasis added).

But even if this Court were to decide that her arrest contradicted state law, Plaintiff would still not be entitled to relief. As the Supreme Court has held, warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections. *Virginia v. Moore*, 553 U.S. 164, 176 (2008). When States go above the Fourth Amendment minimum, "the Constitution's protections concerning search and seizure remain the same." *Id.* at 173. Arrest ensures that a suspect appears to answer charges and does not continue a crime, and it safeguards evidence and enables officers to conduct an in-custody investigation. *Id.*

Further, "[a] State is free to prefer one search-and-seizure policy among the range of constitutionally permissible options, but its choice of a more restrictive option does not render the less restrictive ones unreasonable, and hence unconstitutional." *Id.* at 174. If it were otherwise, "[t]he constitutional standard would be only as easy to apply as the underlying state law, and state law can be complicated indeed." *Id.* at 175. Linking Fourth Amendment protections to state law would cause them to "vary from place to place and from time to time . . . [and] it would be strange to construe a constitutional provision that did not apply to the States at all when it was adopted to now restrict state officers more than federal officers, solely because the States have passed search-and-seizure laws that are the prerogative of independent sovereigns." *Id.* at 176. Therefore, Plaintiff cannot show that she was wrongfully arrested under state law, and she certainly cannot show that her Fourth Amendment rights were violated when she was arrested for Unlawful Visitation Interference and Defendants are entitled to summary judgment on Count I.

**j.   Officers Had Probable Cause to Arrest Plaintiff for Resisting Arrest.**

Even assuming, *arguendo*, that probable cause did not exist to arrest Plaintiff for Unlawful Visitation interference, Officers still would have been justified in arresting Plaintiff for the offense of Resisting Arrest. 720 ILCS 5/31-1 (West 2014).

In Illinois, the crime of resisting a peace officer involves the commission of "a physical act of resistance or obstruction ... that impedes, hinders, interrupts, prevents, or delays the performance of the officer's duties, such as by going limp or forcefully resisting arrest." *People v. Agnew–Downs,* 404 Ill.App.3d 218, 344 Ill.Dec. 24, 936 N.E.2d 166, 173 (2010). Illinois courts define "resisting" or "resistance" as "withstanding the force or effect of or the exertion of oneself to counteract or defeat." *Id.* Further, "[r]esisting even an unlawful arrest of a known police officer violates the statute." *Hardrick v. City of Bolingbrook,* 522 F.3d 758, 762 (7th Cir.2008).

Summary judgment may be appropriate where the refusal to submit to authority is unambiguous on the record before the court. *See Dockery v. Blackburn,* 911 F.3d 458, 468 (7th Cir. 2018) (holding that video evidence unambiguously showed the plaintiff had not submitted to officer's authority before being tasered a second time).

In the instant case, Officer McCallum informed Plaintiff that she was under arrest and attempted to grab her wrist. SOF ¶ 37. Rather than comply with Officers' attempts to place her in custody, Plaintiff backpedaled from Officers, pulled her arms towards her body in an attempt to resist being handcuffed, and contorted her body in an attempt to defeat arrest. SOF ¶ 54. Plaintiff's actions are consistent with those that the 7th Circuit has held constitute active resistance. See *Dockery*, 911 F.3d at 467("Examples of active resistance include 'kicking and flailing,' *Clarett v. Roberts*, 657 F.3d 664, 674–75 (7th Cir. 2011); declining to follow instructions while acting in a belligerent manner, *Forrest v. Prine*, 620 F.3d 739, 745–46 (7th Cir. 2010); and swatting an arresting officer's hands away while backpedaling, *Brooks v. City of Aurora*, 653 F.3d 478, 481 (7th Cir. 2011).")

The case of *Brooks v. City of Aurora* is instructive. In *Brooks*, the plaintiff was in his backyard when officers approached and informed him that he was under arrest pursuant to an arrest warrant for Driving on a Suspended License. *Id.* at 484. In response, the plaintiff "backpedaled away" and "escaped" the defendant-officer's attempt to grab his wrists by "rais[ing] his arms to his shoulders." *Id.* The defendant-officer then used pepper-spray against the plaintiff to bring him into custody. *Id.* The plaintiff alleged that the underlying arrest warrant was illegally procured. *Id.* at 483.

