THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MELISSA HALIGAS, | |
| Plaintiff, | Case No. 1:22-cv-00313 |
| v. | Hon. Elaine E. Bucklo |
| CITY OF CHICAGO et al., | |
| Defendants. | |

Under Local Rule 56.1(b), plaintiff Melissa Haligas submits the following response to Defendants' statement of uncontested material facts in support of their summary judgment motion, ECF No. 96, and statement of additional facts that require denial of summary judgment.

## I.    PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

Under Local Rule 56.1(b)(2), Plaintiff responds as follows to Defendants' statement of facts, ECF No. 96:

**JURISDICTION & VENUE**

1.    Jurisdiction and venue are proper as this action is brough [sic] under 42 U.S.C. § 1983 to redress the alleged deprivations of Plaintiff's civil rights under color of law which are alleged to have occurred within the Northern District of Illinois. Plaintiff's Complaint ("Pl. Comp."), ECF No. 1, a copy of which is attached hereto as **Exhibit A**, at ¶¶ 7-9; *see also* Defendant Officers' Answer to Plaintiff's Complaint, Affirmative Defenses, and Jury Demand ("Officers' Answer"), ECF No. 34, at ¶¶ 7-9 attached as **Exhibit B** ; Defendant City's Answer to Plaintiff's Complaint, Affirmative Defenses, and Jury Demand ("City Answer), ECF No. 35, at ¶¶ 7-9, attached as **Exhibit C**.

**RESPONSE: Admit.**

2.    The claims at issue from Plaintiff's Complaint are her allegations that on Friday, January 31, 2020, Defendant Officers falsely arrested her (Count I), used excessive force against her (Count II), Defendant Officer Delgado failed to intervene to stop Defendant Officer McCallum from making a false arrest and using excessive force (Count III). Ex. A. Plaintiff also alleges liability for Defendant City under 42 U.S.C. § 1983 based on allegations that Defendant City had a custom of "unnecessarily escalating encounters" (Count IV) and failed to adequately train officers

to respond to disputes involving parenting agreements and situations where people become upset (Count V). *Id.* Plaintiff also asserts a claim for indemnification (Count VI). *Id.*

**RESPONSE: Admit.**

**PARTIES**

3.      At all times relevant hereto, Melissa Haligas (Plaintiff") resided in Chicago, Illinois. Ex. A, at ¶ 3; Ex. B, at ¶ 3; Ex. C. at ¶ 3; *see also* Deposition of Melissa Haligas (Pl. Dep.), a copy of which is attached as **Exhibit D**, at 15:19 – 16:8.

**RESPONSE: Admit.**

4.      At all times relevant hereto, Defendant Officer Richard McCallum was employed by the City of Chicago as a police officer with the Chicago Police Department. Ex. A, at ¶ 4; Ex. B, at ¶ 4; Ex. C. at ¶ 4; *see also* Deposition of Richard McCallum (McCallum Dep.), a copy of which is attached as **Exhibit E**, at 23:9-10. On January 31, 2020, Officer McCallum was assigned to the 18th district as a patrol officer. *Id.* at 23:24-24:4.

**RESPONSE: Admit.**

5.      At all times relevant hereto, Defendant Officer Juan Delgado was employed by the City of Chicago as a police officer with the Chicago Police Department. Ex. A, at ¶ 5; Ex. B, at ¶ 5; Ex. C. at ¶ 5; *see also* Deposition of Juan Delgado, a copy of which is attached as **Exhibit F**, at 23: 14-22. On January 31, 2020, Officer Delgado was assigned to the 18th district as a patrol officer. *Id.* at 23:20-22.

**RESPONSE: Admit.**

6.      At all times relevant hereto, Defendant City was a municipal corporation located in Cook County, Illinois. *See* Ex. A, at ¶ 6; Ex. B, at ¶ 6; Ex. C. at ¶ 6.

**RESPONSE: Admit.**

**RESPONDING TO CALL OF DOMESTIC DIPSUTE**

7.      On Friday, January 31, 2020, shortly before 4:00 PM, Chicago Police Officers Richard McCallum and Juan Delgado, responded to a call of a domestic dispute by Kevin Howard at Plaintiff's apartment building. Ex. E at 69:11-73:03; Ex. F at 66:2-11; Deposition of Kevin Howard, attached as **Exhibit G**, at 16:12-19, 17:16-24; 18:2-4; Ex. D at 117:13-14.

**RESPONSE: Plaintiff admits that Delgado and McCallum responded to Kevin Howard's call, but she denies that Howard described his concern as "a domestic dispute." Howard told the 911 dispatcher that his ex-girlfriend was not giving him his parenting time.**

**911 audio, attached hereto as Exhibit 2; ECF No. 96-5, McCallum Dep. 68:18–23 (McCallum testifying Defendants came in response to a call about possible interference with parenting time).**

8.      Kevin Howard met both officers in the lobby and advised them that Plaintiff, his ex-girlfriend, was refusing to turn over custody of their son pursuant to a court order. Ex. E. at 80:17-25; Ex. F at 77:9-25; Ex. G at 18:21-24, 21:10-12, 19:13-22, 21:10-12.

**RESPONSE: Admit.**

9.      Defendant Officers were wearing body worn camera (BWC). *See* Body Worn Camera footage for Officer McCallum, attached as **Exhibit H**, at 1:20-5:20; *see also* Body Worn Camera footage for Officer Delgado, attached as **Exhibit I**, at 3:24-7:22 (both videos showing the interactions between Defendants and Mr. Howard).

**RESPONSE: Admit.**

10.     Mr. Howard presented Officer McCallum with a copy of a court order, dated January 8, 2020, on his phone. Ex. E at 73:12-22; Ex. F at 70:13-16, Ex. G at 19:21-22, Ex. H at 1:50-1:56, 22:25-22:31.

**RESPONSE: Admit.**

11.     Officer McCallum skimmed every line of the document and identified the provisions of the order that he determined were the most relevant to parenting time. Ex. E at 79:22-25, 76:19-77:15, 80:15-25, 91:8-14; Ex. H at 2:05-3:50.

**RESPONSE: Plaintiff admits that McCallum skimmed the document Howard showed him on Howard's phone and identified some provisions he found relevant. A jury could infer, however, based on the length of that document and the amount of time McCallum spent looking at Howard's phone, that McCallum did not skim every line. 1/8/2020 Order, attached hereto as Exhibit 3; ECF No. 96-8, McCallum video 1:50–3:53. Moreover, McCallum admitted that, after reading the document, he knew there were other, related orders governing parenting time, which he did not review for provisions relevant to parenting time. ECF No. 96-5, McCallum Dep. 87:8–24 (McCallum knew from reading the document Howard gave him that "there was multiple orders"); ECF No. 96-6, Delgado Dep.**

**220:2–224:5 (Delgado asking Howard about additional orders after arresting Haligas);** *cf.* **ECF No. 96-5, McCallum Dep. 79:22–80:7 (McCallum did not read every word of the order he reviewed);** *id.* **at 81:23–82:19 (McCallum did not understand all the order language he read).**

12.    Mr. Howard advised that his parenting time began at 3:00 PM – a fact Plaintiff acknowledges – but that Plaintiff was refusing to turn over their son because he was ill. Ex. E at 80:21-25, 81:19-22, 197:13-16; Ex. G at 21:10-12. Ex. H at 1:20-2:31; Ex. I at 3:24-3:52; Ex. D, at 110:21-23; 113:21–114:1; 128:11-20.

