**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MELISSA HALIGAS,          )
                                     )     Case No. 22-cv-313
        Plaintiff,      )
                                     )     Judge Elaine E. Bucklo
v.                                 )
                                   )     Magistrate Judge Young B. Kim
CITY OF CHICAGO, RICHARD    )
MCCALLUM, and JUAN DELGADO,   )
                                   )
        Defendants.     )

**DEFENDANTS' REPLY IN SUPPORT OF THEIR
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Tyler D. Michals
Jessica Griff
City of Chicago, Department of Law
2 North LaSalle Street, Suite 420
Chicago, Illinois 60602
(312) 744-1056 (Phone)
(312) 744-6566 (Fax)
Tyler.michals@cityofchicago.org
jessica.griff @cityofchicago.org
***Attorneys for Defendant Officers***

Maxwell Evan Lisy
City of Chicago, Department of Law
Federal Civil Rights Litigation Division
2 North LaSalle Street, Suite 420
Chicago, Illinois 60602
(312) 742-0305
Attorney No.: 6321014
<u>Maxwell.lisy@cityofchicago.org</u>
***Counsel for Defendant City of Chicago***

## <u>TABLE OF CONTENTS</u>

Argument ............................................................................................................................. 1

    I.     No Reasonable Jury Could Find That Officers Lacked Probable Cause to Arrest Plaintiff..................................................................................................................... 1

          A.     Officers Had Porbable Cause to Arrest Plaintiff for Unlawful Visitation Interference ................................................................................................ 5

          B.     Officers Had Probable Cause to Arrest Plaintiff for Resisting Arrest............ 11

    II.    Officers are Entitled to Qualified Immunity on Plaintiff's Unlawful Arrest Claim ... 14

    III.   No reasonable Jury Could Find that Officers Used Excessive Force in Arresting Plaintiff.................................................................................................................. 17

    IV.   Officers are Entitled to Qualified Immunity as to Plaintiff's Excessive Force Claim. ............................................................................................................ 22

    V.    Officer Delgado is Entitled to Summary Judgment on Plaintiff's Failure to Intervene Claim..................................................................................................................... 26

    VI.   Punitive Damages Should be Dismissed........................................................... 27

    VII.  Because There is No Underlying Claim Against the Officers, Plaintiff is Not Able to Recover Damages Against the City................................................................... 28

Conclusion ....................................................................................................................... 28

## TABLE OF AUTHORITIES

Page(s)

Cases

*Abbott v. Sangamon County, Ill.*,
 705 F. 3d 706 (7th Cir. 2013) ................................................................................................. 12

*Alicea v. Thomas*,
 815 F.3d 283 (7th Cir. 2016) ............................................................................................ 22, 23

*Bevier v. Hucal*,
 806 F. 2d 123 (7th Cir. 1986) ................................................................................................ 13

*Brooks v. City of Aurora*,
 653 F.3d 478 (7th Cir. 2011) ........................................................................................... Passim

*Bryan*,
 630 F.3d 805 (9th Cir. 2010) ................................................................................................. 16

*Chavez Garcia v. Arona*,
 2020 WL 902827 (N.D. Ill. Feb. 25, 2020) ............................................................... 22, 23, 24

*Clarett v. Roberts*,
 657 F.3d 664 (7th Cir. 2011) ................................................................................................. 23

*Dockery v. Blackburn*,
 911 F.3d 458 (7th Cir. 2018) ........................................................................................... 23, 24

*Florence v. Board of Chosen Freeholders of County of Burlington*,
 132 S.Ct. 1510 (2012) ........................................................................................................... 25

*Forrest v. Prine*,
 620 F.3d 739 (7th Cir. 2010) ................................................................................................. 23

*Garcia v. City of Chicago*,
 2012 WL 601844 (N.D. Ill. Feb. 23, 2012) ........................................................................... 18

*Graham v. Connor*,
 490 U.S. 386 (1989) ......................................................................................................... 16, 17

*Harper v. Albert*,
 400 F.3d 1052 (7th Cir. 2005) ............................................................................................... 24

*Id.*,
 569 F.3d 767 (7th Cir. 2007) ........................................................................................... 20, 21

*Jump v. Village of Shorewood*,
 42 F.4th 782 (7th Cir. 2022) ................................................................................................... 2

*Kisela v. Hughes*,
 584 U.S. 100 (2018) ............................................................................................................... 21

*Mullenix v. Luna*,
 577 U.S. 7 (2015) ............................................................................................................. 12, 13

*Mustafa v. City of Chicago*,
 442 F.3d 544 (7th Cir. 2006) ............................................................................................... 6, 8

*Payne v. Pauley*,
 337 F. 3d 767 (7th Cir. 2003) ......................................................................................... 10, 11

*People v. Agnen–Downs*,
 404 Ill.App.3d 218, 344 Ill.Dec. 24, 936 N.E.2d 166 (2010) ............................................... 16

*Rosado v. Gonzalez*,
 832 F.3d 714 (7th Cir. 2016) ................................................................................................. 24

*Schmidt v. Nissan Motor Acceptance Corp.*,
    104 F.Supp.2d 955 (N.D. IL 2000)...................................................................9

*Sheik-Abdi v. McClellan*,
    37 F.3d 1240 (7th Cir.1994)...........................................................................7

*Sow v. Fortville Police Dept.*,
    636 F. 3d 293 (7th Cir. 2011)........................................................................16

*Stokes v. Board of Educ. Of the City of Chicago*,
    599 F.3d 617 (7th Cir. 2010)...................................................................7, 8, 9

*Turner v. City of Champaign*,
    979 F.3d 563 (7th Cir. 2020).........................................................................22

*Wheeler v. Lawson*,
    539 F.3d 629 (7th Cir. 2008)...................................................................13, 21

*Williams v. Jaglowski*,
    269 F.3d 778 (7th Cir. 2001).........................................................................14

*Zitzka v. Vill. Of Westmont*,
    743 F.Supp 2d 887 (N.D. IL 2010)............................................................3, 6, 7

## Statutes

720 ILCS 5/10-5.5........................................................................................1, 2

720 ILCS 5/31-1(a).....................................................................................1, 10

Inst. 7.28...........................................................................................................25

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MELISSA HALIGAS, | ) | |
| | ) | Case No. 22-cv-313 |
| Plaintiff, | ) | |
| | ) | Judge Elaine E. Bucklo |
| v. | ) | |
| | ) | Magistrate Judge Young B. Kim |
| CITY OF CHICAGO, RICHARD | ) | |
| MCCALLUM, and JUAN DELGADO, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

Now Come Defendants, the City of Chicago ("the City"), by and through one of its attorneys, Maxwell Lisy, Assistant Corporation Counsel Supervisor, and Officers McCallum and Delgado ("Officers"), by and through one of their attorneys, Tyler D. Michals, Assistant Corporation Counsel, and in reply supporting their Rule 56 Motion for Summary Judgment, Defendants state the following:

**ARGUMENT**

Officers are entitled to summary judgment in this case for numerous reasons. First, no reasonable jury could find that Officers lacked probable cause to arrest Plaintiff. This is so because, as a matter of law, Officers had probable cause to believe Plaintiff committed two separate offenses: Unlawful Visitation Interference (720 ILCS 5/10-5.5) and Resisting Arrest 720 ILCS 5/31-1(a). Second, no reasonable jury could find that Officers used excessive force in placing Plaintiff under arrest. That is because Plaintiff was actively resisting arrest and Officers used little force in placing handcuffs on Plaintiff.

