IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Melissa Haligas, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 22 C 313 |
| | ) | |
| | ) | |
| City of Chicago, Richard | ) | |
| McCallum, and Juan Delgado, | ) | |
| | ) | |
| Defendants. | ) | |

Memorandum Opinion and Order

Chicago Police Officers Richard McCallum and Juan Delgado (the "Officers") were called to Melissa Haligas' apartment building by her ex-boyfriend, who claimed she was violating a court order by failing to hand over their son. After speaking with the ex-boyfriend and cursorily reviewing a copy of the order on his phone, the Officers proceeded to Haligas' apartment, where they ultimately arrested her. Haligas was not charged with any crime and was released the same day. She sued the Officers under 42 U.S.C. § 1983 for false arrest, excessive force, and failure to intervene, and sued the City of Chicago under state law for indemnification and under § 1983 for failure to train and for its alleged policy of escalating police encounters with non-threatening suspects. Defendants now move for summary judgment.

For the reasons explained below, the motion is granted in part and denied in part.

I.

The following facts are described as favorably to Haligas as the record and Federal Rule of Civil Procedure 56 permit. On January 31, 2020, the Officers responded to a call from Haligas' ex-boyfriend Kevin Howard at Haligas' apartment building. Pl.'s Resp. to Defs.' Statement of Material Facts ("Pl.'s Resp. to DSMF"), ECF 109 ¶ 7. Both Officers were wearing body-worn cameras ("BWCs"). *Id.* ¶ 9. Howard told the Officers that Haligas was violating a court order by failing to bring down their son to go with Howard for the weekend. *Id.* ¶ 8. Howard showed the Officers a copy of the court order on his phone. *Id.* ¶ 10.

Officer McCallum briefly scrolled through the document and, based on his review, understood that multiple orders governed Haligas' and Howard's co-parenting relationship. *Id.* ¶ 11; Defs.' Resp. to Pl.'s Add'l Statement of Material Facts ("Defs.' Resp. to PSAMF"), ECF 118 ¶ 4. He noted the order contemplated Friday pickups "no earlier than 3 p.m." McCallum BWC, ECF 96-8 at 2:30–2:38. He further stated, while reviewing the document, "This is a confusing . . .," before trailing off. *Id.* at 3:08–3:10; Defs.' Resp. to PSAMF ¶ 8 (Officer McCallum testified at his deposition that he found aspects of the court order he reviewed confusing). Officer McCallum also reviewed messages between Haligas and Howard

2

before giving Howard his phone and going up to Haligas' apartment with Officer Delgado. Pl.'s Resp. to DSMF ¶¶ 13-14. Officer Delgado did not review the court order. Defs.' Resp. to PSAMF ¶ 5.

The Officers knocked on Haligas' door, and she invited them into her apartment. Pl.'s Resp. to DSMF ¶ 16. Shortly after walking in, Officer McCallum demanded, "Why aren't you handing over your son?" *Id.* ¶ 19. Haligas explained that her son was sick and asleep, and she was waiting for him to wake up. *Id.* She showed the Officers that her son's things were packed and ready to go as soon as he woke up. Defs.' Resp. to PSAMF ¶ 20.

Haligas explained the court order simply said that Howard was not allowed to pick up their son before 3:00 p.m., the implication being that it does not necessarily say that Howard is entitled to pick him up at any point starting at 3:00 p.m. Pl.'s Resp. to DSMF ¶ 21. She told them they did not understand the court order and offered to pull it up for them. McCallum BWC at 8:28-8:31; Defs.' Resp. to PSAMF ¶ 14. But Officer McCallum declined her offer, saying he had just looked at it. Pl.'s Resp. to DSMF ¶ 24; Defs.' Resp. to PSAMF ¶ 15. Haligas reiterated: "The court order says he cannot get him before 3 p.m.," McCallum BWC at 8:32-8:36, again apparently trying to emphasize the distinction between a prohibition on picking their son up before 3:00 p.m. and a requirement that as soon as the clock strikes three, Haligas was required to hand him over. The disagreement continued:

Officer McCallum: You violate the order.

Haligas: I didn't violate anything.

. . .