The plaintiff sued the defendant-officer under Section 1983 for unlawful arrest and excessive force. *Id.* at 482. The trial court granted defendants' summary judgment motion on both counts, finding that the defendant-officer was entitled to qualified immunity. *Id.* at 480. The 7th Circuit agreed. Regardless of the validity of the underlying arrest warrant, the plaintiff still had no right to resist arrest. *Id.* at 484.

In *Brooks*, the defendant-officer had attempted to place the plaintiff under arrest before having established probable cause for Resisting Arrest. That is precisely what happened in this case. Although Officer McCallum had initially attempted to arrest Plaintiff for Unlawful Visitation Interference, rather than Resisting Arrest, that did not preclude Officers from subsequently obtaining separate probable cause to arrest Plaintiff exclusively for the latter offense. In fact, Plaintiff was not "seized" under the Fourth Amendment until after she had resisted arrest. *Id.* at 484-85. As the 7th Circuit found in *Brooks*:

> [A]lthough [the defendant-officer] attempted to seize [the plaintiff] before probable cause for resisting arrest arose, [the plaintiff's] evasion of detention means that a successful Fourth Amendment seizure did not occur until after [the plaintiff] was incapacitated by the pepper spray. *See Acevedo v. Canterbury,* 457 F.3d 721, 725 (7th Cir.2006) (explaining that physical force that, under the totality of the circumstances, does not "detain the plaintiff significantly" is not a seizure); *see also California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). [The defendant-officer] testified that, after he had informed [the plaintiff] that he was under arrest, he placed his hand on [the plaintiff's] wrist in an attempt to handcuff him, but [the plaintiff] "made a jerking motion and broke free of [the defendant-officer's] grasp." R.28–3 at 15. Although a seizure can occur even where "the restraint on the individual's freedom of movement is

> brief," here the initial grasp did not "detain [the plaintiff] significantly." *Acevedo,* 457 F.3d at 724–25. Indeed, the plaintiff maintains that his freedom of movement was not curtailed at all until after he had backpedaled away from the officer. *See* R.24–3 at 60–61. The attempted seizure began when [the defendant-officer] went to lay hands on [the plaintiff], but [the plaintiff's] resistance prevented the action from reaching its completion, and, under *California v. Hodari D.,* 499 U.S. 621, 626–29, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), [the defendant-officer's] declaration that [the plaintiff] was under arrest did not suffice to establish a seizure until [the plaintiff] finally submitted.

*Id.* at 484-85.

This language applies with equal force to the present case. Here, Officer McCallum reached for Plaintiff's wrist in order to place her under arrest for Unlawful Visitation Interference. SOF ¶ 37. Plaintiff responded by pulling her arm away, backing up, and putting her arms in a position so as to make it difficult to handcuff her. SOF ¶ 45-54. Regardless of the merits of the underlying crime of Unlawful Visitation Interference, Plaintiff still had no right to resist arrest.

Additionally, it is immaterial whether Officers intended to arrest Plaintiff for either Unlawful Visitation Interference, *or* Resisting Arrest, so long as a reasonable officer would have had probable cause for either offense. *See Devenpeck v. Alford,* 543 U.S. 146, 153–55, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004) (holding that, if an officer has probable cause to arrest a suspect for any crime, there is no Fourth Amendment violation even if the officer lacked probable cause with respect to the actual offense charged); see also *Williams v. Rodriguez,* 509 F.3d 392, 399 (7th Cir.2007) (explaining that an officer's subjective reason for making an arrest is immaterial so long as "a reasonable officer ... would have had probable cause to arrest [the plaintiff] for any offense").

For the foregoing reasons, Officers had probable cause to arrest Plaintiff for Unlawful Visitation Interference and, separately, for Resisting Arrest. Therefore, Plaintiff's claim for unlawful arrest falls short.

## II. PLAINTIFF'S CLAIM FOR EXCESSIVE FORCE FAILS.

Plaintiff's claim that Officers used excessive force in arresting her must fail. The uncontroverted evidence aptly demonstrates that the force used by Officers was routine, minor, and certainly no greater than necessary to effectuate a valid arrest.