**RESPONSE: This fact is disputed. Plaintiff never "acknowledged" to Defendants that, under the circumstances, Howard's parenting time began that day at 3 p.m. Instead, she explained numerous times that the officers did not understand the order correctly, and she offered to show them the provision she was relying upon for her view that her son's illness entitled her to allow him to finish his nap before handing him off to his father.** *See, e.g.,* **ECF No. 96-6, Delgado Dep. 147:10–149:14;** *id.* **at 153:10–22 (Haligas telling Defendants they don't understand the order); ECF No. 96-5, McCallum Dep. 98:3–8 (McCallum conceding he turned down Haligas's offer to show him order language);** *id.* **at 98:20–99:10 (same);** *id* **at 101:3–13 (McCallum conceding he didn't let Haligas show him the language she was relying on because he didn't think it would change his mind);** *id.* **at 114:8–15 (McCallum testifying he decided Haligas had no valid defense to Howard's accusation "without looking at the language" she wanted to show him);** *id.* **at 202:17–204:24 (McCallum conceding that, while she was still calm, Haligas offered to show Defendants the order language she was relying on, explaining they misunderstood what they'd read, and they turned her down); Ex. 5, Higgins Dep. 138:24–140:3 (acknowledging Haligas pleaded with McCallum to show him the court order and McCallum said "no").**

13.    Officer McCallum also reviewed messages between Plaintiff and Mr. Howard

contained on Mr. Howard's phone where it was also conveyed to Officer McCallum that Plaintiff was not turning over their son to Mr. Howard because their son was ill. Ex. E at 81:1-6; Ex. I at 3:57-5:18. Ex. D at 118:11-16. Nothing in these messages mentioned that Plaintiff could maintain custody of M.H. based on any court order or clause. *See* Messages Between Plaintiff and Kevin Howard, attached as **Exhibit N**.

       **RESPONSE: Admit.**

       14.     Officer McCallum returned Mr. Howard his cell phone, and the officers proceeded to Plaintiff's apartment on the 22nd floor. Ex. I at 5:18-6:00.

       **RESPONSE: Admit.**

       15.     Based on what Officer McCallum was presented with from Mr. Howard, Officer McCallum believed that if there was other pertinent information to the court case that Mr. Howard did not present, he could learn that information through Plaintiff as a part of his investigation. Ex. E at 89:1-6, 92:18-22, 93:1-95:8.

       **RESPONSE: Admit.**

**PLAINTIFF'S ARREST**

       16.     Plaintiff, who was wearing a night gown, answered the door to her apartment and immediately invited the officers into her apartment, despite the officers having offered to speak with her in the hallway. Ex. H at 6:46-7:08; Ex. I at 8:54-9:10; Ex. D at 149:8-18. Officers did not have any information about Plaintiff's criminal history prior to making contact with her. Ex. E, at 68:8-10.

       **RESPONSE: Admit.**

       17.     She also insisted that the officers talk in a lowered voice so her son does not wake up. Ex. E at 201:11-13; Ex. H at 7:07-7:11; Ex. I at 9:12-9:17; Ex. D at 51:2-4.

       **RESPONSE: Plaintiff admits that she asked the officers to please keep their voices down to avoid waking her son. Plaintiff denies that she "insisted the officers talk in a lowered voice." ECF No. 96-9, Delgado video 8:58–9:50.**

       18.     Officer McCallum refused to lower his voice to ensure that the interaction is recorded on his BWC, and that Plaintiff heard what he said. Ex. E at 201:16-201:14; Ex. D at 151:6-13.

       **RESPONSE: Plaintiff objects to this fact as immaterial to summary judgment. In any event, Plaintiff disputes that McCallum's true concern in refusing to lower his voice was the**

**ability of his body worn camera microphone to record his statements. McCallum did not provide that explanation to Plaintiff at the time he refused to lower his voice; rather he first mentioned it at his deposition more than three years later. ECF No. 96-5, McCallum Dep. 201:14–202:12. A jury could infer from McCallum's demeanor and language when he encountered Plaintiff that he refused to lower his voice out of animus or another motivation. ECF No. 96-9, Delgado video 8:58–9:50 (McCallum responding to Plaintiff' request, "my volume is going to be what it is so I can communicate").**

19. Officer McCallum asked "why aren't you handing over your son?" Plaintiff responded, "because he has the stomach flu," and that she would not wake him up until after his nap. Ex. H at 7:22-7:25; Ex. I at 9:24-9:27; Ex. D at 123:4-9.

**RESPONSE: Admit.**

20. Officer McCallum explained that Plaintiff had not provided a valid justification for not handing over custody, nor did Plaintiff ever mention that a clause in any prior parenting agreement addressed instances where M.H. was sick. Ex. H at 7:26-7:34; Ex. I at 9:29-9:36; Ex. D at 150:16-24, 156:4-13.

**RESPONSE: These facts are disputed. Plaintiff repeatedly asked the officers for permission to show them the language on which she was relying in requesting accommodation from Howard. Plaintiff's repeated statements that the officers misunderstood the court order, coupled with her repeated requests to show them the relevant language would support a jury finding that Plaintiff indeed mentioned clauses in previous parenting agreements addressing what to do in the event of her son's illness. *See, e.g.,* ECF No. 96-6, Delgado Dep. 147:10–149:14; *id.* at 153:10–22 (Haligas telling Defendants they don't understand the order); ECF No. 96-5, McCallum Dep. 98:3–8 (McCallum conceding he turned down Haligas's offer to show him order language); *id.* at 98:20–99:10 (same); *id* at 101:3–13 (McCallum conceding he didn't let Haligas show him the language she was relying on because he didn't think it would change his mind); *id.* at 114:8–15 (McCallum testifying**

**he decided Haligas had no valid defense to Howard's accusation "without looking at the
language" she wanted to show him);** *id***. at 202:17–204:24 (McCallum conceding that, while
she was still calm, Haligas offered to show Defendants the order language she was relying
on, explaining they misunderstood what they'd read, and they turned her down); Ex. 5,
Higgins Dep. 138:24–140:3 (acknowledging Haligas pleaded with McCallum to show him the
court order and McCallum said "no").**

21.     Plaintiff insisted that the officers did not understand the court order, and that it
prohibits Mr. Howard from picking up their son before 3:00 PM. Ex. H at 8:23-8:32; Ex. I at 10:30-
40.; Ex. D at 99:4-5, 110:3-4, 114:18–115:21.

**RESPONSE: Admit.**

22.     She explained that the order was drafted to make sure Mr. Howard did not pick up
their son "mid-nap." Ex. H at 8:43-8:54; Ex. I at 10:45-10:57; Ex. D at 109:15–110:1

**RESPONSE: Admit.**

23.     The officers explained that it was 4:00 PM, therefore the fact that their son was
napping had nothing to do with the language of the order. Ex. H at 8:00-8:39, 8:55-9:00; Ex. I at
10:18-10:30, 10:57-11:02; Ex. D 110:21-23.

**RESPONSE: Plaintiff admits that Defendants used words to that effect, but she denies
that they "explained" the order to her. Defendants could not have "explained" the order to
Plaintiff, as they had not read the relevant provision and did not understand what they had
read.** *See, e.g.,* **ECF No. 96-6, Delgado Dep. 147:10–149:14;** *id***. at 153:10–22 (Haligas telling
Defendants they don't understand the order); ECF No. 96-5, McCallum Dep. 98:3–8
(McCallum conceding he turned down Haligas's offer to show him order language);** *id.* **at
98:20–99:10 (same);** *id* **at 101:3–13 (McCallum conceding he didn't let Haligas show him the
language she was relying on because he didn't think it would change his mind);** *id.* **at 114:8–
15 (McCallum testifying he decided Haligas had no valid defense to Howard's accusation
"without looking at the language" she wanted to show him);** *id***. at 202:17–204:24 (McCallum**

conceding that, while she was still calm, Haligas offered to show Defendants the order language she was relying on, explaining they misunderstood what they'd read, and they turned her down); Ex. 5, Higgins Dep. 138:24–140:3 (acknowledging Haligas pleaded with McCallum to show him the court order and McCallum said "no").

24.    Plaintiff offered to show the order to the officers, and the officers explained that they had just looked at it. Ex. H at 8:25-8:33; Ex. I at 10:30-10:36; Ex. D, 199:13-24, 200:1-4. Plaintiff did not tell the officers that the language they needed to see was in an order from June 2017. Ex. D 199:14-200:4.