Also, Officers are entitled to qualified immunity as to both the unlawful arrest and excessive force claims. Finally, because the Officers are entitled to summary judgment, Plaintiff cannot recover damages against the City.

## I.   NO REASONABLE JURY COULD FIND THAT OFFICERS LACKED PROBABLE CAUSE TO ARREST PLAINTIFF.

In their Memorandum of Law in Support of Summary Judgment (hereinafter, "Defendants' Memorandum")(ECF No. 97), Defendants argued that probable cause existed to arrest Plaintiff for either of two offenses: 1) Unlawful Visitation Interference, and/or 2) Resisting Arrest. The law is clear, probable cause under the Fourth Amendment allows Officers to make an arrest if they reasonably believe a crime has been, is being, or is about to be committed. *Jump v. Village of Shorewood*, 42 F.4th 782, 789 (7th Cir. 2022). That is the case here.

Plaintiff's arrest for Unlawful Visitation Interference (720 ILCS 5/10-5.5) was justified based on Plaintiff's refusal to turn over M.H. pursuant to the most recent parenting agreement, which stipulated that Kevin Howard ("Howard") would have custody after 3 p.m. on the day in question – and it was after 3 p.m. when Officers entered Plaintiff's apartment. See *Defendants' Statement of Facts* ("DSOF")(ECF No. 96), at ¶ 12.

In addition, Officers had probable cause to arrest Plaintiff for resisting arrest. Again, probable cause exists "when a reasonable officer with all the knowledge of the on-scene officers would have believed that the suspected committed an offense defined by state law." *Jump*, 42 F.4th at 789. Clearly, the Officers were justified in arresting Plaintiff based on the combination of Plaintiff's words and actions, which constituted resisting arrest. (DSOF ¶¶ 20, 39, 41, 50, 51).

In her response, however, Plaintiff disputes that probable cause existed to arrest her for either offense. Plaintiff argues a variety of reasons for why a reasonable jury could find a lack of probable cause. Some of these reasons wholly mischaracterize the record, but, regardless, none of them require a denial of summary judgment.

### a. Unlawful Visitation Interference

As for Plaintiff's arrest for Unlawful Visitation Interference, Plaintiff insists that the Officers' basis for probable cause relied exclusively on 1) Howard's "self-serving" claims, and 2) a "cursory glance at a 'confusing' document Howard showed them his phone." See *Pl's Resp. to Summary Judgment,* ("Pl's Resp.")(ECF No. 108), at p. 6. As an initial matter, Plaintiff acknowledges that Officers can rely on a single credible witness to establish probable cause. *Id.* (citing *Zitzka v. Vill. Of Westmont*, 743 F.Supp 2d 887, 908 (N.D. IL 2010)). There is nothing from the conversation between Officers and Howard that suggested Howard was not credible. Contrary to Plaintiff's assertion, Officers did not need to be inherently "skeptical" of Howard's story.

Importantly, Officers did not rely on any "self-serving" claims of Howard. Instead, McCallum asked Howard if he had documentation to back up his claim that Plaintiff was infringing on his parenting time. DSOF ¶ 10-11. In the same vein, Plaintiff vastly overstates the lack of diligence on behalf of McCallum. Body Worn Camera ("BWC") video plainly shows McCallum scrolling through the relatively brief parenting order for nearly two full minutes. See DSOF ¶ 11. In that time, McCallum reads portions of the order aloud—including the paragraph granting Howard parenting time over M.H. after 3 p.m. on the day in question. *Id.*

This can hardly be referred to as a "cursory glance," as Plaintiff terms it. But semantics aside, McCallum's uncontroverted testimony was that he was able to review the pertinent portions of the order, which he believed he understood, even though he found portions of the order "confusing." DSOF ¶ 11. Still, to the extent Plaintiff characterizes the entire document as "confusing," such a claim is misleading. See *Defendants' Resp. to Pl.'s Statement of Additional Facts*, (ECF No. 118), ¶ 8. Further, McCallum had also reviewed messages that were sent between Plaintiff and Howard where Plaintiff indicated that M.H. was sick. DSOF ¶ 13.

In spite of this evidence, Plaintiff goes so far as to say, "Defendants failed to perform *any* investigation that could have created the basis of probable cause." *Pl's Resp.*, p. 8 (emphasis original). She also asserts that Officers "knew" they needed to conduct further investigation "but did not," or "forgot," to do so. *Id.* Such a claim is at odds with the facts. Based on what Officer McCallum was presented with from Howard, Officer McCallum believed that if there was other pertinent information to the court case that Howard did not present, he could learn that information through Plaintiff as a part of his investigation. DSOF ¶ 15. It was after speaking with Plaintiff inside her apartment that Officer McCallum determined he had probable cause for making an arrest for unlawful child visitation interference, because Plaintiff explicitly said she would not turn M.H. over to Howard. DSOF ¶ 48.

To refute this, Plaintiff points out that she told Officers they didn't understand the order, which is true, but she goes further, alleging that she offered to show Officers a provision of an order specifying what to do in instances where M.H. was sick, which is not true. See *Pl's Resp.*, at p. 8. In fact, at her deposition, Plaintiff conceded that she had done no such thing:

> [Defense Counsel] Q. Okay, but at this point, the officers are telling you, well, it is well after three [p.m.]. It is 4 o'clock and he wants to take custody of the kid, of [M.H.], and you are not telling them, yes, but when he is sick there is a clause that says we have to cooperate. You didn't say anything about that, correct?
>
> [Plaintiff] A. I mean yes, that is correct.

DSOF, **Ex. D**, *Plaintiff's Deposition,* 160:15-24.

Officer McCallum also repeatedly explained how his probable cause determination was aided by Plaintiff's failure to point to anything in any parenting order suggesting that a specific provision covered what to do where M.H. was sick. DSOF, **Ex. E**, *McCallum Deposition,* e.g., 113:1-6:

> [Plaintiff's Counsel] Q. And you made that determination without reading the portion of the order that [Plaintiff] wanted to show you, correct?
>
> [McCallum] A. I didn't know what portion of the order that she wanted to show me. She just discussed that she wanted to show -- she wanted

4

to show me the order, and she kept relating that he was sick. But she never related the two -- that there was anything in the order about sickness.")

See also, *Id.* at 100:16-24; 206:2-8; 209:13—210:2.

Indeed, Officers spoke with Plaintiff inside her apartment for three minutes before the situation turned sour. DSOF ¶ 31. In that span, Plaintiff never informed Officers about anything that would contradict their understanding of the January 8th parenting agreement. DSOF ¶ 20. Instead, Plaintiff took the opportunity to address a myriad of other issues, including: The history between her and Howard for why 3 p.m. was the court ordered pick up time; she also chided Officers for speaking too loudly, admonished them for their lack of understanding regarding parenting in general, asked Officers if they would like to wake M.H. themselves, offered to call the child advocate,[1] stood on her refusal to turn M.H. over to Howard, ordered Officers to leave her apartment, and threatened to call her doorman to have them removed. DSOF ¶¶ 17, 22, 24, 26-27, 28-30. But, again, setting aside all the things she *did* say, Plaintiff made *no* mention of *any* clause involving what to do if M.H. was sick. DSOF ¶ 20.