Officer McCallum: Listen, you're not going to change my opinion of this. You're violating the order. You either-

Haligas: I'm not violating anything.

Officer McCallum: If you refuse to give over your son . . . .

McCallum BWC 9:18-9:36.

Haligas said she was not going to wake up her son, to which Officer McCallum responded that she would go to jail for "unlawful violation of visitation." Pl.'s Resp. to DSMF ¶ 28. Haligas repeated that Officer McCallum did not know what was in the court order and offered to call their child advocate. *Id.* ¶ 29. Officer McCallum again insisted that he had already looked at the order. McCallum BWC 9:48-9:50. Haligas walked toward the kitchen area of her apartment to get her phone, presumably to call the child advocate. *Id.* at 9:50-9:55. As she did, Officer McCallum said, "You're gonna be going to jail." *Id.*

Haligas then asked the Officers to leave her apartment, but they refused. Pl.'s Resp. to DSMF ¶¶ 31-32. Haligas said she was going to call 9-1-1, at which point Officer McCallum said, "That's it," attempted to snatch the phone out of her hand, and told her she would be arrested if she did not calm down. Defs.' Resp. to PSAMF ¶ 33; McCallum BWC at 10:08-10:17. He advanced on Haligas as

4

she backed up into her kitchen. *Id.* at 10:18-10:24. In a panicked voice, Haligas said, "Excuse me," and tried to get past Officer McCallum, but he physically rebuffed her. *Id.* at 10:25-10:30.

Officer McCallum told her to turn around and put her hands behind her back. Pl.'s Resp. to DSMF ¶ 47. Haligas, who was backed up against the wall, screamed, brought her arms in toward her body, and fell to the floor. McCallum BWC at 10:30-10:44. She claims the Officers pulled her to the floor and then pulled her up again. Defs.' Resp. to PSAMF ¶ 23. She continued to scream as the Officers physically restrained her, including exclamations about her wrists. McCallum BWC at 10:30-11:05; Pl.'s Resp. to DSMF ¶ 55. In the minutes that followed, Haligas continued to express that she was in pain. *See* McCallum BWC at 11:27-13:10 (repeatedly drawing attention to her wrist and saying "ow" as she whimpered). In response to some of these complaints, the Officers said things like "stop it" and "we know." *Id.*

While the Officers waited for other law enforcement to arrive, Haligas sat handcuffed on the floor of her kitchen, offering once more to call the child advocate and to pull the order up; McCallum replied, again, that he had already read the order. *Id.* at 14:35-14:40, 16:58-17:03. Haligas was eventually escorted to a police vehicle in handcuffs. Pl.'s Resp. to DSMF ¶ 66. That evening, she was taken to Northwestern Memorial Hospital, but did not receive treatment there at that time. *Id.* ¶¶ 71-72. The next day, she went

to Northwestern Immediate Care for examination of her right wrist; her records show she presented with pain, swelling, and a contusion. *Id.* ¶ 73; Defs.' Resp. to PSAMF ¶ 40.

## II.

If the Officers had probable cause to arrest Haligas, her false arrest claim is barred. *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 622 (7th Cir. 2010) (citation omitted). "An officer has probable cause to arrest if 'at the time of the arrest, the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Neita v. City of Chicago*, 830 F.3d 494, 497 (7th Cir. 2016) (quoting *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012)). It is an objective inquiry that turns on how a reasonable officer under the circumstances would assess the situation, without regard to the officer's subjective state of mind. *Abbott v. Sangamon County*, 705 F.3d 706, 714 (7th Cir. 2013).

Defendants offer up two possible crimes for which there was probable cause to arrest Haligas. The first is unlawful visitation interference under 720 Ill. Comp. Stat. 5/10-5.5(b). That statute provides:

> Every person who, in violation of the visitation, parenting time, or custody time provisions of a court order relating to child custody, detains or conceals a

child with the intent to deprive another person of his
or her rights to visitation, parenting time, or custody
time commits the offense of unlawful visitation or
parenting time interference.