An officer who has the right to arrest an individual also has the right to use some degree of physical force or threat of force to effectuate the arrest, circumscribed only by the Fourth Amendment's insistence on reasonableness. *Graham v. Connor*, 490 U.S. 386, 396 (1989). In judging the reasonableness of any particular use of force, this Court must consider factors such as the severity of the crime, whether the arrestee poses an immediate threat to the safety of the officers or others, and whether he or she is actively resisting arrest or attempting to flee and evade arrest. *Graham v. Connor,* 490 U.S. at 396; *see also, Abdullahi v. City of Madison,* 423 F.3d 763, 768 (7th Cir. 2005)("The reasonableness of the force used depends on the totality of the facts and circumstances known to the officer at the time the force is applied. *Abbott v. Sangamon County, Ill.,* 705 F.3d 706 at 724 (7th Cir. 2013).

It is an objective inquiry, the dispositive question being "whether, in light of the facts and circumstances that confronted the officer (and not 20/20 hindsight), the officer behaved in an objectively reasonable manner," irrespective of the officer's underlying intent or motivation. *Padula v. Leimbach,* 656 F.3d 595, 602 (7th Cir. 2011); *Graham,* 490 U.S. at 397; *Bell v. Irwin,* 321 F.3d 637, 640 (7th Cir. 2003). In answering this question, courts are to remain cognizant of "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 397. As a result, courts "give considerable leeway to law enforcement officers' assessments about the appropriate use of force in dangerous situations." *Baird v. Renbarger,* 576 F.3d 340, 344 (7th Cir.2009).

Whether a particular use of force was objectively reasonable "is a legal determination rather than a pure question of fact for the jury to decide." *Phillips v. Community. Ins. Corp.*, 678 F.3d 513, 520 (7th Cir. 2012).

### a. Officers Did Not Use Excessive Force

The evidence in this case demonstrates that Officers did not use excessive force in arresting Plaintiff. Plaintiff was actively resisting arrest, and was clearly in a heightened state of agitation. Although Plaintiff claimed in her deposition that Officer McCallum, twisted her shoulder, "bashed" her up against a stove,[2] and pushed her to the ground, Plaintiff's characterizations of Officers' actions are blatantly contradicted by the Body Worn Camera video. SOF ¶ 54. The force used by Officers to bring Plaintiff under arrest was no greater than what was necessary to effectuate her valid arrest.

If anything, the video demonstrates that Plaintiff's flailing about while refusing to be handcuffed, in addition to her attempts to avoid arrest by maneuvering around the kitchen, posed a danger not only to Officers, but to herself. The force used was not excessive in light of Plaintiff's active resistance. Force may be justified based on the suspect's level of resistance; active resistance may justify more force than passive resistance or no resistance. *Abbott*, 705 F.3d at 730. As relevant here, active resistance "requires aggression or struggling; willful noncompliance amounts only to passive resistance requiring minimal use of force." *Phillips v. Community Ins. Corp*, 678 F.3d 513, 524 (7th Cir. 2012).

In this case, it is obvious that Plaintiff was actively resisting arrest. As the video makes clear, Plaintiff pulled away from Officer McCallum, backed away after being told she was under arrest, pulled her arms in to avoid being placed into handcuffs, and continued to struggle while Officers attempted

---

[2] Plaintiff attributes being "bashed" against the stove to the actions of Officer McCallum, not Officer Delgado. SOF ¶ 54.

to place her into handcuffs. SOF ¶ 45-54. The video evidence is fully corroborated by the testimony of Officers. But this is also corroborated by Plaintiff's testimony.

During her deposition, Plaintiff repeatedly acknowledged that she had attempted to move around Officer McCallum as he approached her in the kitchen. SOF ¶ 53. Plaintiff conceded that the video shows Officer McCallum instructing her to put her hands behind her back several times. SOF ¶ 52. Plaintiff further acknowledged that she responded, "no," and did not comply by putting her arms behind her back. SOF ¶ 53.

Plaintiff further admitted that, having backed away against the wall, she was unable to back up any further, and to trying to contort her body in a way to "get[] smaller." Plaintiff admitted to pulling her arms into her body, because she did not want to be "anywhere near [Officer McCallum]." SOF ¶ 54. Yet, rather than simply lean against the wall after backing away from Officers, Plaintiff attempted to evade Officer McCallum by moving towards him – "How else would I get out of there?" *Id.* According to Plaintiff, she "could've gotten around [Officer McCallum], but he sideswipe[d] me." *Id.*

Plaintiff further acknowledged that she was screaming (during her deposition, Plaintiff described her actions as both "hysterical" and "embarrassing.") SOF ¶ 51. She further pointed out that if Klauminzer, who was standing nearby, had been trying to calm her down, "he wasn't doing a good job." SOF ¶ 53.