**RESPONSE: Plaintiff admits the first sentence of this paragraph. Plaintiff objects that the facts in the second sentence of this paragraph are immaterial.**

25.    Officer McCallum did not review the order again because Plaintiff had not disputed that her son belongs with Mr. Howard after 3:00 PM, Plaintiff did not hand it to him, and she did not explain to Officer McCallum how Officer McCallum's understanding of the order was incorrect, nor whether there was any clause in the order pertaining to a situation where M.H. was sick. Ex. E. at 113:1-6, 209:21-210:2, 210:21-24, 211:11-22, 212:6-11, 213:3-5; Ex. D at 150:16-24, 156:4-13.

**RESPONSE: Plaintiff objects that this paragraph contains numerous "facts." Moreover, the information in this paragraph is not a statement of undisputed facts, but rather a narrative of Defendant McCallum's version of what transpired and his biased explanation for why he acted how he did, supported only by citations to his and his co-defendant's deposition testimony. The record is replete with evidence to support contrary jury findings, including evidence that Plaintiff disputed Howard was entitled to pick up their son after 3 p.m. under the circumstances, and that the order contained supporting language that McCallum and Delgado refused to review. *See, e.g.,* ECF No. 96-6, Delgado Dep. 147:10–149:14; *id.* at 153:10–22 (Haligas telling Defendants they don't understand the order); ECF No. 96-5, McCallum Dep. 98:3–8 (McCallum conceding he turned down Haligas's offer to show him order language); *id.* at 98:20–99:10 (same); *id* at 101:3–13 (McCallum conceding**

**he didn't let Haligas show him the language she was relying on because he didn't think it**

**would change his mind);** *id.* **at 114:8–15 (McCallum testifying he decided Haligas had no**

**valid defense to Howard's accusation "without looking at the language" she wanted to show**

**him);** *id.* **at 202:17–204:24 (McCallum conceding that, while she was still calm, Haligas**

**offered to show Defendants the order language she was relying on, explaining they**

**misunderstood what they'd read, and they turned her down); Ex. 5, Higgins Dep. 138:24–**

**140:3 (acknowledging Haligas pleaded with McCallum to show him the court order and**

**McCallum said "no").**

26.     Plaintiff then asked Officer McCallum "would you like to wake my son yourself?"
and showed the officers her son sleeping in his bedroom. Ex. H at 9:00-9:16; Ex. I at 11:04-11:20;
Ex. D, at 151:6-13.

**RESPONSE: Plaintiff admits that she said those words, but she disputes the facts in**

**this paragraph to the extent they assume the veracity of the paragraph above. Plaintiff also**

**objects to this fact as immaterial to summary judgment.**

27.     Officer McCallum explained that Plaintiff was violating a court order, which
Plaintiff denied and stated "you know what? A part of being a parent, you're accommodating. I've
accommodated him a whole bun[ch]." Ex. H at 9:18-9:34; Ex. I at 11:20-11:35.

**RESPONSE: Plaintiff denies that McCallum "explained" anything about the order**

**to her, as he did not read the relevant order language or understand the language he did**

**read; however, Plaintiff admits that she spoke those words. This portion of the video is an**

**example of one of Plaintiff's many attempts to explain to Officer McCallum that she was** *not*

**violating the order, and his refusal to review the relevant language.** *See, e.g.,* **ECF No. 96-6,**

**Delgado Dep. 147:10–149:14;** *id.* **at 153:10–22 (Haligas telling Defendants they don't**

**understand the order); ECF No. 96-5, McCallum Dep. 98:3–8 (McCallum conceding he**

**turned down Haligas's offer to show him order language);** *id.* **at 98:20–99:10 (same);** *id* **at**

**101:3–13 (McCallum conceding he didn't let Haligas show him the language she was relying**

**on because he didn't think it would change his mind); *id.* at 114:8–15 (McCallum testifying**

**he decided Haligas had no valid defense to Howard's accusation "without looking at the**

**language" she wanted to show him); *id*. at 202:17–204:24 (McCallum conceding that, while**

**she was still calm, Haligas offered to show Defendants the order language she was relying**

**on, explaining they misunderstood what they'd read, and they turned her down); Ex. 5,**

**Higgins Dep. 138:24–140:3 (acknowledging Haligas pleaded with McCallum to show him the**

**court order and McCallum said "no").**

28.     Plaintiff said she would not wake up her son. Ex. H at 9:36-9:38; Ex. I at 11:38-11:40; Ex. D at 159:13-21. Officer McCallum advised her that she would go to jail for unlawful violation of visitation. Ex. E at 214:14-24; Ex. H at 9:38-9:43; Ex. I at 11:40-11:46; Ex. D 160:14-17.

**RESPONSE: Admit.**

29.     Plaintiff stated to Officer McCallum that he did not understand what is in the court order, and stated she would like to call her child advocate. Ex. H at 9:43-9:48, Ex. D, 157:21-158:12, 99:4-5, 110:3-4, 114:18 – 115:21.

**RESPONSE: Plaintiff denies that she stated she "would like" to call the child**

**advocate. In response to McCallum telling Plaintiff "you're going to jail . . . for unlawful**

**violation of visitation"—a petty offense that is not punishable by imprisonment—Plaintiff**

**said: "You don't even know what is in our court order. How about I call our child advocate**

**first?" ECF No. 96-9, Delgado video 11:30–11:54; Benigno Dep. 39:6–40:7, attached as**

**Exhibit 4 (Defendants were trained that unlawful violation of parenting time is a petty office**

**the first time it is committed, meaning it cannot result in jail time).**

30.     Officer McCallum explained that regardless of what the child advocate had to say, he would still arrest her because ultimately, he would have to "answer to" a judge. Ex. H at 9:49-10:03.

**RESPONSE: Plaintiff admits that McCallum used words to that effect.**

31.     More than three minutes after allowing Officers into her apartment, Plaintiff stepped towards the officers, pointed to the apartment entrance, and told them to leave. Ex. E at 217: 19-21; Ex. H at 10:03-10:08; Ex. I at 8:55-12:11; Ex. D at 161:16-23.

**RESPONSE: Plaintiff denies that she "stepped towards the officers," and admits the remaining facts in this paragraph. ECF No. 96-9, Delgado video 11:45–12:18.**

32.     The officers refused, and Officer McCallum indicated for Plaintiff to calm down. Ex. H at 10:07-10:11; Ex. I at 12:09-12:13; Ex. D at 223:19-22.

**RESPONSE: Plaintiff does not understand what Defendants mean by the words "McCallum indicated for Plaintiff to calm down," and therefore denies the fact. Plaintiff admits McCallum repeatedly shouted at her to calm down before arresting her, and later told her he arrested her because she refused to calm down and she was going to jail because he told her to calm down. ECF No. 96-9, Delgado video at 12:05–13:45.**

33.     Officer McCallum took out a pair of handcuffs, in preparation for making an arrest of Plaintiff. Ex. E at 219:17-18; Ex. F at 171:2-6; Ex. I at 12:12-12:13.

**RESPONSE: Plaintiff denies that McCallum intended to arrest Plaintiff at that moment. At that moment, McCallum gave Plaintiff no verbal warning he intended to arrest her. ECF No. 96-9, Delgado video 12:01–12:17. Later, however, McCallum said to Plaintiff "turn around and put your hands behind your back," and then immediately began handcuffing Plaintiff. ECF No. 96-9, Delgado video 12:01–13:05. The juxtaposition of those two moments supports the inference that McCallum did not intend to arrest Plaintiff until the later point in time. That inference is bolstered by the fact that McCallum's supervisor, Lt. John O'Malley viewed the video and came to the same conclusion: There was only one point in time when McCallum intended to handcuff Plaintiff, and it was not the moment to which this paragraph refers. ECF No. 96-12, O'Malley Dep. 165:2–166:24, 167:22–168:2.**

34.     Plaintiff then threatened to call 911. Ex. E at 219: 9-11; Ex. H at 10:09-10:11; Ex. I at 12:12-12:14.

**RESPONSE: Plaintiff denies that she "threatened" to call 911 but admits that she said she would call 911 if the officers refused to leave. ECF No. 96-9, Delgado video at 12:05–12:15.**

35.     Officer McCallum again asked Plaintiff to calm down. Ex. H at 10:10-10:12; Ex. I at 12:13-12:15; Ex. D at 223:19-22.