While inside the apartment, Plaintiff argues that McCallum "suddenly became clear" as to the terms of the parenting agreement, but this mischaracterizes the testimony. In fact, McCallum had been consistently clear about the parenting agreement on the principal points at issue: 1) that Howard's parenting time began at 3 p.m. that day, 2) that it was after 3 p.m., and 3) that Plaintiff was refusing to turn over M.H. DSOF ¶ 10-13, 15. Officer McCallum was clear that, in speaking with Plaintiff inside her apartment, he was seeking other pertinent information relating to the order he had read. DSOF ¶ 15.

---

[1] Plaintiff makes reference to her offer to call the child advocate, but this has little relevance. As McCallum testified, he did not know who the child advocate was – or even whether the person Plaintiff would be calling was in fact who it purported to be – and did not know what the child advocate's role would have been in relation to the dispute. See DSOF, **Ex. E**, *McCallum Deposition*, 103:17—104:4.

Plaintiff makes much of the fact that, when the offense is minor, Officers have more of an obligation to conduct reasonable avenues of investigation. *Pl.'s Resp.*, pp. 6, 8, 11, 16. In this case, however, once Officers established probable cause, there was no need to conduct further investigation. *See Mustafa v. City of Chicago*, 442 F.3d 544 (7th Cir. 2006)("[P]olice officers have no duty to investigate extenuating circumstances or search for exculpatory evidence once probable cause has been established via the accusation of a credible witness.") Further, the cases Plaintiff cites have little bearing on the facts at bar.

In *Zitzka*, cited approvingly by Plaintiff, the District Court granted partial summary judgment in favor of the police officers for two of the plaintiffs' unlawful arrest claims, while finding that other claims could go to a jury. *Zitzka*, 743 F. Supp 2d 887. The facts of *Zitzka* are complex, involving a longstanding feud between the plaintiffs and their local police department, and between the plaintiffs and their entire neighborhood. *Id.* As a result, over the course of more than a year, the plaintiffs were arrested at various times for various crimes, such as battery, criminal defacement of property, electronic harassment, and disorderly conduct. *Id.* None of the charges against the plaintiffs resulted in a conviction. *Id.* at 907.

In the two instances for which the District Court found that the defendant-detective should have conducted further investigation to establish probable cause, the plaintiffs (a husband and wife), had been arrested well after the suspected crime had occurred. For example, the plaintiffs were accused of making a harassing telephone call to a victim on April 19, 2005. *Id.* at 908. The defendant-detective investigating the crime, however, did not seek an arrest warrant until nearly two months later. *Id.* Moreover, the defendant-detective had sought the arrest warrant even after discovering that the allegedly harassing telephone call had come from a number unrelated to the plaintiffs. *Id.* at 910. The Court found that the defendant-detective should have investigated further after finding out that the phone call had come from an unrelated number. *Id.*

The other incident for which the District Court concluded that the officers lacked probable cause also involved an arrest that occurred weeks after the incident. This second incident, involving a criminal trespass, occurred on May 30, 2005. *Id.* at 912. One of the witness-victims of the trespass had allegedly seen the plaintiff standing on his property, while another witness-victim had seen the plaintiff standing only on the sidewalk. *Id.* at 913. Again, the detective investigating did not seek an arrest warrant until more than two weeks later. *Id.*

The District Court found that a reasonable jury could have found that the detective should have been skeptical of the witness who claimed to have seen the plaintiff standing on his property. *Id.* at 913.[2] This was "especially" so in light of the conflicting testimony about where the plaintiff had been standing. *Id.* The District Court found that the other factors – the information available to the officers, the amount of time that passed since the crime occurred, the gravity of the alleged crime, and the danger of its imminent repetition – each warranted the detective in conducting further investigation. *Id.* In other words, the ruling in *Zitzka* is consistent with the precedent that, when time elapses between the criminal conduct and the arrest, further investigation may be warranted. See *Stokes v. Board of Educ. Of the City of Chicago*, 599 F.3d 617, 625 (7th Cir. 2010) (citing *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1247 (7th Cir.1994) ("[W]here there is 'a lapse of time between the alleged lawbreaking and the arrest, ... we find it more likely that some type of investigation — for example, the questioning of witnesses — will be appropriate,' but finding no need for investigation where the alleged crime had just occurred and the officers arrived to find a chaotic scene").

In contrast, the facts here do not involve a situation where Plaintiff was arrested weeks after the offense had been committed, which may have obligated Officers to conduct their investigation differently. Here, Officers personally observed the offense being committed. They arrived on scene,

---

[2] The witness who allegedly saw the plaintiff standing on his property was the principal target of the plaintiffs' ire. The entire feud between the plaintiffs and the community began when they accused this witness of sexually assaulting their daughter, and subsequently blamed the police department for failing to properly investigate. *Zitzka*, 743 F. Supp 2d 887.

spoke with Howard, reviewed a court ordered parenting agreement, reviewed messages sent between Plaintiff and Howard, and spoke with Plaintiff. After Plaintiff refused to wake M.H. and ordered Officers out of the apartment, no further investigation could be made. At the conclusion of their investigation, Officers justifiably determined that probable cause existed to believe that Plaintiff's refusal to turn M.H. over to Howard during his lawful parenting time was a crime that was being committed and that would continue to be committed. Nothing more was needed. See *Mustafa*, 442 F.3d at 548 ("[P]olice officers have no duty to investigate extenuating circumstances or search for exculpatory evidence once probable cause has been established via the accusation of a credible witness. [Citation]. They may simply arrest the accused suspect.")

Finally, Plaintiff cites to *Stokes*, 599 F.3d 617, but that case is not helpful to Plaintiff. In *Stokes*, the plaintiff had been arrested for disorderly conduct after a fight broke out between parents within the principal's office at an elementary school. *Id.* The plaintiff argued that further investigation should have been conducted, but the District Court found that probable cause supported the plaintiff's arrest, and granted summary judgment for the defendants. *Id.* at 619, 624. The 7th Circuit affirmed. *Id.* at 626. In doing so, the Court explained that police officers must be given "latitude to make reasonable judgments in light of the circumstances," and that "the Fourth Amendment does not require an officer with probable cause to arrest to wait while pursuing further investigation." *Id.* at 624. Likewise, here, Officers were entitled to latitude in making reasonable judgment in light of the evidence they had at hand, to wit: A valid court order, a credible complainant (Howard), and a non-complying suspect (Plaintiff).

Based on the foregoing, Officers, as a matter of law, had probable cause to arrest Plaintiff for unlawful arrest. Therefore, Officers must be granted summary judgment on Plaintiff's unlawful arrest claim.