*Id.*

Defendants maintain that Howard's allegation that Haligas was unlawfully withholding their son, plus Officer McCallum's review of the child custody order on Howard's phone, gave them probable cause to arrest Haligas for this crime. It is true that "[o]nce a reasonably credible witness informs an officer that a suspect has committed a crime, the police have probable cause to arrest the suspect." *Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir. 2006) (citations omitted). But Howard's credibility is questionable, given the adverse relationship one might expect between separated parents in general and which Howard's resort to police intervention suggests was present here in particular. Nor is it clear that the document on Howard's phone was enough to overcome concerns about Howard's reliability. The BWC footage shows Officer McCallum quickly scrolling through the child custody order and expressing he found the document "confusing." He also understood that it was not the only order that spoke to the conditions of custody between Haligas and Howard. Yet any uncertainty on Officer McCallum's part apparently dissolved when he entered Haligas' apartment, as he steadfastly maintained that he had reviewed the court order and knew what it required. Even

Haligas' repeated assertions that she was not violating the order and her offers to get a copy for him did not shake him from his position that he had seen all he needed to. In response to one of these offers by Haligas, Officer McCallum was explicit that it would not change his opinion.

While the Officers had no "free-standing affirmative duty" to "pursue all avenues of investigation before arrest," *Jump v. Vill. of Shorewood*, 42 F.4th 782, 791 (7th Cir. 2022), further investigation is sometimes warranted. Whether that is so depends on factors such as "the information available to the officer, the gravity of the alleged crime, the danger of its imminent repetition, and the amount of time that has passed since the alleged crime." *Stokes*, 599 F.3d at 625; *see also BeVier v. Hucal*, 806 F.2d 123, 127 (7th Cir. 1986) ("Under Seventh Circuit precedent, . . . probable cause is a function of information and exigency." (footnote omitted)). Here, the circumstances did not require quick action on the Officers' part, as no serious crime was underway. Further investigation, moreover, was well within reach: Haligas offered to give the Officers a court order--whether the same order Officer McCallum had already viewed or a different one, we do not know--she claimed would show she was in compliance. And there is sufficient evidence to conclude that a reasonable officer would hesitate to rely too heavily on the information Officer McCallum had received so far, from a potentially biased

witness and a single, incomplete, court order that he found confusing. Under these circumstances, the Officers are not entitled to summary judgment on whether there was probable cause to arrest Haligas for violation of the unlawful visitation interference statute. *See Zitzka v. Vill. of Westmont*, 743 F. Supp. 2d 887, 908 (N.D. Ill. 2010) ("[I]f the victim's or witness's information would lead a reasonable officer to be suspicious, the officer has a duty to pursue reasonable avenues of investigation and may not close his or her eyes to facts that would clarify the situation." (citing *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009); *Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003))).

Defendants argue that they had probable cause to arrest Haligas for the separate offense of resisting arrest. *See* 720 Ill. Comp. Stat. 5/31-1(a). That statute provides:

> (a) A person who knowingly:
>
> > (1) resists arrest, or
> >
> > (2) obstructs the performance by one known to the person to be a peace officer . . . of any authorized act within his or her official capacity commits a Class A misdemeanor.

*Id.* Illinois courts interpret "resisting" or "resistance" to mean "withstanding the force or effect of or the exertion of oneself to counteract or defeat." *People v. Agnew-Downs*, 936 N.E.2d 166, 173 (Ill. App. Ct. 2010) (citation omitted).

As an initial matter, I must "pinpoint the moment" at which Officer McCallum "arrested or attempted to arrest" Haligas, "which is necessary to determine whether her actions constituted resisting arrest." *Abbott*, 705 F.3d at 719 (citing *Agnew-Downs*, 936 N.E.2d at 173–74). The relevant moment is "'when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.'" *Abbott*, 705 F.3d at 719 (quoting *Ochana v. Flores*, 347 F.3d 266, 270 (7th Cir. 2003)). The first arguable mention of arrest during the encounter came when Officer McCallum said, "Well then you're going to jail" and "You're gonna be going to jail." McCallum BWC at 9:37–9:40, 9:52–9:54. When he said these things, however, he does not appear to have moved toward Haligas or to have otherwise indicated to her that this was anything other than a possible, but not inevitable, outcome. Further, immediately after he tried grabbing Haligas' phone from her hand, he said "Calm down, or you're gonna be arrested," *id.* at 10:14–10:17, and had drawn his handcuffs, Delgado BWC, ECF 96-9 at 12:11–12:14.[1] One could reasonably infer from this statement that Haligas was not yet under arrest, but that she *might* be if she did not calm down. It was not until Officer McCallum