It is clear that Plaintiff's verbal and physical reaction constituted resisting arrest and the Officers used minimal force to get her into custody. In fact, the *de minimis* amount of force used by Officers in this case is trivial relative to what the case law in this Circuit permits officers to use when faced with active resistance. In *Padula*, for example. defendant-officers attempted to arrest the plaintiff for the offense of driving under the influence. *Padula,* 656 F.3d at 597. Plaintiff refused to exit the car, prompting the defendant-officers to forcibly remove him. *Id.* at 598. While lying on his stomach, the plaintiff refused to "put his hands behind his back and physically resisted their attempts to handcuff

him." *Id.* at 599 In attempting to get handcuffs on the plaintiff, the defendant-officers maced the Plaintiff "two or three times," and struck him "four times" with a baton. *Id.* at 598. The district court granted summary judgment for the defendant-officers, and the 7th Circuit agreed.

The 7th Circuit found that "[i]t was ... reasonable to use mace to attempt to control [the plaintiff] under the circumstances, which involved a physical struggle both before and after placing him in handcuffs." *Id.* at 603. Further, "[t]he force used was carefully calibrated to the arrestee's active resistance: as a means of imposing force, pepper spray is generally of limited intrusiveness." *Id.* Additionally, "[t]he Officers' use of batons was also reasonable.... [The] baton strikes were 'stern,' but not 'severe,' which was appropriate in response to [the plaintiff] kicking and flailing his arms." *Id.; see also Clarett v. Roberts,* 657 F.3d 664, 675 (7th Cir.2011)(No excessive force where officers "used three taser deployments because the arrestee was 'kicking and flailing at him and continued this assaultive behavior when he tried to arrest her.'")

To the extent that Plaintiff alleges that Officers committed excessive force in handcuffing her, thereby causing injuries to her wrist, such a claim falls short of making out a constitutional violation. Initially, while Plaintiff attempted to wrest herself free from the grasp of Officers, Plaintiff exclaimed, "my wrist, my wrist!" SOF ¶ 55. Seconds later, however, once Plaintiff had been secured, she never repeated any complaint about her handcuffs being either too tight, or any discomfort or pain to either of her wrists. *Id.* Plaintiff acknowledged that she did not tell Officers about any shoulder pain. *Id.*[3] Similarly, Plaintiff testified that she had been previously diagnosed with tendonitis in her wrists the year prior, but she never informed Officers of this. *Id.* This set of facts is fatal to Plaintiff's excessive force argument with respect to the handcuffing.

---

[3] According to her testimony, Plaintiff wasn't aware this was something a person could do. SOF ¶ 55.

When it comes to the application of handcuffs, "[a] person has the right to be free from an officer's *knowing* use of handcuffs in a way that would inflict unnecessary pain or injury, if that person presents little or no risk of flight or threat of injury." *Rooni v. Biser*, 742 F.3d 737, 742 (7th Cir. 2014) (emphasis added). "[A] reasonable officer cannot be expected to accommodate an injury that is not apparent or that otherwise has not been made known to him." *Stainback v. Dixon*, 569 F.3d 767 at 773 (7th Cir. 2009). Thus, absent evidence that Officers used the handcuffs "in a manner that would clearly injure or harm a typical arrestee" or that it was "objectively clear" to Officers that Plaintiff "suffered from any infirmities" such that she could not be safely handcuffed, Plaintiff's failure to inform Officers that her handcuffs were too tight is dispositive in Officers' favor. *Id.* at 773(holding that the defendant officers did not use excessive force in handcuffing the plaintiff, even though the plaintiff suffered two torn rotator cuffs requiring surgery, where the plaintiff "complained generally about pain after he was handcuffed ..., without any elaboration regarding a preexisting injury or other infirmity"); *see also Howell v. Smith*, 853 F.3d 892, 899-90 (7th Cir. 2017) (holding that the officer did not use excessive force in handcuffing the plaintiff where the officer "was not overly forceful when placing him in handcuffs," and the plaintiff told the officer "that he recently had surgery that limited the mobility of his arm" but "never stated explicitly that he was in pain or actively suffering in any way"); *Sow*, 636 F.3d at 304 (holding that the officer did not use excessive force in handcuffing a plaintiff who once complained that the handcuffs were too tight, but who "presented no evidence that he provided any elaboration," "did not complain of any injury when he was taken to jail," and "did not receive any treatment resulting from the use of the handcuffs"); *Garcia v. City of Chicago*, 2012 WL 601844, at *8 (N.D. Ill. Feb. 23, 2012) (holding that the officer did not use excessive force in handcuffing the plaintiff where he "stopped complaining about the handcuffs once he was in the police car, did not complain about the handcuffs when he arrived at the police station, did not report