**RESPONSE: Admit.**

36.     Officer McCallum sensed that Plaintiff was escalating matters, and the situation was no longer calm. Ex. E at 218:5-20; 220:7-14; Ex. D at 161:11-15.

**RESPONSE: Plaintiff objects that McCallum's statements about his sensations are not undisputed facts upon which summary judgment may be based. The record is replete with evidence to support a jury finding that McCallum—not Plaintiff—escalated the encounter, including by twice threatening to send Plaintiff to jail for a petty offense he knew was not punishable by jail time; backing Plaintiff into the corner of her kitchen, frightening her; refusing to allow Plaintiff to show him the parenting order she was relying upon; refusing to speak with Plaintiff's son's child advocate; refusing to allow Plaintiff to get dressed before handcuffing her and leading her out of her apartment; and threatening to charge her with a felony in response to her question about whether the force he used against her was excessive. *See generally* ECF No. 96-9, Delgado video 11:30–25:14; Benigno Dep. 39:6–40:7, attached as Exhibit 4 (Defendants were trained that unlawful violation of parenting time is a petty office the first time it is committed, meaning it cannot result in jail time).**

37.     Officer McCallum was holding handcuffs and reached for Plaintiff's hand, which was holding a cell phone, to make an arrest. Ex. E at 226:1-3; Ex. H at 10:11-10:13; Ex. I at 12:14-12:16.

**RESPONSE: This fact is disputed. The more reasonable interpretation of what's**

**shown in the cited portion of video is that McCallum was in fact reaching toward Plaintiff to**

**snatch her cell phone out of her hand in retaliation for her telling him she was going to call**

**911. ECF No. 96-9, Delgado video 12:01–12:17. That inference is bolstered by the fact that**

**before reaching for the phone, McCallum does not announce any intent to arrest Plaintiff,**

***id*.; but later in the encounter, just before McCallum did, in fact, arrest Plaintiff, McCallum**

**instructed her: "turn around and put your hands behind your back." *Id*. at 12:01–13:05.**

**Moreover, Defendants' boss's boss, Lt. O'Malley, who viewed the video, agreed that**

**McCallum never attempted to place Plaintiff under arrest until the moment when he told**

**her to put her hands behind her back. ECF No. 96-12, O'Malley Dep. 165:2–166:24, 167:22–**

**168:2.**

38.     Officer McCallum again asked Plaintiff to calm down, advising he would otherwise arrest her. Ex. H at 10:14-10:17; Ex. I at 12:17-12:20.

**RESPONSE: This fact is disputed insofar as the characterization of McCallum's**

**conduct conceals the threatening nature of his words. Plaintiff admits McCallum repeatedly**

**shouted at her to calm down while backing her into her kitchen as she became visibly more**

**fearful. ECF No. 96-9, Delgado video 12:05–13:45.**

39.     Plaintiff yelled at Officer McCallum "I will call my doorman right now and have you removed from this premises!" Ex. H at 10:17-10:21; Ex. I at 12:20-12:24.

**RESPONSE: Admit.**

40.     As she threatened to call her doorman, Officer McCallum approached Plaintiff in her kitchen, continuing to advise her to be calm because he was going to place handcuffs on her. Ex. E at 221:3-12; Ex. H at 10:20-10:24; Ex. I at 12:23-12:28; Ex. D at 167:1-13.

**RESPONSE: This is not a statement of undisputed facts, but rather McCallum's**

**characterization of events shown on the body worn camera footage. Plaintiff admits that she**

**said she would call her doorman and have Defendants removed from the premises. And she**

admits that McCallum repeatedly shouted at her to calm down. Plaintiff denies that she "threatened" McCallum in any way, and further denies that McCallum merely "advised her to be calm." ECF No. 96-9, Delgado video 12:20–13:45.

41.     Plaintiff then started to yell "back up" at Officer McCallum while flailing her arm. Ex. H at 10:22-10:24; Ex. I at 12:25-12:28.

RESPONSE: Plaintiff admits that she told McCallum to back up as he was advancing menacingly toward her. She denies that she was "flailing her arm." ECF No. 96-9, Delgado video 12:20–13:45.

42.     Officer McCallum was worried that Plaintiff could use an object in her kitchen to cause injury to him or someone else. Ex. E at 221:20-23.

RESPONSE: McCallum's claimed worry—raised for the first time at his deposition more than three years after the arrest—is not an undisputed fact upon which summary judgment may be based. The circumstances depicted in the video and the fact that McCallum never mentioned any fear that Plaintiff might arm herself with a kitchen utensil during the encounter would support a jury inference that McCallum did not reasonably believe Plaintiff presented a serious threat of imminent harm to him on January 31, 2020. ECF No. 96-9, Delgado video 12:05–13:45. Moreover, McCallum testified that Haligas never brandished a weapon at him, threatened to brandish a weapon, or threatened any physical harm to the officers during the encounter. ECF No. 96-5, McCallum Dep. 120:16–121:1. McCallum also testified he *did not believe* Haligas was going to use any weapon against him. *Id.* at 122:10–13. Finally, McCallum completed paperwork *on the day of the arrest* in which he attested that Haligas did not present a threat of battery to the officers at any time. ECF No. 96-5, McCallum Dep. 275:23–277:13 (reviewing and adopting use of force report in which he documented that Haligas did not present an imminent threat of battery, had no weapon, and

did not physically attack the officers without a weapon).

43.     In moving towards Plaintiff in her kitchen, he hoped to back her into corner where she would have less access to the rest of the kitchen. Ex. E at 222:2-7.

**RESPONSE: McCallum's self-serving testimony about his "hope," which he contends justify his conduct, is not an undisputed fact that could support summary judgment. The circumstances depicted in the video and the fact that McCallum never mentioned any fear that Plaintiff might arm herself with a kitchen utensil during the encounter would support a jury inference that McCallum did not reasonably believe Plaintiff presented a serious threat of imminent harm to him on January 31, 2020. ECF No. 96-9, Delgado video 12:05–13:45. Moreover, McCallum testified that Haligas never brandished a weapon at him, threatened to brandish a weapon, or threatened any physical harm to the officers during the encounter. ECF No. 96-5, McCallum Dep. 120:16–121:1. McCallum also testified he *did not believe* Haligas was going to use any weapon against him. *Id.* at 122:10–13. Finally, McCallum completed paperwork *on the day of the arrest* in which he attested that Haligas did not present a threat of battery to the officers at any time. ECF No. 96-5, McCallum Dep. 275:23–277:13 (reviewing and adopting use of force report in which he documented that Haligas did not present an imminent threat of battery, had no weapon, and did not physically attack the officers without a weapon).**

44.     Officer McCallum believed he was de-escalating the situation by securing her to make sure she is not a threat. Ex. E 222:13-16, 224:4-6, 225:12-13.

**RESPONSE: McCallum's self-serving testimony about his "belief" is not an undisputed fact that could support summary judgment. The circumstances depicted in the video and the fact that McCallum never mentioned any fear that Plaintiff might arm herself with a kitchen utensil during the encounter would support a jury inference that McCallum**

**did not reasonably believe Plaintiff presented a serious threat of imminent harm to him on**

**January 31, 2020. ECF No. 96-9, Delgado video 12:05–13:45. Moreover, McCallum testified**

**that Haligas never brandished a weapon at him, threatened to brandish a weapon, or**

**threatened any physical harm to the officers during the encounter. ECF No. 96-5, McCallum**

**Dep. 120:16–121:1. McCallum also testified he _did not believe_ Haligas was going to use any**

**weapon against him. _Id._ at 122:10–13. Finally, McCallum completed paperwork _on the day_**

**_of the arrest_ in which he attested that Haligas did not present a threat of battery to the officers**

**at any time. ECF No. 96-5, McCallum Dep. 275:23–277:13 (reviewing and adopting use of**

**force report in which Delgado documented that Haligas did not present an imminent threat**

**of battery, had no weapon, and did not physically attack them without a weapon).**

45.    Plaintiff tried to maneuver around Officer McCallum in order to leave the kitchen area, Plaintiff ran into Officer McCallum. Ex. H at 10:24-10:27; Ex. I at 12:28-12:31; Ex. D at 164:13- 16.