**b. Officers had probable cause to arrest Plaintiff for resisting arrest.**

Plaintiff's argument against probable cause for resisting arrest is similarly unavailing. She argues, for instance, that she had no reason to know that Officers were attempting to arret her. *Pl's Resp.*, p. 12. This Court need not accept Plaintiff's assertion where it is blatantly contradicted by the BWC.[3] The video clearly shows that Officer McCallum explicitly told Plaintiff she would be going to jail if she refused to turn over M.H. to Howard. DSOF ¶ 28. McCallum then informed Plaintiff that regardless of what the child advocate said, she would be arrested if she continued to refuse to turn M.H. over to Howard. DSOF ¶ 30. Once Plaintiff ordered Officers to leave her apartment, Officer McCallum removed his handcuffs in anticipation of placing Plaintiff under arrest. DSOF ¶ 33. Then, Officer McCallum reached for Plaintiff's wrist in order to apply handcuffs. DSOF ¶ 37. Officer McCallum then warned Plaintiff that if she did not calm down, he would place her under arrest. DSOF ¶ 38. As Plaintiff got progressively more upset, Officer McCallum approached her, with handcuffs in his hand, in order to place her under arrest. DSOF ¶ 40. The above referenced facts, established by the video and supported by the deposition testimonies, give the lie to Plaintiff's claim that she did not know Officers were attempting to arrest her.

Moreover, McCallum told Plaintiff to put her hands behind her back numerous times to which Plaintiff responded, "No, leave me alone." DSOF ¶ 50. Plaintiff now claims that she was not responding to McCallum's lawful order, but rather, she was "in her own head." See *Pl.'s Resp*, p. 13. But again, this does not support her argument. Probable cause is an objective inquiry viewed from the perspective of a reasonable police officer. *Stokes*, 599 F. 3d at 622 ("A court evaluates probable cause

---

[3] Plaintiff repeatedly suggests that this Court's hands are tied by its findings at the motion to dismiss stage. *Pl.'s Resp.*, pp. 10-15,19, 22, 25. But at the summary judgment stage, the case sits in an entirely different posture. Whereas the motion to dismiss was limited to the initial pleadings, this Court now has the benefit of the full record, including video, discovery answers and depositions, that add essential details to the situation surrounding Plaintiff's claims. See *Schmidt v. Nissan Motor Acceptance Corp.*, 104 F.Supp.2d 955 (N.D. IL 2000)("The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide its merits.")

not with the benefit of hindsight, and not on the facts as perceived by an omniscient observer, but on the facts as they appeared to a reasonable person in the defendant's position, even if that reasonable belief turned out to be incorrect."). However Plaintiff might rationalize her refusal to comply with Officers' attempts to place her under arrest in hindsight, it was clearly reasonable for Officers to understand her statement of "No, leave me alone," to be in response to McCallum's order to place her hands behind her back. Even if Plaintiff was, as she suggests, "in her own head," Officers were not obligated to get in there with her.

Just as important, however, is the incontrovertible fact that Plaintiff's body movements in the face of arrest constituted active resistance. 720 ILCS 5/31-1(a). Plaintiff argues that backing away and yelling, as she did, does not in itself constitute resisting arrest. See *Pl.'s Resp.*, p. 12. But this ignores the applicable case law, as well as the remainder of Plaintiff's actions, including that she pulled her arms in towards her body, contorted her body in an effort to "get smaller," and struggled against Officers while they attempted to apply handcuffs. DSOF ¶ 50-54. Plaintiff calls this interpretation of events as "strained," but the incident is captured on video, and in any event, the video is supported by Plaintiff's own testimony. *Id.* As explained more fully in *Defendants' Memorandum* Plaintiff's actions constituted resisting arrest as a matter of law, and no reasonable jury could find otherwise.

Plaintiff relies on *Payne v. Pauley*, 337 F. 3d 767 (7th Cir. 2003), but that case carries little weight here. In *Payne*, by the defendant-officer's own admission, he and the plaintiff told "clearly two stories." *Id.* at 770. The Court adopted the version of facts as laid out by the plaintiff, and denied the defendant-officer's motion for summary judgment. *Id.*

The situation encountered in *Payne* simply has no relevance here. Although the defendant-officer in *Payne* claimed the plaintiff had taken certain actions to avoid arrest, there was no video, and the Court deferred entirely to the plaintiff's version of events. *Id.* at 776. Critically, in the absence of video, the plaintiff had denied taking virtually any actions to avoid arrest whatsoever, recounting a

completely different sequence of events. *Id.* at 776 ("In fact, [the plaintiff] . . . asserts that she did not shout or swear at [the defendant-officer]; she did not attempt to speak to her son once he was placed in the police car; she did not disobey any orders from [the defendant-officer] regarding moving the truck; and she did not resist arrest, or incite the crowd."); see also *Id.* at 774 (The plaintiff further claimed that the defendant-officers "grappled over" the plaintiff's arm for approximately thirty minutes – not because the plaintiff was resisting arrest, but "because the officers were arguing over who would handcuff her.")

In contrast, here we have the benefit of BWC that helps to elucidate the available testimony. Furthermore, the stories of both parties support one another in material aspects. At her deposition, Plaintiff admitted to hearing McCallum order her to put her hands behind her back multiple times. DSOF ¶¶ 47, 50, 52. She even admitted to not complying with that order. *Id.* Plaintiff could not deny maneuvering her body to avoid arrest, a fact that could hardly be denied in light of the BWC. She tacitly acknowledged pulling away to the maximum extent she could within her enclosed kitchen. *Id.* **Ex. D**, at 168:6-11(Plaintiff explaining that she couldn't "pull away any more" than she already had, since she had already backed up against the wall). Plaintiff also admitted to "getting smaller" as McCallum and Delgado approached to effectuate the arrest. *Id.* Plaintiff also admitted to pulling her arms towards into her body – [Defense Counsel] Q. My question is, do you agree that . . . you are pulling your arms into your body? [Plaintiff] A. Yes, I'm covering myself more and more. *Id.* at 168:16-19. Thus, the situation in *Payne* is entirely dissimilar to the facts at bar.

Moreover, Plaintiff's attempt to distinguish *Brooks v. City of Aurora*, 653 F.3d 478 (7th Cir. 2011) is unconvincing. Plaintiff claims that, unlike the plaintiff in *Brooks*, the video does not show that she "repeatedly, physically rebuffed" the Officers' attempt to arrest her. *Pl's Resp.*, p. 15. In reality, not only does the video show exactly that, but her own testimony corroborates what the video shows. DSOF ¶ 50; See also DSOF, **Ex. D**, *Plaintiff's Deposition*, 167:23—168:5 (Plaintiff admitting to backing

up as far as possible against the kitchen wall to avoid arrest); *Id.* (Plaintiff admitting to "getting smaller" in response to Officers' attempts to handcuff her); *Id.* at 168:16-19 (Plaintiff admitting to pulling her arms in towards her body as Officers are trying to handcuff her.)

The uncontroverted evidence in this case clearly shows that Plaintiff resisted arrest. This issue is ripe for summary judgment, since no reasonable jury could find otherwise. Therefore, this Court should grant Defendants' motion for summary judgment as to Count I (False Arrest) because Officers had probable cause to arrest Plaintiff for interference with parental visitation and resisting arrest.