---

[1] Defendants maintain that Officer McCallum was reaching for Haligas' wrist in order to handcuff her. The video evidence viewed in the light most favorable to Haligas does not support this as the only reasonable interpretation.

said, "Alright, turn around and put your hands behind your back," and reached for her, McCallum BWC at 10:30-32, that I can conclude as a matter of law a reasonable person would have understood that her freedom of movement was being restrained.

In determining whether Haligas resisted arrest, her conduct after that moment is what counts. *Abbott*, 705 F.3d at 720 (conduct prior to being under arrest is not resisting).[2] She was backed up against the wall, brought her arms in close to her body, and eventually landed on the ground. Defendants assert that Haligas resisted by dropping her body to the ground, but Haligas' version of how she ended up on the ground--that the Officers pulled her down--finds enough support in the video evidence and Haligas' deposition testimony. Defendants also assert that Haligas' movements after she was on the ground constituted resistance, but again a reasonable jury could believe Haligas that these movements were caused by force applied by the Officers.

Haligas pulling her arms in close to her body after being told to turn around and put her hands behind her back presents a closer question. Still, it is not unambiguous from the evidence that she was resisting. In *Brooks v. City of Aurora*, 653 F.3d 478, 484 (7th Cir. 2011), though the court ultimately found qualified

---

[2] That means her backing up into her kitchen and trying to get around Officer McCallum cannot constitute resisting arrest, despite defendants' contentions to the contrary.

immunity applied, it observed that there may be a question of fact as to the existence of probable cause to arrest a suspect for violation of Illinois' resistance statute when he "backpedaled away, escaped [the officer's] attempt to grab his wrist and raised his arms to his shoulders." Here, too, there is a dispute of material fact as to the nature of Haligas' movement and, thus, whether that movement was enough to supply probable cause. Accordingly, summary judgment on the question of whether there was probable cause to arrest Haligas for resisting arrest is unavailable.

Even absent probable cause, however, qualified immunity might shield the Officers from liability. Qualified immunity "protects public officials from liability for damages if their actions did not violate clearly established rights of which a reasonable person would have known." *Fleming v. Livingston County*, 674 F.3d 874, 879 (7th Cir. 2012) (citation and internal quotation marks omitted). Once raised by defendants, as it has been here, it is the plaintiff's burden to demonstrate that it does not apply. *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008). Its application depends on two questions: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir. 2013)

(citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The first question is resolved above: viewing the facts most favorably to Haligas, her Fourth Amendment right to be free from unlawful seizure was violated. The second question "is similar to but distinct from the first," and asks in the false arrest context "'whether a reasonable officer could have mistakenly believed that probable cause existed.'" *Id.* at 758 (quoting *Fleming*, 674 F.3d at 878). In other words, the question is whether the Officers had "arguable probable cause." *Id.*

A reasonable officer could have mistakenly believed that probable cause existed to arrest Haligas for resisting arrest because when Officer McCallum instructed Haligas to put her hands behind her back, she shouted "No!" and brought her arms in toward her body. These actions arguably could have appeared to a reasonable officer in Officer McCallum's shoes to "impede[]" or "hinder[]" his attempt to arrest her, which has been held to run afoul of section 5/31-1(a). *Agnew-Downs*, 936 N.E.2d at 173; *see id.* (holding that even going limp can be a form of resistance). So even if the Officers were mistaken about whether Haligas pulling her arms toward her body supplied probable cause to arrest her for resisting arrest, or about whether she was resisting arrest based on her conduct, that mistake was not unreasonable. *See Pearson*, 555 U.S. at 231 ("The protection of qualified immunity applies regardless of whether the government official's error is a mistake

13

of law, a mistake of fact, or a mistake based on mixed questions of law and fact." (citation and internal quotation marks omitted)).