any physical injury or request medical treatment while in custody, and sought no medical treatment upon his release").

As relevant here, "[a]lthough the Seventh Circuit 'ha[s] on occasion recognized valid excessive force claims based on overly tight handcuffs,' the plaintiffs in those cases, unlike [the plaintiff], complained to the defendants that their handcuffs were too tight." *Tibbs v. City of Chicago*, 469 F.3d 661, 666 (7th Cir. 2006) (collecting cases). Plaintiff did not complain to Officers about the application of handcuffs beyond her initial exclamation, which occurred at a time where Officers were still struggling to secure her. Officers are therefore entitled to summary judgment as to the alleged excessive force.

### b. Officer Delgado Did Not Use Excessive Force

Plaintiff's excessive force claim against Officer Delgado, in particular, plainly does not withstand scrutiny. The Body Worn Camera evidence definitively shows that the force used by Officer Delgado was no greater than necessary to assist Officer McCallum in bringing Plaintiff into custody.

For her part, Plaintiff could not say during her deposition what actions of Officer Delgado's constituted excessive force. She further conceded that it was possible Officer Delgado did not use excessive force, particularly in light of the fact that her alleged injuries were to the right side of her body, whereas Officer Delgado was positioned to her left. SOF ¶ 54. Instead, to hold Officer Delgado accountable, Plaintiff relies on pure conjecture:

> Like I said it's really hard. I don't want to say anything unless I'm --
> even in the video it is not -- it is not completely clear. Someone -- I
> know -- I can say for certain McCallum did use excessive force.
> Delgado, I couldn't feel whose hand was doing what. So to just blame
> McCallum when it could be Delgado as well, I don't think that's fair.

*Id.*

Plaintiff testified that she was looking the other way from Officer Delgado at the time, and all Plaintiff could point to was that Officer Delgado was attempting to put her in handcuffs. *Id.* When

asked whether Officer Delgado used any force other than applying handcuffs, Plaintiff responded: "I don't believe so. No. But he certainly didn't protect me." *Id.* Plaintiff essentially faults Officer Delgado for not "do[ing] anything about" Officer McCallum's use of force, and for being an "accomplice" to Officer McCallum. *Id.* This is duplicative of her failure to intervene claim, which is addressed below in Argument III.

Officer Delgado is entitled to summary judgment as to the excessive force claim.

### III. PLAINTIFF'S FAILURE TO INTERVENE CLAIM AGAINST OFFICER DELGADO MUST FAIL.

Plaintiff has failed to adequately demonstrate that Officer McCallum violated the U.S. Constitution when he arrested Plaintiff, and therefore Plaintiff's claim against Officer Delgado for failure to intervene must fail. See *Turner v. City of Champaign*, 979 F.3d 563, 571 (7th Cir. 2020) (a failure to intervene claim necessarily fails where plaintiff failed to allege an underlying constitutional violation); *Towne v. Donnelly*, No. 20 C 4097, 2021 WL 3022327, at *3 (N.D. Ill. July 16, 2021) (dismissing the plaintiff's failure-to-intervene claim where he failed to timely allege an underlying constitutional violation).

Additionally, the Seventh Circuit has held that failure to intervene is not a viable source of liability as Section 1983 claims only support direct, and not vicarious, liability. *See Mwangangi v. Nielsen*, 48 F.4th 816, 834 (7th Cir. 2022) (C. J. Easterbrook, concurring) ("What statute or constitutional rule *requires* one employee of the government to stop another from making a mistake? The Supreme Court has held many times that § 1983 supports only direct, and not vicarious, liability."). *Id.* Specifically, Judge Easterbrook found that based on cases such as *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), that "failure to intervene" claims have no basis in the Constitution or Supreme Court precedent. *Id.*

Accordingly, because the officers plainly had probable cause to arrest plaintiff, and did not employ excessive force in doing so, her Fourth Amendment rights were not violated and the failure to intervene claim against Officer Delgado should be dismissed.