**RESPONSE: Plaintiff disputes that she "ran into" McCallum. ECF No. 96-4, Haligas**

**Dep. 164:20–166:4; ECF No. 96-9, Delgado video 12:28–12:33.**

46.    In Plaintiff's attempt to get around Officer McCallum. Ex. H at 10:24-10:27; Ex. I at 12:28-12:31; Ex. D at 226:17-19.

**RESPONSE: Plaintiff does not understand this paragraph and cannot respond to it.**

47.    Officer McCallum then asked her to turn around and put her hands behind her back. Ex. H at 10:30-10:31; Ex. I at 12:33-12:35; Ex. D at 166:15-19, 167:1-16.

**RESPONSE: Plaintiff disputes the facts in this paragraph to extent that, by use of the**

**word "then," this paragraph adopts facts in the preceding paragraphs she has disputed.**

**Plaintiff admits McCallum instructed her to turn around and put her hands behind her back.**

48.    By this time, Officer McCallum had determined he had probable cause for making an arrest for unlawful child visitation because Plaintiff had explicitly said she would not turn M.H. over to Mr. Howard. Ex. E at 224:12-19; 226:12-18.

**RESPONSE: McCallum's self-serving deposition testimony on one of the ultimate issues in this case—whether he reasonably believed he had probable cause to arrest Plaintiff—is not an undisputed fact that could support summary judgment in his favor. The record is replete with evidence to support the inference that McCallum *did not* reasonably believe Haligas was committing a crime when he arrested her. *See infra*, Plaintiff's Statement of Additional Facts ¶¶ 1-20.**

49.     Despite Officer McCallum's repeated orders, Plaintiff moved backwards to a wall in her kitchen. Ex. H at 10:31-10:35; Ex. I at 12:35-12:39; Ex. D at 223:23–224:1.

**RESPONSE: Plaintiff admits that she walked backward into her kitchen as McCallum charged toward her, but she disputes that she did so "despite McCallum's repeated orders." ECF No. 96-4, Haligas Dep. 162:3–164:19.**

50.     Officer McCallum repeatedly ordered Plaintiff to turn around and place her hands behind her back, and in response, Plaintiff held her arms tight to her body and yelled "no, leave me alone". Ex. H at 10:31-10:38; Ex. I at 12:35-12:41; Ex. D at 167:12-24; 168:1-19.

**RESPONSE: Plaintiff admits that she spoke those words but denies that she did so "in response" to McCallum's "orders." ECF No. 96-4, Haligas Dep. 166:15–167:13 (Haligas testifying that she didn't hear McCallum's "order" because she was "so in her head" with disbelief over the situation).**

51.     While continuing to yell, she then dropped her body weight to the ground. Ex. H at 10:38-10:40; Ex. I at 12:40-12:42; Ex. D at 171:13-16, 183:2-4, 224:15-18.

**RESPONSE: This fact is disputed. Plaintiff testified that McCallum pulled her to the ground. ECF No. 96-4, Haligas Dep. 171:2–9.**

52.     Plaintiff verbally and physically refused to turn her body around so the officers could handcuff her wrists. Ex. H at 10:40-10:49; Ex. I at 12:42-12:48; Ex. D 167:12-24, 168:1-19.

**RESPONSE: This fact is disputed. Plaintiff testified that she did not hear McCallum's "orders" at this point because she was "so in her head" with disbelief over the situation. ECF**

No. 96-4, Haligas Dep. 166:15–167:13.

53.    As Officers tried to handcuff her, she moved her body between the floor and the ground to resist arrest. Ex. H at 10:50-11:15; Ex. I at 12:49-13:17; Ex. D at 164:13-16, 166:1-4, 167:20–168:5, 171:13-16, 226:14-19. While this was going on, Klauminzer was urging Plaintiff to calm down, albeit unsuccessfully. Ex. D, at 170:1-5.

**RESPONSE: These facts are disputed. Plaintiff denies that she resisted arrest and denies that she moved her body between the floor and the ground. She testified that she *was not* resisting arrest and the officers pulled her to the ground and pulled her up again afterward. ECF No. 96-4, Haligas Dep. 167:1–22; 170:16–177:8; 178:4–12.**

54.    She contorted her body and moved her arms to avoid contact with the officers. Ex. H at 10:31-11:15; Ex. I at 12:35-13:15; Ex. D at 168:1-19, 226:12-13. For her part, Plaintiff claims that Officer McCallum used excessive force in arresting her. Ex. D at 171:18-21, 185:2, 259:16-19. 226:18- 19, 229:18-23. She could not, however, point to any force used by Officer Delgado that would constitute excessive force. Ex. D, at 270:7-13, 270:11 – 271:9.

**RESPONSE: Plaintiff admits that she did not wish to be touched or harmed by the officers. ECF No. 96-4, Haligas Dep. 168:6–22. Plaintiff further admits that she alleges in this lawsuit that McCallum used excessive force in arresting her. ECF No. 1. Plaintiff objects to the final fact in this paragraph as immaterial to summary judgment, and she notes that the body worn camera footage is replete with evidence that would permit a jury to conclude the officers used excessive force against her. *See, e.g.,* ECF No. 96-9, Delgado video 12:05–13:45.**

55.    While Officers attempted to put Plaintiff's arms behind her back to apply handcuffs, Plaintiff yelled, "My wrist, my wrist." Ex. I at 12:56-13:00. After handcuffs were applied, and the situation had de-escalated, Plaintiff did not mention anything further about wrist pain, shoulder pain, handcuff tightness, or prior medical conditions; nor did Plaintiff tell Officers about any clause of a court order pertaining to what to do if M.H. was sick. Ex. I at 13:15-13:17; Ex. D at 197:11-16, 201:4- 9, Ex. D at 157:6-8, 215:19-24, 261:16–262:4, 263:2-12.

**RESPONSE: Plaintiff admits she cried out in pain, indicating that McCallum was hurting her wrist. Plaintiff denies that she never mentioned wrist pain or handcuff tightness after minute 13:00 of the Delgado body worn camera video. *See, e.g.,* ECF No. 96-9, Delgado**

video 13:39-14:04 (Haligas crying in pain, "Look at my wrist! Look at my wrist! Ow look at my wrist!" and "Help me!" until McCallum tells her, "Stop it," and "We know."); *id*. at 14:34-44 (Haligas again moaning in pain and McCallum again telling her to "Stop it."); ECF No. 96-11, Cianflone video 2:39–3:05 (hospital transport officers discussing with Defendants' supervisors the need for Haligas to obtain medical care before being released). Whether Plaintiff told Defendants "about any clause of a court order pertaining to what to do if M.H. was sick" is not material to the summary judgment analysis. But in any event, the record is replete with evidence that Plaintiff attempted to inform Defendants of the relevant order language, but they refused to listen to her or review the order provisions she wished to show them. *See, e.g.*, ECF No. 96-6, Delgado Dep. 147:10–149:14; *id*. at 153:10–22 (Haligas telling Defendants they don't understand the order); ECF No. 96-5, McCallum Dep. 98:3–8 (McCallum conceding he turned down Haligas's offer to show him order language); *id.* at 98:20–99:10 (same); *id* at 101:3–13 (McCallum conceding he didn't let Haligas show him the language she was relying on because he didn't think it would change his mind); *id.* at 114:8–15 (McCallum testifying he decided Haligas had no valid defense to Howard's accusation "without looking at the language" she wanted to show him); *id*. at 202:17–204:24 (McCallum conceding that, while she was still calm, Haligas offered to show Defendants the order language she was relying on, explaining they misunderstood what they'd read, and they turned her down); Ex. 5, Higgins Dep. 138:24–140:3 (acknowledging Haligas pleaded with McCallum to show him the court order and McCallum said "no").