## II.     OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFF'S UNLAWFUL ARREST CLAIM.

In Defendants' opening brief, Officers argued that they were entitled to qualified immunity on Plaintiff's unlawful arrest claim so long as they had arguable probable cause to arrest Plaintiff for either the offense of Unlawful Visitation Interference or Resisting Arrest. See ECF No. 97, Argument IV(a)-(c). Arguable probable cause protects officers who reasonably but mistakenly believe that probable cause exists. *Abbott v. Sangamon County, Ill.,* 705 F. 3d 706 (7th Cir. 2013). For the reasons outlined above, Officers must have had *at least* arguable probable cause to believe that Plaintiff was breaking the law because, even if it was a mistaken belief, it was not an unreasonable one. Therefore, Officers are entitled to qualified immunity.

Still, even if this Court found that Officers lacked arguable probable cause, they are nonetheless entitled to qualified immunity because there was no constitutional violation, and even if there was, the violation was not so clearly established at the time of Officers' alleged misconduct every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna,* 577 U.S. 7, 11 (2015).

Once a defendant raises the defense of qualified immunity, as Defendants did in their motion, the plaintiff then bears the burden of defeating it either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack

of an analogous decision, no reasonable officer could have thought he was acting lawfully. See *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008).

Here, Plaintiff has failed to meet her burden to overcome qualified immunity. Plaintiff has not demonstrated that a constitutional violation occurred when she was arrested. As argued above, Officers had probable cause to arrest Plaintiff for multiple offenses. Yet, even assuming, *arguendo*, that this Court could find Officers lacked arguable probable cause to arrest Plaintiff for either offense, Plaintiff cannot demonstrate that such a violation was "clearly established" such that "every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 577 U.S. at 11.

Plaintiff's argument against qualified immunity is based on the notion that Officers were required to conduct a more thorough investigation prior to arresting Plaintiff. But none of the cases Plaintiff cites are closely analogous.

For example, Plaintiff cites *Bevier v. Hucal*, 806 F. 2d 123 (7th Cir. 1986), to argue that Officers were required to pursue reasonable avenues of investigation, *i.e.*, Officers should have asked Plaintiff to show them prior orders. *Pl.'s Resp.*, p. 16. In *Bevier*, the 7th Circuit held that defendant-officers conducting a child-neglect investigation should have pursued further avenues of investigation. *Id.* at 128. But *Bevier* in apposite – there, the children at issue had been removed to safety, and so there was "no threat of its imminent repetition." *Id.* at 127. Moreover, there was no risk of the plaintiffs attempting to evade arrest, and therefore further "investigation would not have interfered with [defendant's] police duties." *Id.* Still, the Court contrasted the facts of *Bevier* with cases in which an Officer has established probable cause as to every element of the crime. *Id.* at 128.

Certainly *Bevier* does not stand for the proposition that Officers were required by the Constitution to review every previous order issued in Plaintiff's family law case, especially considering no specific order was ever brought to their attention. DSOF ¶ 20. But most importantly, as opposed to the plaintiffs in *Bevier*, Plaintiff effectively ended any opportunity to investigate further by ordering

officers out of the apartment. At that point, Officers were under no obligation to ignore the crime (unlawful visitation interference) that was then occurring.

It was plainly sufficient for Officers to have reviewed the most recent order, and to then confront Plaintiff with the terms of that order to seek out whether she had a reason for her non-compliance. DSOF ¶ 15. Once confronted with the order, Plaintiff's responses clearly indicated that the order was exactly what it purported to be. DSOF ¶ 12. Plaintiff never disputed that Howard's parenting time began at 3 p.m., nor did she tell Officers that a prior order had indicated there was a provision dealing with an instance where M.H. was sick. DSOF ¶¶ 12, 20, 55. Moreover, after three minutes of discussing the issue inside her apartment, Plaintiff ordered Officers to leave, at which point further investigation was rendered impracticable, and Officers had concluded that probable cause existed. DSOF ¶ 31, 48. Thus, Officers are entitled to qualified immunity in arresting Plaintiff for Unlawful Visitation Interference.

As for Plaintiff's arrest for Resisting Arrest, Officers are also entitled to qualified immunity. In her response, Plaintiff cites to *Payne*, which, as already discussed, has very little weight when applied here. Plaintiff also cites *Williams v. Jaglowski*, 269 F.3d 778, 782 (7th Cir. 2001), but doesn't explain how the facts of that case are closely analogous. Instead, Plaintiff uses *Williams* for the propositions that 1) "[Plaintiff] 'did not engage in any physical act that in any way hindered or impeded' Defendants' arrest", and 2) "without some physical act of resistance, 'defendants did not have . . . arguable probable cause to arrest' [Plaintiff] for resisting arrest." *Pl.'s Resp.*, p. 18.

The record is clear: Plaintiff did, by her own admission, engage in physical acts that hindered the ability of Officers to place her under arrest. DSOF ¶ 50-54; *Id.*, **Ex. D**, *Plaintiff's Deposition* at 167:23—168:5 (Plaintiff admitting to backing up as far as possible against the kitchen wall to avoid arrest); *Id.* (Plaintiff admitting to "getting smaller" in response to Officers' attempts to handcuff her); *Id.* at 168:16-19 (Plaintiff admitting to pulling her arms in towards her body as Officers are trying to

14

handcuff her.) Therefore, any argument that rests upon the notion that she committed no physical acts of resistance is at odds with the record and should be disregarded.

Although it is Plaintiff's burden to overcome the qualified immunity defense by pointing to a closely analogous case, the most closely analogous set of facts comes from the case cited by Officers in their Motion: *Brooks*, 653 F.3d 478. Plaintiff attempts to wriggle out of *Brooks'* reach by arguing that she backed up only "a couple feet" from Officers, did so before Officers announced their intention to arrest her, and did not contort her body in a "defensive posture." *Pl.'s Resp.*, p. 15. As already discussed, Officer McCallum had clearly demonstrated his intent to arrest Plaintiff. At her deposition, Plaintiff acknowledged that McCallum told her to put her arms behind her back, and that she did not comply. DSOF ¶ 53. Further, the notion that she did not contort her body in a defensive posture is not only refuted by the BWC, but by her own testimony. See DSOF ¶¶ 50, 52, 54.

In sum, Plaintiff's reliance on case law where a plaintiff performed no acts of physical resistance is unavailing. No objective review of the record could support the notion that Plaintiff did not attempt to physically resist being placed under arrest. As explained above, Plaintiff's own testimony supports what the video shows, and there is no need to decide between competing versions of events. She has cited no analogous case law to suggest that Officers here are not entitled to qualified immunity on Plaintiff's unlawful arrest claim. The most analogous case law, *Brooks*, supports the opposite conclusion—that Officers here are shielded by qualified immunity.

### III.   NO REASONABLE JURY COULD FIND THAT OFFICERS USED EXCESSIVE FORCE IN ARRESTING PLAINTIFF.

In light of the available record, no reasonable jury could find that Officers used an unreasonable amount of force in arresting Plaintiff. In her response to summary judgment, Plaintiff argues otherwise. See *Pl.'s Resp.*, p. 20-21. In essence, she relies on the notion that she was merely a "non-resisting or passively resisting subject" engaging in "willful noncompliance." *Id.* at 20. This benign spin would be convenient if it were supported by the record.