Haligas fails to overcome the Officers' invocation of qualified immunity on the issue of probable cause to arrest for resisting arrest, which she can do "by 'point[ing] to a clearly analogous case establishing a right to be free from the specific conduct at issue' or by showing that 'the conduct [at issue] is so egregious that no reasonable person could have believed that it would not violate clearly established rights.'" *Wheeler*, 539 F.3d at 639 (quoting *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001)). Given that Haligas does neither, and that Officer McCallum was not unreasonable in thinking Haligas was resisting arrest, the Officers are entitled to summary judgment on her false arrest claim. That is so even if the Officers were dead wrong to attempt to arrest her for unlawful visitation interference, because "Illinois law is clear that a person violates section 5/31-1(a) if he or she resists or obstructs even an unlawful arrest made by a known peace officer." *Abbott*, 705 F.3d at 720 (citations omitted).

### III.

Haligas bases her suit not only on the fact of the arrest itself, but also on how that arrest was carried out--namely, the force the Officers used in handcuffing her. Whether a particular use of force violates the Fourth Amendment depends on "the facts

14

and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). As with the probable cause inquiry, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)).

The first and second *Graham* factors weigh heavily in Haligas' favor. The crimes at issue were relatively minor when viewing the evidence most favorably to her. Haligas had explained to the Officers that she was going to hand over her son as soon as he woke up from his nap, and she even showed them that his bags were packed and ready to go. At the time force was applied, Haligas, weighing about 125 pounds and wearing nothing other than a nightgown, was unarmed and cornered in her kitchen. So while the alleged crime of resisting arrest certainly can be serious, the circumstances here do not suggest that significant force was warranted. Haligas posed virtually no threat, serious or otherwise, to the Officers' or others' safety.

The parties' most substantive dispute centers on the third *Graham* factor--whether Haligas was actively resisting arrest. The

15

Officers characterize her as "flailing about while refusing to be handcuffed," "pull[ing] her arms in to avoid being placed into handcuffs," and continuing to struggle while the Officers attempted to handcuff her. Mem., ECF 97 at 21–22.[3] A jury could reasonably conclude, however, that she was not flailing about or struggling, but that the chaotic movement seen in the video is the result of the Officers imposing force on her. Her refusal to put her hands behind her back and instead keeping them in front of her, moreover, could be viewed as merely passive resistance, which would justify only "the minimal use of force." *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 525 (7th Cir. 2012); *see Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) (finding jury might find only passive resistance where suspect "refused to release his arms for handcuffing" and officer "knew that [the suspect] was unarmed and there was little risk [the suspect] could access a weapon").

Further, the record supports Haligas' contention that the handcuffing was rough. She screamed that her wrists hurt immediately upon being handcuffed and continued to express pain and discomfort afterward. Her cries were loud enough that the

---

[3] Defendants also discuss Haligas' backing up into her kitchen and her attempt to get around Officer McCallum. But as explained above, those actions happened before the Officers had probable cause to arrest her, so they do not bear on whether she was actively resisting arrest.

Officers must have heard them, and in fact they verbally responded to her complaints on at least two occasions, saying "stop it" and "we know." Haligas went to a medical provider the following day for pain, swelling, and a contusion. Taken together, that is enough to proceed with her claim that the Officers applied the handcuffs too tightly or too roughly and that they were made aware of the pain Haligas was in. *See Rooni v. Biser*, 742 F.3d 737, 742 (7th Cir. 2014) ("A person has the right to be free from an officer's knowing use of handcuffs in a way that would inflict unnecessary pain or injury, if that person presents little or no risk of flight or threat of injury." (citations omitted)); *Garcia v. City of Chicago*, No. 09 C 5598, 2012 WL 601844, at *8 (N.D. Ill. Feb. 23, 2012) ("[A]n excessive force claim based on handcuffing can survive summary judgment where the plaintiff adduces evidence of significant pain resulting from handcuffing under circumstances where the need for restraint was light." (citations omitted)).

Many of defendants' cases in support of their argument for summary judgment on the excessive force claim involved (1) suspects who were unambiguously actively resisting arrest or (2) handcuffing-specific cases in which the officers were not sufficiently made aware that the handcuffs were causing pain. Those cases are distinguishable from this one for the reasons explained above: (1) it is not clear Haligas was actively resisting, and (2) she made the Officers aware of the pain caused by her handcuffs.