## IV.    OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY.

Each of Plaintiff's constitutional claims fail, because Officers in this case are entitled to qualified immunity. "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" (quoting *Malley,* 475 U.S. at 341, 343, 106 S.Ct. 1092)); *Thayer,* 705 F.3d at 247, 2012 WL 6621169, at *6 ("'Qualified immunity protects police officers who reasonably interpret an unclear statute.'" (brackets omitted) (quoting *Mustafa,* 442 F.3d at 549)). Once a defendant raises the defense of qualified immunity, the plaintiff bears the burden of defeating it either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully. *E.g., Wheeler v. Lawson,* 539 F.3d 629, 639 (7th Cir.2008).

### a.    Plaintiff's arrest for Unlawful Visitation Interference did not violate a clearly established constitutional right.

Plaintiff's arrest for Unlawful Visitation Interference did not violate a clearly established constitutional right. As argued above in Argument I Section a, *infra,* probable cause existed to believe Plaintiff had committed the offense of Unlawful Visitation Interference. The applicable law suggests that an arrest for this offense was entirely proper. *Fitzpatrick,* 2013 IL 113449 ¶ 21.

Even if there is some ambiguity, the very fact that ambiguity exists weighs in favor of shielding Officers from liability in this case. See *Abbott,* "[W]e need not determine whether there was probable cause, for the simple fact that reasonable minds could differ as to the meaning of the law leads to the conclusion that [the defendant officer] is shielded by qualified immunity; *Hunter,* 502 U.S. at 229, 112 S.Ct. 534 ("The qualified immunity standard 'gives ample room for mistaken judgments' by protecting

'all but the plainly incompetent or those who knowingly violate the law.' " (quoting *Malley,* 475 U.S. at 341, 343, 106 S.Ct. 1092)); *Thayer,* 705 F.3d at 247, 2012 WL 6621169, at \*6 ("'Qualified immunity protects police officers who reasonably interpret an unclear statute.'" (brackets omitted) (quoting *Mustafa,* 442 F.3d at 549)).

Officers are entitled to qualified immunity for arresting Plaintiff for Unlawful Visitation Interference.

### b. Alternatively, Plaintiff's arrest was justified because she resisted arrest.

Officers are entitled to qualified immunity, since Plaintiff committed the offense of Resisting Arrest.

As in *Brooks*, discussed above, rather than submit to the arrest, Plaintiff backed away from Officers, and put her arms in a position to resist being placed into handcuffs. As the 7th Circuit held in *Brooks*, whether or not the evidence was sufficient to convict Plaintiff of Resisting Arrest in criminal court, it was nevertheless sufficient "to cloak the officers with immunity from suit." *Id.*

This case fits squarely within the holding of *Brooks*, and this Court should find, as the 7th Circuit did in *Brooks*, that Officers are entitled to summary judgment because they are shielded from liability under the doctrine of qualified immunity.

### c. Whether Plaintiff was arrested for Unlawful Visitation Interference or Resisting Arrest, Officers are entitled to qualified immunity because they had arguable probable cause.

At the very least, Officers are entitled to qualified immunity in this case because they had arguable probable cause to arrest Plaintiff for either Unlawful Visitation Interference or Resisting Arrest. *Cibulka v. City of Madison*, 992 F.3d 633, 638 (7th Cir. 2021). As the 7th Circuit recently put it, "[a] defendant is entitled to qualified immunity in a false-arrest case when, if there is no probable cause, 'a reasonable officer could have mistakenly believed that probable cause existed." *Id.* Thus, "as

long as [the officers] reasonably, albeit possibly mistakenly, believed that probable cause existed to arrest [the plaintiff], then [they are] entitled to qualified immunity." *Id.*

For the reasons outlined above, it was perfectly reasonable for Officers to believe that probable cause existed to arrest Plaintiff. Even if they were mistaken in this belief, however, they are still entitled to qualified immunity because the applicable case law demonstrates that such a belief was reasonable. *Id.*

### d. The force used by Officers to bring Plaintiff under arrest was not so excessive as to have violated Plaintiff's clearly established constitutional rights.