56.     Officer Delgado called for a sergeant to come to the scene, and explained to Plaintiff that she is under arrest for violating the court order and resisting arrest. Ex. H at 12:28-12:30, 14:25- 14:29; Ex. I at 14:40-14:50; Ex. D at 210:4-10.

**RESPONSE: Plaintiff admits that Delgado called his supervisor to the scene and told**

Plaintiff that information but disputes that she was arrested for resisting arrest. A reasonable jury could find Defendants arrested Haligas for unlawful violation of parenting time, not for resisting arrest. Ex. 5, Higgins Dep. 78:22–24 (Defendants' supervisor referring to parental visitation as the "initial charge"). Alternatively, a jury could find that Defendants arrested Haligas simply because they felt she wouldn't calm down, not because they reasonably suspected her of committing any crime. ECF No. 96-5, McCallum Dep. 226:24–227:21; ECF No. 96-9, Delgado video 12:05–13:45 (McCallum and Delgado answering Haligas's question "why are you doing this?" each by saying "because you won't calm down"; McCallum then explaining to Haligas's fiancé: "that's why she's going to jail. Because I told her to calm down").

57. Officer Delgado asked Plaintiff's fiancé, Jay Klauminzer, who was also present, to grab a jacket, jeans, and shirt for Plaintiff. Ex. H at 14:04-14:06; Ex. I at 14:14-14:16, 16:05-16:17; Ex. D at 189:9-12.

**RESPONSE: This fact is immaterial to summary judgment and misleading. Defendants repeatedly refused to allow Haligas to put clothes on before leading her out of the building in handcuffs. Their supervisor, however, after arriving at the scene, instructed them to allow Haligas's fiancé to help her dress. *See, e.g.,* ECF No. 96-10, Higgins video 10:45–11 (McCallum telling Haligas she can't get dressed); *id.* at 13:30–13:40 (Higgins telling McCallum to allow fiancé to help Plaintiff put pants on).**

58. Officer McCallum explained that he would call the child advocate at the station, but that Plaintiff had not mentioned anything the child advocate would explain that is not in the order he read. Ex. H at 14:30-14:45; Ex. I at 16:37-16:47.

**RESPONSE: Plaintiff admits McCallum said those words, but disputes either that they are material to summary judgment or that they were true statements. McCallum admitted at his deposition that he lied to Haligas about his intent to call the child advocate.**

ECF No. 231:11–232:10 ("Q. So when you told Ms. Haligas that you would call the child advocate from the station, that was not true? A. I was not going to charge—call the child advocate correct. Q. You never had any plan of calling the child advocate? A. No.").

59. Officer Delgado also explained to Plaintiff that the order says "past three o'clock" and that it was 4:04 PM when the officers had arrived, and that she was refused to give over the child and refused orders from Officer McCallum. Ex. H at 15:02-15:11; Ex. I at 17:05-17:14.

**RESPONSE: Plaintiff admits Delgado said those words but denies the words are material to summary judgment.**

60. Officer McCallum also explained that it is not up to child advocate to resolve disputes regarding the meaning of the court order. Ex. H at 15:28-15:49; Ex. I at 17:30-17:51.

**RESPONSE: Plaintiff admits McCallum said those words but denies the words are material to summary judgment.**

61. Plaintiff repeatedly apologized. Ex. H at 14:55-14:58, 15:55-15:58; Ex. I at 17:00-17:02; Ex. D at 190:21-24, 193:7–194:1.

**RESPONSE: Plaintiff admits she apologized to Defendants but denies her apologies are material to summary judgment. Moreover, Plaintiff testified that she apologized only in an effort to de-escalate the situation. ECF No. 96-4, Haligas Dep. 190:21–191:12 (explaining why she apologized as follows: "They clearly saw me as a threat it seemed to me. And nothing else I was doing was working for lack of a better word. Telling the truth, offering to show the order, offering to call [the child advocate], asking them to leave, like I was trying different things to resolve the situation. And also deescalate it. And nothing seemed to be working. And you know what, I'm not afraid to apologize. I'll apologize like just to like--I wanted their guards to go down. Like what is going on here? That never should have happened. That totally could have been avoided.").**

62. Another individual that was present, Jay Klauminzer, Plaintiff's fiancé, incorrectly claimed the court order allowed Plaintiff to have custody past 3:00 PM, and until 5:00 PM, on days

when Plaintiff's son was not in school. Ex. H at 17:09-17:19; Ex. I at 19:14-19:20, 34:35-34:51; Ex. D at 195:6-10.

**RESPONSE: Plaintiff admits that Klauminzer mentioned that provision of the parenting agreement but objects that those facts are immaterial.**

63.     Officer McCallum pointed out that he did not see that rule in the order, and that this is the first time Plaintiff and Mr. Klauminzer had mentioned it. Ex. H at 17:21-17:27; Ex. 2 at 19:20- 19:31.

**RESPONSE: Plaintiff admits that McCallum said those things but denies that she failed to mention earlier in the encounter that her desire to deliver her son to his father after her son's nap arose from the fact that her son had been ill the night before. ECF No. 96-5, McCallum Dep. 81:11–22; 197:13–16; ECF No. 96-9, Delgado video 9:00–10:08.**

64.     Mr. Klauminzer explained that he had a copy of the "original" order, but kept searching a phone for an additional order to support his claim that Plaintiff was not in violation of a court order, and Officer McCallum explained that the order he viewed was dated from January 8, 2020 – just a few weeks earlier. Ex. H at 22:20-22:35; Ex. I at 24:14-24:36.

**RESPONSE: Admit.**

65.     Sergeant Higgins arrived. Ex. H at 27:32-27:35; Ex. I at 29:25-29:29; BWC for Sergeant John Higgins, attached as **Exhibit J**, at 3:34-3:38.

**RESPONSE: Admit.**

66.     Officers helped gather Plaintiff's belongings, Mr. Klauminzer helped Plaintiff get dressed, and Sergeant Higgins and Officer McCallum escorted Plaintiff to a police vehicle. Ex. H at 31:00-43:30; Ex. J at 12:00-20:00.

**RESPONSE: Plaintiff denies that officers helped her gather her belongings or that Defendants permitted her to get dressed. Defendants repeatedly refused to allow Haligas to put clothes on before leading her out of the building in handcuffs. Their supervisor, however, after arriving at the scene, instructed them to allow Haligas's fiancé to help her dress. *See, e.g.,* ECF No. 96-10, Higgins video 10:45–11 (McCallum telling Haligas she can't get dressed); *id.* at 13:30–13:40 (Higgins telling McCallum to allow fiancé to help Plaintiff put**

**pants on). Plaintiff admits that Higgins and McCallum led her in handcuffs through her building and into a police car.**

67. Officer Delgado brought Plaintiff's son to Mr. Howard in the lobby. Ex. I at 35:50-37:20; Ex. D at 42:6-12.

**RESPONSE: Admit.**

68. Shortly before exiting the apartment, Plaintiff stated, "I know I'm not handling this situation appropriately, if I had a do-over, I would do things very different." Ex. H at 36:53-37:00; Ex. D 218:4-15.

**RESPONSE: Plaintiff admits that she said those words, but objects that this fact is immaterial.**

**TRANSPORT TO HOSPITAL**

69. Officers eventually transported Plaintiff to Northwestern Memorial Hospital for an injury she claimed. BWC Footage for Officer Salvatore Cianflone, attached as **Exhibit K**, at 3:20-5:50; Deposition of Lieutenant Michael O'Malley, attached as **Exhibit L**, at 82:19-25; Ex.D at 238:15-22.

**RESPONSE: Admit.**

70. Officers also advised Plaintiff that she would be released without charging. Ex. K at 8:25-8:40.

**RESPONSE: Admit.**

71. Plaintiff was taken to Northwestern Memorial Hospital that evening, although she did not want to go. Exhibit D at 81:2-7.