Plaintiff argues that, even *if* she had stiffened her body or gone deadweight, that's a form of only "passive resistance." *Id.* For support, Plaintiff cites *Bryan v. MacPherson*, a Ninth Circuit case where the Court found that a protestor who refuses to bear his own weight, even when instructed to do so by police, is only passively resisting. *Bryan*, 630 F.3d 805, 830 (9th Cir. 2010). Plaintiff did not need to look to the Ninth Circuit for relevant case law. The law in this Circuit is sufficient to show that Officers' use of force – to the extent force was used at all – was entirely justified in light of Plaintiff's resistance.

"As in other Fourth Amendment contexts, the `reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are `objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The right to make an arrest necessarily carries with it the right to some degree of physical coercion to effect it. *Id.* at 396. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Sow v. Fortville Police Dept.*, 636 F. 3d 293 (7th Cir. 2011).

As explained more fully in Defendants' Memorandum, Plaintiff was not merely a passive resister, as she claims. Instead, Plaintiff was actively interfering with Officers' ability to place her into custody. The 7th Circuit's reasoning in *Brooks* applies with equal force to this case, demonstrating how, as a matter of law, Plaintiff resisted arrest:

> In Illinois, the crime of resisting a peace officer involves the commission of "a physical act of resistance or obstruction ... that impedes, hinders, interrupts, prevents, or delays the performance of the officer's duties, such as by going limp or forcefully resisting arrest." *People v. Agnew–Downs*, 404 Ill.App.3d 218, 344 Ill.Dec. 24, 936 N.E.2d 166, 173 (2010). Illinois courts define "resisting" or "resistance" as "withstanding the force or effect of or the exertion of oneself to counteract or defeat." *Id.* Importantly for our purposes, "[r]esisting even an unlawful arrest of a known police officer violates the statute." [citations omitted].

*Brooks*, 653 F.3d 478 at 484.

Here, Plaintiff's actions fall squarely within what this Circuit has deemed to be resisting arrest. By her own admission, Plaintiff committed voluntary physical acts, which impeded, hindered, interrupted, prevented, *and* delayed the performance of Officers in carrying out their duties. DSOF ¶¶ 45, 46 49, 50, 51, 52, 53, 54. Further, by Plaintiff's own admission, Plaintiff both attempted to withstand the force of arrest, *and* exerted herself to counteract the arrest. *Id.* All of this is supported by the BWC, and Plaintiff's actions constituted resisting arrest as a matter of law.

Plaintiff's other arguments for excessive force fall flat. For example, Plaintiff alleges that she posed no threat to Officers while in her kitchen. *Pl.'s Resp.*, p. 21. While Plaintiff was unarmed, she was also visibly agitated, and as McCallum testified, the kitchen can be a dangerous location given its access to items that could be used as weapons. DSOF ¶¶ 42-44. Officers did not know Plaintiff, and therefore could only guess at the limits of her emotional volatility. *Id.* It's also telling that, after the situation had calmed down, Plaintiff apologized for her actions numerous times, and admitted that she should have handled the situation differently. DSOF ¶ 61, 68.

In hindsight, perhaps, it could be said that Plaintiff did not pose much of a physical threat – as Officers later agreed. But in the moment, Officers could not be sure that Plaintiff posed no threat. DSOF ¶ 42-44; See also *Id*, **Ex. D**, *McCallum Deposition*, 118:19-25 ("[Plaintiff] appeared angered towards me, and she was aggressive, and she also ordered us to leave the apartment. So I believe she did not want to comply with me placing her into custody. And we're in an area where there could be multiple weapons, chemicals, sharp objects, heavy objects that could cause me pain or harm.") At any rate, such issues are not judged with the benefit of hindsight. See *Graham v. Connor*, 490 U.S. 386, 397 (1989)("As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.")

It should also be noted that Plaintiff makes no particularized allegations of excessive force used except as to the application of handcuffs. See *Pl.'s Resp.*, pp. 20-26. She argues that Officers applied handcuffs too tightly as evidenced by her exclamations of pain over her wrist. *Pl.'s Resp.*, p. 21-24. She also imparts knowledge to Officer McCallum because he responded to her initial claims of pain by responding, "Stop it," and "We know." *Id.* at 21.

But the case law is clear that it is not necessarily sufficient for a plaintiff to make a general complaint of wrist pain without any follow up – even where officers are made aware of it initially. See *Garcia v. City of Chicago*, 2012 WL 601844, at *8 (N.D. Ill. Feb. 23, 2012) (holding that the officer did not use excessive force in handcuffing the plaintiff where the plaintiff "stopped complaining about the handcuffs once he was in the police car, did not complain about the handcuffs when he arrived at the police station, did not report any physical injury or request medical treatment while in custody, and sought no medical treatment upon his release.")

Here, while Plaintiff claimed to have suffered wrist pain while being handcuffed, she never requested that Officers loosen the cuffs. DSOF ¶ 55. She also had no qualms about maneuvering around while handcuffed, including, at one point, showing impressive dexterity by bringing a water bottle to her mouth despite the cuffs. DSOF, **Ex. I**, *Delgado BWC* at 30:20—30-25. Later that evening, Plaintiff was transported to Northwestern Memorial Hospital where she left before receiving treatment. DSOF ¶ 72.

The following day, February 1, 2020, Plaintiff went to Northwestern Immediate Care for two separate reasons: 1) For an examination of her right wrist, and 2) for an unrelated health reason. DSOF ¶ 73. According to Carly Martinez, the physician assistant who treated Plaintiff on February 1st, Plaintiff did not complain of pain to her left wrist, elbows, or shoulders. DSOF ¶ 73. The x-ray on her right wrist came back negative. DSOF, **Ex. M**, *Deposition of Dr. Martinez* at 36:1-3. Dr. Martinez drew no conclusions about whether Officers used excessive force in this case, and the only

18

information she had regarding Plaintiff's alleged wrist pain came from Plaintiff herself. *Id.* at 23:22-25:3; 50:5-10. Based on these facts, no reasonable jury could find that Officers used excessive force in arresting Plaintiff. Officers are therefore entitled to summary judgment as to this claim.

### a. NO REASONABLE JURY COULD FIND THAT DELGADO USED EXCESSIVE FORCE

Even assuming, *arguendo*, that this Court finds that there is a question of fact as to whether Officer McCallum used excessive force in arresting Plaintiff, no reasonable jury could find that Officer Delgado committed excessive force. At her deposition, when Plaintiff was asked directly what force Delgado used that was excessive, Plaintiff offered up only conjecture:

> [Plaintiff] A. I can say for certain McCallum did use excessive force. Delgado, I couldn't feel whose hand was doing what. So to just blame McCallum when it could be Delgado as well, I don't think that's fair.
>
> [Defense Counsel] Q. Other than handcuffing you, did Delgado use any other force on you?
>
> [Plaintiff] A. I don't believe so. No. But he certainly didn't protect me.
>
>                        \***
>
> [Defense Counsel] Q. So is it possible that in placing handcuffs on you, Officer Delgado did not use any excessive force?
>
> [Plaintiff] A. That is a possibility, yeah. I can't say for sure.

DSOF, **Ex. D**, *Plaintiff's Deposition*, 270:10-17; 271:3-9.