17

I agree with defendants, however, that the excessive force claim cannot proceed against Officer Delgado. The only evidence Haligas points to in support of maintaining this claim against him is the BWC footage, which she claims leaves a jury question as to Officer Delgado's role in the handcuffing. The footage clearly shows, however, that although Officer Delgado assisted restraining Haligas while Officer McCallum handcuffed her, he did not do the handcuffing--and it is the handcuffing that forms the basis of Haligas' claim. *See* McCallum BWC at 10:40–11:05. Insofar as Haligas seeks to hold Officer Delgado accountable for failing to stop Officer McCallum from using excessive force, that goes to her failure to intervene claim.

The Officers again raise the defense of qualified immunity, which Haligas can defeat by "establish[ing] that it was objectively unreasonable for the [Officers] to believe that the force was lawful--i.e., [she] must demonstrate that the right to be free from the particular use of force under the relevant circumstances was 'clearly established.'" *Abbott*, 705 F.3d at 725 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). As before, to show that the right was "clearly established," she must show that "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

Material factual disputes prevent the Officers from prevailing on their qualified immunity defense at this point. If

18

a jury concludes that Haligas' resistance was merely passive and that the force imposed via handcuffing was substantial, then the Officers have run afoul of Haligas' clearly established right to be free from excessive force. That is because precedent has settled that disproportionate force, in the form of unnecessarily rough or tight handcuffing, cannot be imposed upon a non-resisting or passively resisting, non-threatening suspect where a reasonable Officer would have been aware that the handcuffs were too tight. *See Rooni*, 742 F.3d at 742; *see also Payne v. Pauley*, 337 F.3d 767, 780 (7th Cir. 2003) ("[I]t was unlawful to use excessively tight handcuffs and violently yank the arms of arrestees who were not resisting arrest, did not disobey the orders of a police officer, did not pose a threat to the safety of others, and were suspected of committing only minor crimes.").

IV.

Defendants argue that Haligas' claim against Officer Delgado for failure to intervene fails because there were no underlying constitutional violations. But because Haligas' excessive force claim may proceed, this argument fails.

Relying on nothing more than a concurring opinion, defendants also contend that failure to intervene is not a viable claim under § 1983 in this circuit. *See Mwangangi v. Nielsen*, 48 F.4th 816, 834 (7th Cir. 2022) (Easterbrook, J., concurring) ("What statute or constitutional rule *requires* one employee of the government to

19

stop another from making a mistake? The Supreme Court has held many times that § 1983 supports only direct, and not vicarious, liability." (emphasis in original) (citations omitted)). To the contrary, the viability of failure-to-intervene claims under § 1983 is firmly grounded in the majority holdings of Seventh Circuit cases. *See, e.g.*, *Doxtator v. O'Brien*, 39 F.4th 852, 864–65 (7th Cir. 2022) (explaining the elements of a failure-to-intervene claim under § 1983); *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (same).

Defendants also seek to strike Haligas' request for punitive damages, which she may recover upon a showing of "evil motive or intent, or . . . reckless or callous indifference to" her federally protected rights. *Smith v. Wade*, 461 U.S. 30, 56 (1983). Defendants' argument on this point appears in a single sentence: "For the reasons set forth more fully above, Plaintiff cannot show that the Officers violated her Constitutional rights, let alone that they acted with malice." Mem., ECF 97 at 32. But as discussed above, Haligas may be able to show a constitutional violation. And she will not be required to show the Officers acted with malice, but can recover punitive damages by showing reckless disregard. I therefore decline to strike her request for punitive damages.

Finally, defendants move for summary judgment on Haligas' *Monell* claims and her indemnity claim against the City because those claims depend on a finding of liability against the Officers.

But because Haligas' excessive force claim against Officer McCallum and her failure to intervene claim against Officer Delgado will proceed, her *Monell* and indemnification claims against the City can, too.

V.

For the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part. It is granted as to the false arrest claim. It is also granted as to the excessive force claim against Officer Delgado. It is otherwise denied.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: September 3, 2024