Finally, Officers are entitled to qualified immunity because it would not have been obvious to a reasonable officer that the relatively minor amount of force used to bring Plaintiff into custody was unlawful.

"[T]he qualified-immunity doctrine gives 'enhanced deference to officers' on-scene judgments about the level of necessary force.' " *Abbott v. Sangamon County*, 705 F.3d 706, 725 (7th Cir. 2013)). "[E]ven if the plaintiffs demonstrate that excessive force was used, they must further establish that it was objectively unreasonable for the officer to believe that the force was lawful—i.e., they must demonstrate that the right to be free from the particular use of force under the relevant circumstances was "clearly established." *See, e.g., al-Kidd,* 131 S.Ct. at 2080. A constitutional right is "clearly established" for qualified-immunity purposes where "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034; *see also United States v. Lanier,* 520 U.S. 259, 270, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997); *Estate of Escobedo v. Bender,* 600 F.3d 770, 779 (7th Cir.2010). "In other words, 'existing precedent must have placed the ... constitutional question beyond debate.' " *Reichle v. Howards,* ——— U.S. ———, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012) (quoting *al-Kidd,* 131 S.Ct. at 2083). To place the constitutional question beyond debate, the precedent must be "particularized to the facts of the case." *Dockery v. Blackburn,* 911 F.3d 458, 466 (7th Cir. 2018).

Alternatively, "[a] plaintiff may also overcome an officer's qualified immunity by showing that the conduct in question is "so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott*, 705 F.3d at 723–24. In other words, Plaintiff must show that "a general constitutional rule already identified in the decisional law ... appl[ies] with obvious clarity to the specific conduct in question," so that "a reasonable person necessarily would have recognized it as a violation of the law." *Cibulka v. City of Madison*, 992 F.3d 633 (7th Cir. 2021)(internal citations omitted).

Plaintiff is unable to meet her burden. The force used in this case was entirely routine, and can hardly be said to amount to a violation of the Constitution. As the 7th Circuit stated in *Cibulka*, "cases involving arguably more forceful conduct "have found officers were entitled to qualified immunity. *Id.* at 640 ("*E.g.*, *Dawson v. Brown*, 803 F.3d 829, 834 (7th Cir. 2015) (holding that an officer "could reasonably believe it was necessary to tackle" a 72-year-old man who was nonviolently interfering with his son's arrest); *Rooni v. Biser*, 742 F.3d 737, 739, 743 (7th Cir. 2014) (holding that an officer was entitled to qualified immunity where he "grabbed [the resisting plaintiff] by the back of the neck and jerked him back" while handcuffing him); *Findlay v. Lendermon*, 722 F.3d 895, 898–900 (7th Cir. 2013) (holding that an officer who tackled a nonviolent suspect was entitled to qualified immunity).")

Again, *Brooks* is instructive. In *Brooks*, the defendant-officer used pepper spray on the plaintiff even after the plaintiff had ceased resisting arrest and was passively facing the officers. *Brooks*, 653 F.3d at 587. Nevertheless, the 7th Circuit held that the defendant-officer was entitled to qualified immunity. "[C]ontrolling law would not have communicated to a reasonable officer the illegality of applying pepper spray to an arrestee who has ceased active, physical resistance for a couple of seconds but has not submitted to the officer's authority, has not been taken into custody and still arguably could pose a threat of flight *or* further resistance." *Id.* at 487. (emphasis added).

Here, of course, Officers did not use pepper spray, or any other instrument aside from handcuffs, but rather merely attempted to bring Plaintiff's hands behind her back in order to apply those handcuffs. Unlike in *Brooks*, Plaintiff here did not cease active resistance, but rather, continued to resist even as Officers were attempting to detain her. Plainly, in addition to actively resisting arrest, and refusing to submit to Officers' authority, Officers were faced with a subject who posed a clear threat to continue in her resistance.

In many ways, then, the Officers' entitlement to qualified immunity in our case is stronger than was the defendant-officer's in *Brooks*. Here, Plaintiff did not cease resisting until Officers were finally able to apply handcuffs. As demonstrated by the Body Worn Camera videos, the force used to get Plaintiff in custody was clearly no greater than was necessary to effectuate an arrest. Under the established law, then, Officers could not reasonably have expected that their conduct was clearly unlawful. In fact, the relevant case law points to the contrary conclusion. Therefore, Officers are entitled to qualified immunity.