**RESPONSE: Admit.**

72. Plaintiff did not receive treatment at Northwestern Memorial Hospital that evening and went home from the hospital. Ex. D at 81:8-9.

**RESPONSE: Admit.**

**TREATMENT THE FOLLOWING DAY**

73. The following day, February 1, 2020, Plaintiff went to Northwestern Immediate

Care for two separate reasons: 1) For an examination of her right wrist, and 2) for an unrelated health reason. Exhibit D at 81:10-22, 242:20–245:2.

**RESPONSE: Plaintiff denies that she went to immediate care on February 1, 2020, for the express purpose of seeking treatment for an unrelated concern, but she admits that she asked about another health concern while she was at the clinic. ECF No. 96-4, Haligas Dep. 242:20–244:12.**

74.     According to Carly Martinez, the physician assistant who treated Plaintiff on February 1st, Plaintiff did not complain of pain to her left wrist, elbows, or shoulders. *Deposition of Carly Martinez*, attached as **Exhibit M** at 46:13-23, 33:9-14.

**RESPONSE: Admit.**

## II.     PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

Under Local Rule 56.1(b)(3), Plaintiff provides this statement of additional facts that require the denial of summary judgment (*see* Leff Decl., attached as **Exhibit 1**):

### A.  Defendants Did Not Reasonably Believe Haligas Was Committing a Crime

1.     Before deciding whether Haligas was violating her and Howard's parenting time agreement, Defendants knew they needed to review the order and identify all the language relevant to the violation at issue. Benigno Dep. 50:4–51:8, attached hereto as **Exhibit 4** (officers trained in those principles); ECF No. 96-6, Delgado Dep. 60:20–62:16; ECF No. 96-5, McCallum Dep. 59:6–12 (need to read order); *id.* at 61:11–15 (need to read entire order); *id.* at 63:12–64:6 (need to be familiar with content of entire order to focus on relevant sections).

2.     Defendants also knew they needed to understand the order language they read before deciding whether Haligas had violated any provision of the agreement. Ex. 4, Benigno Dep. 50:4–51:8; ECF No. 96-6, Delgado Dep. 57:23–58:4; *id.* at 129:9–22 (officers needed to understand the order to decide which parent is entitled to parenting time); *id.* at 130:8–13 (same); ECF No. 96-5, McCallum Dep. 62:1–6.

3.     Defendants knew that if they were confused about what they read in the parenting time order, they needed to call a supervisor for help before acting. Ex. 4, Benigno Dep. 51:20–52:10; *id.* at 53:10–14 (officers are trained that they can't make an arrest without probable cause to believe a crime is being committed).

4.     Defendants knew the parenting agreement was set out over multiple orders. ECF No. 96-5, McCallum Dep. 87:8–24 (McCallum knew from reading the document Howard gave him that "there was multiple orders"); ECF No. 96-6, Delgado Dep. 220:2–224:5 (Delgado asking Howard about additional orders after arresting Haligas).

5.      Delgado did not read any parenting time orders at all. ECF No. 96-6, Delgado Dep. 70:13–19 (Delgado never looked at Howard's phone); *id*. at 131:4–10 (Delgado never looked at parenting order).

6.      McCallum reviewed only one of the multiple orders that governed Haligas and Howard's parenting agreement, and the order he read was not the order that set out what to do in the event M.H. was ill. ECF No. 96-7, Howard Dep. 63:4–11; 1/8/20 Agreed Order, attached hereto as **Exhibit 3.**

7.      McCallum did not read every word of the order he reviewed. ECF No. 96-5, McCallum Dep. 79:22–80:7.

8.      McCallum did not understand all the order language he read. ECF No. 96-5, McCallum Dep. 81:23–82:19 (McCallum conceding there was some order language he did not understand, but rather was confused by).

9.      Based on McCallum's confused comments about the order as he and Delgado walked to and rode the elevator up to Haligas's apartment, a jury could infer that Delgado knew McCallum did not understand the order language McCallum had read. ECF 96-9, Delgado video 7:40-8:30.

10.     Defendants knew the reason Haligas did not turn M.H. over to Howard promptly at 3 p.m. was that M.H. had been ill and vomiting all night and had therefore gotten little rest. As a result, Haligas was waiting for her son to wake up from his nap naturally before bringing him to his dad. ECF No. 96-5, McCallum Dep. 81:11–22 ("Q. You don't dispute then, that the reason Ms. Haligas gave for not turning over [M.H.] was that he was ill, correct? A. Yes—no, I don't dispute that."); *id.* at 197:13–16; ECF No. 96-9, Delgado video 9:00–10:08.

11.     Defendants had no doubt M.H. was genuinely sick. ECF No. 96-6, Delgado Dep.

119:16–18; ECF No. 96-5, McCallum Dep. 81:1–6 (Howard told McCallum M.H. was sick, and McCallum read Haligas's messages to Howard reporting same); *id.* at 105:18–22 (McCallum had no reason to doubt M.H. had been sick).

12.     Defendants concede that after McCallum's review of the information he saw on Howard's phone and their conversation with Howard, they did not have enough information reasonably to conclude that Haligas was committing a crime. ECF No. 96-5, McCallum Dep. 92:3–93:11 (summarizing all the information Defendants had before speaking to Haligas and agreeing, at that time, they "did not have enough information to conclude that a crime was being committed); ECF No. 96-6, Delgado Dep. 76:22–77:14.

13.     Defendants knew they needed to gather information from Haligas to understand if she was committing a crime. ECF No. 96-5, McCallum Dep. 94:6–23; *id.* at 95:10–21.

14.     Haligas told Defendants they did not understand the order language correctly. ECF No. 96-6, Delgado Dep. 147:10–149:11; *id*. at 153:10–22.

15.     Defendants did not allow Haligas to show them the portions of the order that supported her position that she was not obligated to turn M.H. over to Howard at exactly 3 p.m. on January 31, 2020. ECF No. 96-5, McCallum Dep. 98:3–8 (McCallum conceding he turned down Haligas's offer to show him order language); *id.* at 98:20–99:10 (same); *id* at 101:3–13 (McCallum conceding he didn't let Haligas show him the language she was relying on because he didn't think it would change his mind); *id.* at 114:8–15 (McCallum testifying he decided Haligas had no valid defense to Howard's accusation "without looking at the language" she wanted to show him); *id*. at 202:17–204:24 (McCallum conceding that, while she was still calm, Haligas offered to show Defendants the order language she was relying on, explaining they misunderstood what they'd read, and they turned her down); ECF No. 96-6, Delgado Dep. 147:10–149:14; Ex. 5,

Higgins Dep. 138:24–140:3 (acknowledging Haligas pleaded with McCallum to show him the court order and McCallum said "no").

16.     Nothing prevented Defendants from asking for the orders they had not seen. ECF No. 96-5, McCallum Dep. 88:2–10 (McCallum knew he'd seen only one order, and nothing stopped him from asking for the others).

17.     Defendants also turned down Haligas's offer to speak with M.H.'s child advocate so that the advocate could explain what the parenting agreement required. *See, e.g.,* ECF No. 96-5, McCallum Dep. 103:17–21.

18.     A jury could find Defendants relied primarily on Kevin Howard's word for their belief that Howard was entitled to pick up M.H. any time after 3 p.m. on January 31, 2020. ECF No. 96-6, Delgado Dep. 220:2–22 (Delgado conceding the officers went to Haligas's apartment, seized M.H., and brought M.H. down to Howard without ever asking Howard to show identification.

19.     Defendants knew Howard was not a trustworthy source of information about the parenting time order's requirements. ECF No. 96-5, McCallum Dep. 90:2–5 (McCallum conceding it wouldn't be right to rely on Howard's word about what was in the order); *id.* at 90:15–21 ("I would not rely on his word alone."); *id.* at 193:9–25 (McCallum concluded Howard and Haligas did not have a good relationship); ECF No. 96-9, Delgado Dep. 137:12–17 (Delgado conceding he didn't have a reason to believe Howard's characterization of the order); ECF No. 96-7, Howard Dep. 11:12–18 (Howard testifying he and Haligas did not have a good relationship).