As to the arrest, Plaintiff now says that, even though she could not explain what Delgado did to deserve liability at her deposition, he should still be held accountable for excessive force. Pl.'s Resp. pp. 24-25. This is so, Plaintiff says, because even though she was unable to see at the time of her arrest, the video shows the force Delgado used. *Id.* Yet, at her deposition, Plaintiff was shown BWC video from the perspective of both Officers. DSOF ¶ 54. Even after having watched both videos, Plaintiff could not testify as to what force Delgado used that was excessive. Just as Plaintiff could not determine what force Delgado used that was excessive, no reasonable jury could be expected to, either.

## IV. OFFICERS ARE ENTITLED TO QUALFIED IMMUNITY AS TO PLAINTIFF'S EXCESSIVE FORCE CLAIM.

As a threshold matter, to defeat qualified immunity, Plaintiff must show that a constitutional violation occurred. No such violation can be shown where, as here, Officers used very little force aside from attempting to place handcuffs on Plaintiff, who was uncooperative, and Plaintiff suffered very minor injuries. DSOF ¶ 40-55, 73-74.

The case of *Stainback v. Dixon* is instructive. *Id.* 569 F.3d 767 (7th Cir. 2007). In *Stainback*, two defendant-deputies travelled to the home of a third-party to arrest the plaintiff for an outstanding traffic warrant. *Id.* at 769. Upon arrival, the defendants asked the plaintiff to put his hands behind his back, but the plaintiff did not do so. *Id.* Instead, the plaintiff asked the detectives not to handcuff him because it "would hurt." *Id.* Nonetheless, the two defendants "quickly pulled [the plaintiff's] arms behind his back" and handcuffed him. *Id.*

Once in the back of the squad car, the plaintiff complained to the defendants that the handcuffs were hurting his shoulders, and asked that they be removed. *Id.* The defendants responded that the cuffs would be removed in "a few minutes." *Id.* Several minutes later, after the plaintiff had been driven home by the defendants, he asked again that they be removed, but the defendants did not do so. *Id.* After the plaintiff's daughter paid the plaintiff's bond money, the defendants uncuffed and released the plaintiff. *Id.* As a result of the handcuffing, the plaintiff allegedly suffered two torn rotator cuffs, which required surgery and medical treatment. *Id.*

The District Court granted summary judgment for the defendants based on qualified immunity, and the 7th Circuit agreed. *Id.* at 770. The Court explained that "[t]he Officers did not use handcuffs in a manner that would clearly injure or harm a typical arrestee. Furthermore, it was not objectively clear to the Officers that [the plaintiff] suffered from any infirmities." *Id.* at 773. Similarly, here, there is no allegation that Officers used handcuffs in a "manner that would clearly

injure or harm a typical arrestee." Nor did Plaintiff suffer from any apparent physical infirmities. Indeed, the 7th Circuit's conclusion in *Stainback* applies to the facts at bar:

> At most, the record shows that [the plaintiff] said that he did not want to be handcuffed because he thought it would hurt and that [the plaintiff] complained generally about pain after he was handcuffed. These generalized complaints, without any elaboration regarding a preexisting injury or other infirmity, would not have placed a reasonable officer on notice that [the plaintiff] would be injured by these actions. We therefore must conclude that the Officers' actions were reasonable under the circumstances and that no violation of the Fourth Amendment occurred.

*Id.*

In this case, Officers plainly did not violate the U.S. Constitution by placing handcuffs on Plaintiff. Plaintiff alleges that Officers cannot use a high-level of force on a non-resisting or passive resisting subject. *Plaintiff's Resp. to Summary Judgment*, p. 25. But Plaintiff has the situation backwards. The record clearly demonstrates a relatively low amount of force used against a subject who was actively resisting. The notion that a high level of force was used in arresting Plaintiff is plainly belied by the record, and Plaintiff makes no mention of anything that could reasonably be understood to be significant force in her response. See *Pl.'s Resp.*, pp. 20-25.

Again, to overcome qualified immunity, it is Plaintiff who must identify a closely analogous case or persuade the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully. E.g., *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008). She has failed to do so.

The obligation for Plaintiff to find an analogous case is especially important in the excessive force context. As the Supreme Court has pointed out, "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue. *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). The Court went on to say:

> [I]t does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."

The cases Plaintiff cites to do not "squarely govern" the issues at bar. For instance, Plaintiff cites *Payne* approvingly, but as explained above, that case in inapposite. There, the plaintiff and the defendant told entirely different stories. The Court adopted the plaintiff's version of events, which denied any actions whatsoever that could have constituted resisting arrest. As explained in detail above, the events of the instant case are not so divergent. In fact, in material aspects they corroborate one another. Even taking the record in the light most favorable to Plaintiff, Officers were entirely justified in putting handcuffs on Plaintiff.

Plaintiff makes cursory references to *Turner v. City of Champaign*, 979 F.3d 563, 569 (7th Cir. 2020); *Alicea v. Thomas*, 815 F.3d 283, 292 (7th Cir. 2016); and *Chavez Garcia v. Arona*, No. 17 C 6136, 2020 WL 902827, at *5 (N.D. Ill. Feb. 25, 2020). But those cases are either not analogous, or support Officers' case for summary judgment. In *Turner*, the 7th Circuit affirmed a grant of summary judgment for defendant-officers where deadly force was used against the plaintiff, who was having a mental episode and was actively resisting arrest. *Id.* 979 F.3d at 571.

In *Alicea*, one of the defendant-officers ordered a police dog to "bite and hold" a burglary suspect that had complied with the defendant's orders, and had raised his arms in an attempt to submit to arrest while standing in an empty above-ground pool. *Id.* 815 F.3d 283 at 289. Before sending the canine after the plaintiff, the defendant officer had allegedly yelled out, "you like robbing houses you f**king punk?" *Id.* A second defendant officer approached the plaintiff after he had been severely injured by the dog, and allegedly proceeded to punch and stomp on the plaintiff's head. *Id.*

The 7th Circuit found that, "Commanding a dog to attack a suspect who is already complying with orders" and "[p]unching, stomping and kicking a suspect who is on the ground and seriously injured similarly violates clearly established law." *Id.* at 292. Clearly, however, the facts in *Alicea* are not closely analogous to our case. Officers here did not employ the use of a dog, used no insulting language, did not punch, stomp, or kick Plaintiff (who did not suffer serious injuries); and importantly, Officers, here, were dealing with a suspect who was not complying with orders. DSOF ¶¶ 40-55.

Finally, Plaintiff's citation to *Chavez Garcia* strongly supports Officers' case. In *Chavez Garcia*, the plaintiff was arrested as part of an operation conducted by DEA agents. *Id.* No. 17 C 6136, 2020 WL 902827, at *1 (N.D. Ill. Feb. 25, 2020). The plaintiff was not the target of the investigation, and he was, at best, only tangentially related to the suspected criminal activity. *Id.* at *4. There was no video, and the plaintiff denied taking any actions whatsoever to evade arrest; but rather, the plaintiff insisted he complied with every request. *Id.* Nonetheless, the plaintiff alleged that the defendant-officer twisted his arm, placed him face first on the ground, and handcuffed him, causing severe pain that left the plaintiff unable to move his shoulder. *Id.* at *2.