## V. PUNITIVE DAMAGES SHOULD BE DISMISSED.

Finally, this Court should dismiss Plaintiff's request for punitive damages in this case. Under Seventh Circuit Pattern Jury Instructions, punitive damages may be awarded only where there is a showing that the Officers conducted themselves maliciously or with reckless disregard for Plaintiff's rights: "Conduct is malicious if it is accompanied by ill will or spite or is done for the purpose of injuring Plaintiff. Conduct is in reckless disregard of Plaintiff's rights if, under the circumstances, Defendants simply did not care about Plaintiff's safety or rights." 7th Cir. Pat. Jury Inst. 7.28. As the committee comments in the instruction cite, punitive damages are recoverable under § 1983 if Plaintiff makes a showing of "evil motive or intent, or ... reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 35, 56 (1983). *See also Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 930 (7th Cir. 2004)("Punitive damages are recoverable in §1983

actions where the defendant had a reckless or callous disregard to the federally protected rights of others."). *Calhoun v. DeTella*, 319 F.3d 936, 942 (7th Cir. 2003) (same); *Kemezy v. Peters,* 79 F.3d 33, 34 (7th Cir.1996)(punitive damages are "to punish the defendant for reprehensible conduct and to deter him and others from engaging in similar conduct."). For the reasons set forth more fully above, Plaintiff cannot show that the Officers violated her Constitutional rights, let alone that they acted with malice. Therefore, this Court should dismiss Plaintiff's claim for punitive damages.

**VI.    Because there is no underlying claim against the individual officers, Plaintiff is not able to recover damages against the City under *Monell*.**

Plaintiff's claims against the City all fail because they are dependent on Officers being found liable. Count VI of Plaintiff's Complaint seeks to hold the City liable for state law claims based on a statutory duty to indemnify. The City is immune from these allegations because Officers are not liable for any state law claims. 745 ILCS 10/2-109 ("A local public entity is not liable for an injury resulting from an act or omission of its employees where the employee is not liable."); *see also Ross v. Mauro Chev.*, 861 N.E.2d 313, 320 (1st Dist. 2006).

In addition, summary judgment is warranted on Plaintiff's claims under Counts IV and V, respectively, against the City of Chicago for "unconstitutional custom," and failure to train. In *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), the United States Supreme Court established a means for a municipality to be held liable for constitutional violations while ruling out *respondeat superior* liability for federal civil rights claims. In order for a plaintiff to have a viable *Monell* claim, he or she must first establish that they suffered a constitutional injury. *See Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1994). If a plaintiff does not prove that an individual defendant caused plaintiff to suffer a constitutional injury, then that plaintiff cannot succeed against the City on his or her *Monell* claim. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("if [plaintiffs] are unsuccessful in their claims

against the individual defendants, they will no longer have a cause of action against the city."). As plaintiff's claims against Officers fail in their entirety, summary judgment in favor of the City and against Plaintiff is warranted for all claims, state and federal, against the City of Chicago in this matter.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court grant their Motion for Summary Judgment on all of Plaintiff's claims.

Respectfully submitted,

/s/ Tyler D. Michals
Tyler D. Michals
Assistant Corporation Counsel

Jessica L. Griff, Assistant Corporation Counsel Supervisor
Tyler D. Michals, Assistant Corporation Counsel
City of Chicago Department of Law
Federal Civil Rights Litigation Division
2 N. LaSalle Street, Suite 420
Chicago, Illinois 60602
(312) 744-2826
Attorney No. 6309134
Jessica.Griff@cityofchicago.org
Tyler.Michals@cityofchicago.org
*Attorneys for the Defendant Officers*

/s/ Maxwell Evan Lisy
MAXWELL EVAN LISY
Assistant Corporation Counsel Supervisor

Maxwell Evan Lisy, Assistant Corporation Counsel Supervisor
William Cook, Assistant Corporation Counsel
City of Chicago Department of Law
Federal Civil Rights Litigation Division
2 North LaSalle Street, Suite 420
Chicago, Illinois 60602
(312) 742-0305
Attorney No.: 6321014
Maxwell.lisy@cityofchicago.org
*Counsel for Defendant City of Chicago*