20.     A jury could find it was obvious that Haligas intended to turn M.H. over to his father the moment M.H. awoke from his nap: Haligas showed the officers M.H.'s packed bag and told them as much (though they denied hearing her say those words at their depositions). ECF No.

96-6, Delgado Dep. 146:8–17; ECF No. 96-9, Delgado video 9:48–10:08.

### B. Defendants Arrested Haligas Without Cause

21.     After backing Haligas into the corner of her kitchen, Defendants decided to arrest her for unlawful violation of parenting time. Ex. 5, Higgins Dep. 78:22–24 (Defendants' supervisor referring to parental visitation as the "initial charge").

22.     Both Defendants approached Haligas and handcuffed her. ECF No. 96-9, Delgado video 12:05–13:45.

23.     Haligas did not use her body weight to resist the handcuffing, but the officers pulled her to the ground anyway, and then pulled her up again. ECF No. 96-4, Haligas Dep. 167:1–22; 170:16–177:8; 178:4–12.

24.     A jury could find that Defendants arrested Haligas because they felt she wouldn't calm down, not because they reasonably suspected her of committing any crime. ECF No. 96-5, McCallum Dep. 226:24–227:21; ECF No. 96-9, Delgado video 12:05–13:45 (McCallum and Delgado answering Haligas's question "why are you doing this?" each by saying "because you won't calm down"; McCallum then explaining to Haligas's fiancé: "that's why she's going to jail. Because I told her to calm down").

### C. Defendants Did Not Reasonably Believe Haligas Presented Any Threat of Harm

25.     When Defendants first spoke with Haligas, she was calm and respectful. ECF No. 96-5, McCallum Dep. 107:11–19.

26.     Haligas was wearing only a nightgown before McCallum handcuffed her. ECF No. 96-5, McCallum Dep. 119:18–120:4.

27.     Haligas weighed 125 pounds, less than McCallum. ECF No. 96-5, McCallum Dep. 120:13–15.

28.    Haligas was unarmed during Defendants' encounter with her. ECF No. 96-5, McCallum Dep. 120:16–121:1 (Haligas never brandished a weapon, threatened to brandish a weapon, or threatened physical harm to the officers); ECF No. 96-6, Delgado Dep. 256:12–258:8 (reviewing and adopting use of force report in which Delgado documented that Haligas was unarmed).

29.    McCallum did not believe Haligas was going to use any weapon against him. ECF No. 96-5, McCallum Dep. 122:10–13.

30.    Though Delgado claimed at his deposition—more than three years after the arrest—that he considered Haligas's cell phone a potential weapon, he conceded that he could have, but did not, check the box on his use of force report indicating Haligas presented a threat of battery with a weapon. ECF No. 96-6, Delgado Dep. 257:18–258:8.

31.    Defendants concluded Haligas did not present a threat of battery to them at any time. ECF No. 96-5, McCallum Dep. 275:23–277:13; ECF No. 96-6, Delgado Dep.256:12–258:8 (reviewing and adopting use of force report documenting that Haligas did not present an imminent threat of battery, had no weapon, and did not physically attack the officers without a weapon).

32.    McCallum threatened to take Haligas to jail multiple times despite knowing that violation of parenting time is a petty offense, which is not punishable by any term of imprisonment. ECF No. 96-5, McCallum Dep. 139:19–140:17; *id.* at 215:17–217:12 (while Haligas was still calm, McCallum threatened to take her to jail twice); Ex. 4, Benigno Dep. 39:6–40:7 (Defendants were trained that unlawful violation of parenting time is a petty office the first time it is committed, meaning it cannot result in jail time).

33.    A jury could find McCallum tried to snatch Plaintiff's cell phone out of her hand after she told him she planned to call 911 for help. ECF No. 96-9, Delgado video 12:01–12:17.

34.     Haligas's words did not support a reasonable belief that she was resisting arrest. Ex. 4, Benigno Dep. 113:12–18 (telling McCallum she was not violating the parenting agreement and that McCallum did not understand the agreement is not resistance); *id.* at 113:19–25 (telling McCallum she would not turn her son over to his father is not resistance); Higgins Dep. 35:19–36:11, attached as **Exhibit 5** (yelling, crying, and asking police to go away and leave her alone are not forms of resisting arrest).

35.     While Defendants discussed their investigation with their supervisor, Sgt. John Higgens, who later came to the scene, Higgins reacted in a manner suggesting he found their conduct reckless, twice exclaiming, "Holy fuck!". *See* ECF No. 96-10, Higgins video at 21:40–21:59; ECF No. 96-9, Delgado video 48:00-48:23.

**D. Defendants Used Unnecessary Force Against Haligas**

36.     Defendants used force against Haligas on January 31, 2020 when they handcuffed, and after they handcuffed, her. ECF No. 96-5, McCallum Dep. 115:11–116:2; ECF No. 96-9, Delgado video 12:05–14:35 (Haligas crying in pain, "Look at my wrist! Look at my wrist! Ow look at my wrist!" and "Help me!" until McCallum tells her, "Stop it," and "We know."); ECF No. 96-6, Delgado Dep. 212:19–213:25 (testifying that later in the arrest McCallum held a handcuffed Haligas in a "control technique," and he offered to take over because the "control hold" is "taxing" and he assumed McCallum was "tired").

37.     The only reason McCallum used force against Haligas was that she did not put her hands behind her back and allow him to handcuff her after he decided to arrest her for violating the parenting agreement. ECF No. 96-5, McCallum Dep. 117:23–118:8; *see also id.* at 279:1–11 (conceding Haligas did not intentionally injure either officer during her arrest).

38.     Stiffening or dead weight is a form of passive resistance. Ex. 4, Benigno Dep.

112:1–3; ECF No. 96-5, McCallum Dep. 45:11–14.

39.     Before arresting Haligas, Defendants failed to employ any mitigation tactics in which they were trained, including adjusting verbal commands; switching the officer giving verbal directions; creating time, distance, and space between the officer and the subject; and requesting additional personnel to come to the scene. ECF No. 96-5, McCallum Dep. 124:5–11 (McCallum conceding he didn't consider using any de-escalation tactics before the arrest); Ex. 4, Benigno Dep. 121:6–25 (summarizing mitigation tactics on which Defendants were trained); *id*. at 123:10–13 (discussing distance as a mitigation tactic; *id*. at 124:10–25 (discussing time as a mitigation tactic).

40.     Haligas suffered pain, swelling and a contusion from Defendants' use of force against her. Ex. 5, Higgins Dep. 173:23–174:12; *id.* at 181:7–21; ECF No. 96-13, Kaput Dep. 49:16–20 (medical provider who treated Haligas the day after the use of force had no reason to doubt her reports of pain); photographs of injuries, attached hereto as **Group Exhibit 7**.


Dated: February 21, 2024          /s/ Rosalind E. Dillon

                                  Alison R. Leff
                                  Thomas R. Kayes
                                  Rosalind E. Dillon
                                  The Civil Rights Group, LLC
                                  2045 W Grand Ave, Ste B, PMB 62448
                                  Chicago, IL 60612
                                  (708) 722-2243
                                  roz@civilrightsgroup.com

                                  *Attorneys for Plaintiff Melissa Haligas*

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MELISSA HALIGAS, | |
| Plaintiff, | Case No. 1:22-cv-00313 |
| v. | Hon. Elaine E. Bucklo |
| CITY OF CHICAGO et al., | |
| Defendants. | |

**INDEX OF EXHIBITS TO PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS**

| Ex. No. | Description of Exhibit |
|---|---|
| 1. | Declaration of Alison R. Leff |
| 2. | 911 Audio from January 31, 2020, Haligas000016 |
| 3. | 1/8/2020 Agreed Order, FCRL_014498 |
| 4. | Transcript of deposition of John Benigno |
| 5. | Transcript of deposition of John Higgins |
| 6. | 6/29/17 Agreed Order, Haligas000755–793 |
| 7. | Photographs of Haligas Injuries, Haligas000003–11; Haligas000401–09 |