The Court denied the Officer's motion for summary judgment, but in doing so, the court contrasted the facts of *Chavez Garcia* with facts that are more closely analogous to the instant case:

> "Many decisions hold that there is no clearly established rule forbidding a clean takedown to end mild resistance...." *Id.* (collecting cases). Examples of resistance that justified some force include kicking and flailing, declining to follow instructions while acting in a belligerent manner, and swatting an arresting officer's hands away while backpedaling. *See Clarett v. Roberts*, 657 F.3d 664, 674–75 (7th Cir. 2011); *Forrest v. Prine*, 620 F.3d 739, 745–46 (7th Cir. 2010); *Brooks v. City of Aurora*, 653 F.3d 478, 481 (7th Cir. 2011). Summary judgment may be appropriate where the refusal to submit to authority is unambiguous on the record before the court. *See Dockery v. Blackburn*, 911 F.3d 458, 468 (7th Cir. 2018) (holding that video evidence unambiguously showed the plaintiff had not submitted to officer's authority before being tasered a second time).

*Id.* at *5.

The *Chavez Garcia* court explained, "[a] few themes emerge from these cases that illustrate the distance between previous cases upholding application of qualified immunity and this case." *Id.* First, "unlike the plaintiffs in *Brooks* and *Dockery*,[4] [the plaintiff] denies resisting arrest in *any* manner." *Id.* at *5 (emphasis original). In addition, "no objective evidence can corroborate [the defendant's] recounting of the facts, which differs from *Brooks* and *Dockery* where the altercations were captured on video." *Brooks*, 653 F.3d at 481; *Dockery*, 911 F.3d at 461.

Thus, the *Chavez Garcia* case positively refutes Plaintiff's argument against qualified immunity, and places it squarely within the holding of *Brooks*. Plaintiff cannot plausibly claim that she did not resist arrest "in *any* manner," nor can she avoid the fact that objective evidence – i.e., the BWC – corroborates the Officers' recounting of the facts.

In sum, no analogous cases are cited to overcome the defense of qualified immunity. Rather, the relevant case law points to the opposite conclusion.

## V. OFFICER DELGADO IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FAILURE TO INTERVENE CLAIM.

As Plaintiff has failed to demonstrate an underlying constitutional violation, Plaintiff's failure to intervene claim against Delgado must fail. See *Rosado v. Gonzalez*, 832 F.3d 714, 718 (7th Cir. 2016) (quoting *Harper v. Albert,* 400 F.3d 1052, 1064 (7th Cir. 2005)) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation.") As argued in Defendants' Memorandum, ECF No. 97, Plaintiff has not adequately demonstrated that there was any underlying constitutional violation for either unlawful arrest or excessive force. Under the circumstances of this case, Officer Delgado could not reasonably have known that McCallum's attempts to place Plaintiff handcuffs on Plaintiff was a constitutional violation. Therefore, Officer Delgado cannot be held liable for her failure to intervene claim.

---

[4] *Dockery v. Blackburn*, 911 F.3d 458 (7th Cir. 2018),

## VI.     PUNITIVE DAMAGES SHOULD BE DISMISSED

As Officers argued in their Memorandum, this Court should dismiss Plaintiff's request for punitive damages. Defendants rely on their Memorandum, and those reasons stated above, as a sufficient refutation of the notion that Officers acted with "evil" intent, or with reckless disregard for Plaintiff's constitutional rights. Both the record and video evidence irrefutably shows that, at best, the Officers believed (even if mistakenly) that Plaintiff was interfering with the lawful parenting time of M.H's father. As a result, the Officers took steps to rectify that.  Plaintiff's admission that she "could have handled things differently, DSOF ¶ 68, and her repeated apologies to the Officer on scene, DSOF ¶ 61, highlight that, at worst, this was an issue of mistake, not one of "ill will or spite done for the purpose of injuring Plaintiff." 7th Cir. Pat. Jury Inst. 7.28.

Still, Plaintiff argues that there is "[p]lenty of evidence" that Officers acted in reckless disregard for Plaintiff's rights, such as by refusing to allow Plaintiff to show them "the parenting order she was relying upon." *Pl.'s Resp.*, p. 28. As argued above, Plaintiff never articulated there was a separate order that Officer McCallum should have read. DSOF ¶ 55. There was no reckless disregard for Plaintiff's constitutional rights merely because McCallum did not intend to read the same order he had already read. Further, Plaintiff's claim that Officers "repeatedly threatened to take her to jail for a crime they knew was not punishable by imprisonment," is contradicted by her concession that the crime was arrestable. *Pl.'s Resp.*, p. 6 FN 1. In any event, as the Supreme Court has noted, "Persons arrested for minor offenses may be among the detainees to be processed at jails." *Florence v. Board of Chosen Freeholders of County of Burlington*, 132 S.Ct. 1510, 1512 (2012).

Finally, Plaintiff asserts that the misconduct was so obvious to Sgt. Higgins that he twice exclaimed, "Holy fuck!" while questioning them about their investigation. See, *Pl.'s Resp.*, p. 28. This is bogus. As explained in Defendants' Response to Plaintiff's Statement of Additional Facts, ECF No. 118. Plaintiff has taken Higgins' statement entirely out of context. See *Defendants' Response to Pl.'s SOAF*

at ¶ 35. At his deposition, Sgt. Higgins explained that it was *his* misapprehension of the situation, rather than Officers' alleged mishandling, that led to the exclamations. *Id.* Therefore, this Court should dismiss Plaintiff's claim for punitive damages against Officers McCallum and Delgado.

### VII. BECAUSE THERE IS NO UNDERLYING CLAIM AGAINST THE OFFICERS, PLAINTIFF IS NOT ABLE TO RECOVER DAMAGES AGAINST THE CITY.

As argued in   Defendants' Memorandum, because there are no underlying constitutional claims against Officers, Plaintiff cannot recover damages against the City. See *Defendants' Memorandum*, p. 32-33, Argument VI.

<u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, Defendants are entitled to summary judgment on all of Plaintiff's claims. Officers had probable cause to arrest Plaintiff for multiple offenses. No reasonable jury could find otherwise. Further, in light of Plaintiff's resistance, and the minor amount of force used to bring Plaintiff under control, no reasonable jury could find that Officers used excessive force in arresting Plaintiff. In any event, Officers are entitled to qualified immunity, as Plaintiff has utterly failed to meet its burden to combat their qualified immunity defense.

Respectfully Submitted,

BY: */s/ Tyler D. Michals*
Tyler D. Michals
Assistant Corporation Counsel
Jessica Griff, Chief Assistant Corporation Counsel
City of Chicago, Department of Law
2 North LaSalle Street, Suite 420
Chicago, Illinois 60602
(312) 744-1056 (Phone)
(312) 744-6566 (Fax)
Tyler.michals@cityofchicago.org
jessica.griff @cityofchicago.org
***Attorneys for Defendant Officers***

*/s/ Maxwell Lisy*
Maxwell Evan Lisy, Assistant Corporation Counsel Supervisor
City of Chicago Department of Law
Federal Civil Rights Litigation Division
2 North LaSalle Street, Suite 420
Chicago, Illinois 60602
(312) 742-0305
Attorney No.: 6321014
Maxwell.lisy@cityofchicago.org
Counsel for Defendant City of Chicago